**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (*pro hac vice* forthcoming)
kate@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (*pro hac vice* forthcoming)
rafi@pollockcohen.com
Adam Pollock (*pro hac vice* forthcoming)
adam@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (*pro hac vice* forthcoming)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANGELA PRADO, STACI TURNER,** and **KIMBERLY SURETTE,** on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>      v.<br><br>**FUNPLUS INTERNATIONAL AG,** a Swiss public limited company, and **KINGSGROUP HOLDINGS**, a Cayman Islands corporation,<br><br>            Defendants. | Case No. 3:22-cv-5023<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

1  Plaintiffs Angela Prado, Staci Turner, and Kimberly Surette (collectively, "Plaintiffs"),
2  on behalf of themselves and all others similarly situated, by and through their attorneys,
3  for their Complaint against FunPlus International AG and KingsGroup Holdings
4  (collectively, "Defendants" or "FunPlus") allege, on knowledge as to their own actions, the
5  investigation of Plaintiffs' counsel, and otherwise upon information and belief, as follows:

**PRELIMINARY STATEMENT**

7  1.  This is a class action lawsuit against FunPlus for falsely advertising price
8  discounts for in-game purchases and other deceptive and unfair business practices in its
9  mobile application game (or "app"), State of Survival ("SOS"). SOS is among the highest
10  grossing mobile strategy games across both Apple and Android devices, with over 100
11  million downloads and an estimated revenue in excess of $80 million per month.

12  2.  Since its 2019 inception, SOS has generated over a billion in revenue by
13  offering players "microtransactions"—the ability, while in the game, to make discrete in-
14  app purchases of in-game valuables necessary to level up one's account. These in-app
15  purchases, or "packs," generally range in price from $0.99 to $99.99 each.

16  3.  However, in its direct marketing to consumers (including representations
17  made at the time of purchase), FunPlus advertises false former prices to induce players
18  into believing they must act quickly to take advantage of a limited-time sale price.

19  4.  Since SOS launched in 2019 and until present day, FunPlus deceives
20  consumers by offering specific limited-time "bonuses" that purport to massively discount
21  the price of its in-game goods. It uses strikethrough pricing and percentages to trick
22  consumers into believing they were benefitting from limited-time promotions that
23  substantially increased the value of their in-game purchases, especially in relation to
24  purchases made by competing players. These purported savings were false, however,
25  because the original pricing that these ads referenced are fabricated.

26  5.  These advertisements have run for years. But at no point, let alone within
27  three months of the advertised discounts, have these in-game items ever actually been
28  offered at a non-discounted price—*i.e.*, **without** their "limited time" discounts. In other

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   words, FunPlus never sells these items at their "original" price. It just offers false discounts

2   from an original price that did not exist, and its players bought packs on "sale" that were

3   the same prices they would ordinarily pay.

4        6.    Furthermore, the advertised "original" pricing does not reflect the prevailing

5   market retail pricing for these virtual in-game items, which have no real-world value and

6   whose pricing is entirely determined by FunPlus.

7        7.    The Federal Trade Commission ("FTC") describes these kinds of false former

8   pricing schemes as deceptive:

9   > One of the most commonly used forms of bargain advertising is to offer a
10  > reduction from the advertiser's own former price for an article. If the former
    > price is the actual, bona fide price at which the article was offered to the
11  > public on a regular basis for a reasonably substantial period of time, it
    > provides a legitimate basis for the advertising of a price comparison. Where
12  > the former price is genuine, the bargain being advertised is a true one. If,
    > on the other hand, the former price being advertised is not bona fide but
13  > fictitious – for example, where an artificial, inflated price was established for
    > the purpose of enabling the subsequent offer of a large reduction – the
14  > "bargain" being advertised is a false one; the purchaser is not receiving the
    > unusual value he expects.
15

16  16 C.F.R. §233.1(a).

17       8.    California statutory and regulatory law also expressly forbid such pricing

18  schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

19  > No price shall be advertised as a former price of any advertised thing,
20  > unless the alleged former price was the prevailing market price as above
    > defined within three months next immediately preceding the publication of
21  > the advertisement or unless the date when the alleged former price did
    > prevail is clearly, exactly and conspicuously stated in the advertisement.

22       9.    Defendants knew, or reasonably should have known, that their comparative

23  price advertising is false, deceptive, misleading, and unlawful.

24       10.    Defendants have fraudulently concealed from and intentionally failed to

25  disclose to Plaintiffs and the putative class members the truth about their advertised price

26  discounts and former prices.

27       11.    Through this false and deceptive marketing, advertising, and pricing scheme,

28  FunPlus has violated California law prohibiting the advertisement of goods for sale as

     2     

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   discounted from false former prices and prohibiting misleading statements about the

2   existence and amount of price reductions.

3       12.   The claims and issues asserted herein are governed by California state law.

4   The State of California has the greatest interest in policing corporate conduct occurring

5   within the State.

6       13.   Upon information and belief, the false advertisements and misleading

7   statements emanated from the State of California, where FunPlus's key executives and

8   subsidiaries are located.

9       14.   Plaintiffs, individually and on behalf of all others similarly situated, hereby

10  seek restitution, injunctive relief, punitive damages, attorney's fees, and all other relief

11  which the Court may deem appropriate.

12                          **PARTIES**

13      15.   Plaintiff Angela Prado is a resident of California. She began playing SOS

14  around October 2019. She purchased False Strikethrough Packs, False Percentage

15  Packs, and False Limited Availability Packs (defined below) which she otherwise would

16  not have purchased had she known about the deceptive advertising which she reasonably

17  relied upon in making those purchases. She was also double charged for in-app

18  purchases.

19      16.   Plaintiff Staci Turner is a resident of Ohio. She began playing SOS around

20  November 2019. She purchased False Strikethrough Packs, False Percentage Packs, and

21  False Limited Availability Packs (defined below) which she otherwise would not have

22  purchased had she known about the deceptive advertising which she reasonably relied

23  upon in making those purchases. She was also double charged for in-app purchases.

24      17.   Plaintiff Kimberly Surette is a resident of Canada. She began playing SOS

25  around January 2021. She purchased False Strikethrough Packs, False Percentage

26  Packs, and False Limited Availability Packs which she otherwise would not have

27  purchased had she known about the deceptive advertising which she reasonably relied

28  upon in making those purchases. She was also double charged for in-app purchases.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    18.    FunPlus was founded in California, apparently with the name Halfquest, and
2    has since gone through various iterations of names including "FunPlus" and "KingsGroup".
3    On information and belief, FunPlus has offices in San Francisco, San Mateo, and Irvine,
4    California. Its high-level executives are also located in California, including: (a) Yitao Guan,
5    a resident of Menlo Park and FunPlus International's co-founder and Chief Technology
6    Officer; (b) Andy Zhong a/k/a Yingwu Zhong, a resident of San Francisco and co-founder
7    and Chief Executive Officer; (c) Jeremy Horn, a resident of Los Angeles and VP Head of
8    Innovation; (d) Wei Wang, a resident of Irvine and Chief Creative Officer; and (e) Michael
9    Tong, a resident of San Francisco and Chief Strategy Officer.

10   19.    Defendant FunPlus International AG ("FunPlus International") is a Swiss
11   public limited company. FunPlus International was previously known as (i) KingsGroup
12   Europe SA, (ii) KingsGroup International AG, and (iii) KingsGroup International SA. Its
13   directors include Yingwu Zhong (a/k/a Andy Zhong).

14   20.    Defendant KingsGroup Holdings is a Cayman Islands corporation. Yingwu
15   Zhong (a/k/a Andy Zhong) is one of its two directors.

16   21.    Defendants have operated through an opaque corporate structure. On
17   information and belief, Defendants conduct business or have conducted business through
18   (i) Funplus Interactive USA Inc. d/b/a FunPlus Interactive USA LLC, a Delaware company
19   with its principal place of business in San Francisco, California; and (ii) Imagendary USA,
20   LLC f/k/a  FunPlus Interactive USA LLC f/k/a KingsGroup USA, LLC, a Delaware company,
21   with its principal place of business in San Francisco, California.

**JURISDICTION AND VENUE**

22   22.    This Court has jurisdiction over this action under the Class Action Fairness
23   Act of 2005. Pursuant to 28 U.S.C. §§1332(d)(2), this Court has original jurisdiction
24   because the aggregate claims of the putative class members exceed $5 million, exclusive
25   of interest and costs, and at least one of the members of the proposed classes is a citizen
26   of a different state than Defendants.

27   23.    This Court has personal jurisdiction over Defendants because they have

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

offices and key executives in this District, committed the tortious acts alleged herein in this District, regularly conduct business in this District, and have extensive contacts with this forum.

24.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

25.    In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1) and §1391(b)(3), in that Defendants reside in this District and are subject to this Court's personal jurisdiction.

## INTRADISTRICT ASSIGNMENT

26.    Because a substantial part of the events which give rise to Plaintiffs' claims occurred in San Francisco and San Mateo counties, pursuant to Local Civil Rule 3-2, this action should be assigned to the San Francisco or Oakland Division.

## FACTUAL ALLEGATIONS

27.    SOS is a mobile application strategy game developed and operated by Defendants and is available on iPhone and Android devices through the Apple App Store and Google Play platforms, respectively. SOS is a zombie-themed, post-apocalyptic survival game.

28.    Beginning in 2019, SOS has consistently been among the most downloaded mobile game apps on the Apple and Android app stores, having been downloaded over 100 million times by 2021.

29.    To boost popularity, SOS has collaborated with AMC's The Walking Dead, UFC's mixed martial arts, and DC Comics to have specialty heroes and themed events.

30.    Though it is free to initially download, SOS has generated well over a billion dollars in revenue since its inception. It makes this revenue by offering players "microtransactions," or discrete in-app purchases that allow players to advance in the game. These purchases include building material, hero "badges," speed-ups, and other valuables. An "in-app purchase" refers to a financial transaction initiated from within the mobile application itself. The most common form of in-app purchases is for bundled groups

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

of resources, or "packs," generally ranging in price from $0.99 to $99.99 each.

31.    Players engage in "microtransactions" to make in-app purchases containing items that are necessary to progress their account further and maintain competitiveness with other players. This business model contrasts with that of many other popular free apps which offer only non-essential or cosmetic items for purchase. Because SOS offers in-app purchases that advance one's account in direct proportion to the amount of money spent by a player and confer advantages not reasonably attainable by in-game labor alone, it is most accurately classified as a "Pay to Win" mobile game.

32.    In other words, a player who spends money in the game will be more powerful in relation to players who choose not to spend money in the game. The game leverages this by bombarding players with advertisements and invitations to buy additional packs and resources whenever they reach a point in the game where their progress has stalled. In other words, the game's model is designed to create a sense of urgency around the purchase of in-game resources, and SOS further capitalizes on this sense of urgency by suggesting that purchases are limited-time offerings made available at a substantial discount.

33.    Once a player creates an account, they are placed automatically into a specific "State," or server, along with several thousand players who also created their accounts at a similar period in time. Thereafter, they are able to begin upgrading the level of their "Headquarters" within their settlement, and the buildings within it. They do this to strengthen their combat abilities and therefore maintain a competitive position among other players in the server.

34.    The purpose of the game is to advance the strength of one's settlement by upgrading buildings, locating and upgrading heroes, and training a large number of strong troops. The players join large allegiances of other players that compete for dominance within the State through various in-game events.

35.    In order to progress past a certain level in the game, it is necessary to purchase in-app "packs" that contain the required items to level up one's account in the

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  game. These essential items require spending real money, as they are otherwise only
2  available in insufficient amounts through in-game labor alone.

3       36.    After a few days of playing and regularly making upgrades, the cost to
4  acquire the materials needed to make subsequent upgrades increases exponentially.

5       37.    For example, to upgrade one's Headquarters to level 2 costs 3,000 wood,
6  one of the many in-game resources that players acquire. The upgrade is completed
7  instantly. But to upgrade one's Headquarters from level 29 to level 30 requires 290 *million*
8  wood—nearly 1,000,000% of the amount needed for the initial upgrade. Upgrading to level
9  30 also requires 290 million food, 81.1 million metal, and 23.2 million gas (all additional in-
10 game resources). Once initiated, this upgrade takes 948 hours to complete, unless players
11 purchase construction speed-up boosters.

12      38.    If a player does not make any purchases in the game, it would require close
13 to *16 months* of playing two hours each day, 365 days a year, to gather the necessary
14 resources to upgrade their Headquarters to level 30. And this is considered to be the first
15 priority upgrade for players; in other words, a player who manages to upgrade their
16 Headquarters to level 30 has only just begun.

17      39.    Alternatively (and frequently), the game reminds players that instead of
18 devoting countless hours to progress in the game, they can simply purchase packs. The
19 game designs these upgrades to lure players into spending money on resources.

20      40.    These upgrades all cost gameplayers significant, real currency. The packs
21 necessary for these upgrades are generally offered at the following prices: $99.99, $49.99,
22 $19.99, $9.99, $4.99, $1.99 and $0.99. The advertisements for a particular pack at different
23 pricing levels usually have similar graphical advertisements but contain varying amounts
24 of items in proportion to their price.

25      41.    To acquire the resources necessary to reach Headquarters level 30, a player
26 would need to spend approximately $1,400 on packs. However, this cost is never made
27 clear to the player because Defendants know that players would not be willing to pay
28 $1,400 if they were aware of the total cost up front. After all, these are players who

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   specifically selected a free-to-play game instead of spending $20 to $60 on a traditional

2   video game that is available for one time purchase, and with the same mechanics.

3   42.   Knowing this, Defendants instead leverage the incremental upgrade system

4   to spread this total cost over 29 separate upgrades, all while keeping consumers in the

5   dark. There is no in-game mechanism to review one's purchase history or the total amount

6   one has spent. Upgrade costs are only shown for those upgrades for which the player is

7   currently eligible, meaning Defendants hide the explosive exponential costs of in-game

8   upgrades until the game's players have already invested months of time and money into

9   the game.

10   43.   Once players are fully invested, Defendants then use packs to create a false

11   sense of urgency and scarcity to pressure them into making several dozen smaller

12   purchases over a period of days, weeks, or months.

13   44.   In other words, at no point are players told it will cost them $1,400 to upgrade

14   their Headquarters to level 30. Instead, they are bombarded with an endless series of

15   advertisements urgently offering limited-time sales, each providing the opportunity to

16   purchase just the incremental resources needed at the time to reach the next level of

17   upgrade.

18   45.   Defendants follow this model intentionally to foster dangerous consumer

19   behaviors that ultimately result in more purchases, at the expense of its players.

20   46.   Research into microtransactions and human behavior shows that a critical

21   link between microtransaction purchases and problem gaming behavior (*i.e.*, behavior

22   associated with gambling addiction) forms with high frequency purchases.[1] Of note, "Both

23   classical and operant conditioning theories suggest that more frequent events or quicker

24   pay out frequencies could increase the likelihood of problematic microtransaction purchase

25   behavior and problem gambling symptoms through reinforcement."[2]

---

[1] Erin Gibson et. al, *The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review*, 131 Computers in Human Behavior 107219 (2022).

[2] *Id.*

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

47.     Thus, by luring players into making several smaller, time-sensitive purchases of purportedly high-value packs, Defendants specifically intend to foster addictive behaviors by luring consumers into dangerous spending habits.

48.     To advance this goal, Defendants create a false sense of urgency, scarcity, and value for the packs they present to consumers, so that consumers will encounter as much pressure as possible to make the frequent, small purchases that lead to addictive behaviors.

49.     Many displayed packs have a clock timer counting down the time that the pack is still available, creating a sense of urgency and scarcity to induce a player to purchase a pack immediately.

50.     The pack advertisements consist of a graphical image which has, in writing, the name of the pack. The graphical image also contains any relevant descriptions of "sales" or "special offers" including: whether the pack is (supposedly) offered at a lower price than normal, whether the pack now contains some percentage increase in items received than when the pack is normally purchased, whether the pack offer is limited by a certain timer, and the number of packs available to be purchased (e.g., "Only 1 remaining!").

51.     However, these advertisements are false, deceptive, and intended to mislead players into making in-app purchases that they otherwise would not have made.

52.     Defendants falsely promote these packs as being on sale or discounted by misrepresenting that such packs are currently being offered at a lower price than normal, include limited-time bonuses that purport to substantially increase the value of the packs, or have limited availability. Since the game pits players against each other, there is significant pressure on players to take advantage of these limited-time offerings so that they can gain a competitive edge against opponents who presumably are left to pay full price.

53.     Additionally, the advertisements mislead players into believing they will find themselves at a competitive *disadvantage* if they do not purchase packs now, since they

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

54.     FunPlus uses false reference pricing schemes to increase sales because they know these reference prices influence purchasing decisions, as consumers want bargains. Fake discounting and false reference prices are widely recognized to be powerful tools in convincing customers to make purchases, and this issue has been studied repeatedly. As one recent research study from the Harvard Business School summarized:

> Taken together, evidence from our analysis of observational transaction data and our laboratory experiment suggests that fake prices provide sellers with a powerful tool to enhance demand, but one that may come at the expense of misleading consumers about products' true initial selling prices. Consumers take initial prices as signals of product quality and rate offers as being better deals the higher these initial prices are with respect to present selling prices. Accordingly, fake prices have the highest influence on purchase likelihood for less-informed consumers.
> . . .
> By definition, a fake price offers a fake discount—a discount that does not represent a decrease from some previous selling price but, rather, the difference between the current selling price and a fake introductory price. There is much existing literature on the impact of discounts on consumer behavior beyond . . .[3]

55.     FunPlus's use of false discounting is particularly effective in influencing purchasing decisions because SOS, like other freemium games, is already highly addictive. As an editorial in the Society for the Study of Addiction has observed:

> Predatory monetization schemes in video games are purchasing systems that disguise or withhold the longterm cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.
> . . .
> Game monetization schemes have become increasingly sophisticated and have been featured more prominently within popular on-line games. In our view, some of these schemes could be considered predatory. Predatory monetization schemes typically involve in-game purchasing systems that disguise or withhold the true long-term cost of the activity until players are already financially and psychologically committed. Such schemes are designed to encourage repeated player spending using tactics or elements

---

[3] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business School Working Paper (2018) (available at https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-ffba637617d9.pdf)

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

that may involve, either singularly or in combination, limited disclosure of the product; intrusive and unavoidable solicitations; and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play. Such strategies may exploit inequalities in information between purchaser and provider, such as when the industry uses knowledge of the player's game-related preferences, available funds and/or playing and spending habits, to present offers predetermined to maximize the likelihood of eliciting player spending.[4]

56.    There are three primary categories of deceptive pack advertisements within SOS: (a) packs that offer the illusion of price discounts through the strikethrough graphics, hereafter referred to as "False Strikethrough Packs"; (b) packs that falsely advertise that a pack contains extra value by containing an extra percentage increase value relative to normal versions of the same pack, hereafter referred to as "False Percentage Packs"; and (c) packs that falsely allege the limited availability of purchases. Any deceptively advertised pack can belong to more than one of these categories simultaneously or may be deceptive for a separate reason outside of the ones belonging to the three main categories.

**False Strikethrough Packs**

57.    The False Strikethrough Packs display an advertised price for which the pack is currently offered. Above that green arrow is a significantly higher price struck through with a red line. The advertisements suggest that the pack was formerly offered at the higher price but is now heavily discounted.



---

[4] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286

1
2
3
4
5
6
7
8
9



10   58.    However, these packs were in fact never offered at the advertised former

11   reference price.

12   59.    There are dozens of False Strikethrough Packs sold at multiple pricing tiers,

13   including: "Crates of Choice," packs that purport to offer "Crazy Rebates from your Choice

14   of Crates" offered across the $4.99, $9.99, and $19.99 pricing tiers. None of these packs

15   were ever offered at the former reference prices.

16   60.    Defendants had actual knowledge that the False Strikethrough Packs

17   contained false or misleading representations as to their former prices. Defendants

18   designed and promoted these advertisements from 2019 until present day, as the practice

19   of offering these deceptive packs continues.

20   61.    The price at which a pack is obtained is a material consideration when

21   reasonable players, including Plaintiffs, decide to make purchases. Players seek to

22   maximize the amount of items obtained from the pack for the lowest cost. Defendants

23   deceive players into taking advantage of discounts so that players believe they may

24   achieve a competitive advantage on the mistaken belief that  other players may have to

25   pay the substantially-higher non-discounted price for the same number of items.

26   62.    Plaintiffs and the Classes reasonably relied on the "strikethrough" pricing

27   when purchasing numerous False Strikethrough Packs. Had Plaintiffs known the

28   "strikethrough" pricing was false, Plaintiffs would not have purchased many of the False

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  Strikethrough Packs that they purchased.

2  63.    If Plaintiffs and the Classes could ever have reasonably realized that the

3  False Strikethrough Packs were never sold at the original reference price, such realization

4  would have occurred only after enough game play that Defendants would have already

5  achieved their goal of establishing addictive spending habits. Thus, to the extent Plaintiffs

6  or any of the Classes continued to make purchases after developing an understanding that

7  the packs were never offered at the original price, this was the calculated and intended

8  result that Defendants sought when engaging in this deceptive and unfair practice in the

9  first place.

10  **False Percentage Packs**

11  64.    The False Percentage Packs also falsely advertise that a pack possesses

12  extra value by containing a specific percentage increase in items or resources relative to

13  normal versions of the same pack. The false percentage is indicated by a large and

14  attention-grabbing bubble in the pack's graphical advertisement that contains a

15  quantitative claim regarding the increase in value of this pack relative to packs which are

16  not on sale.



27  //

28  //

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108



65. For example, the Darts Mega Bundle pack is offered with a graphical image of a red bubble containing "1550%"—indicating to a reasonable consumer that this specific pack is discounted because it contains a 1550% increase in the value or quantity of items contained within it when compared to a Darts Mega Bundle without such a representation.

66. Defendants intentionally designed the packs to mislead players into believing that the packs represented a sale value, including both a false original reference price and an illusory increase in value, to induce those players to purchase the packs. Defendants knowingly took those ordinary item packs and simply placed a percentage graphic on the ad copies without altering anything else.

67. Defendants have been promoting these False Percentage Packs from 2019 until present day, as the practice continues.

68. Plaintiffs all reasonably relied on the percentage graphics on the False Percentage Packs as a material consideration in purchasing those packs. Had the Plaintiffs known the packs were not actually on sale in the manner represented, they would not have purchased the False Percentage Packs.

**False Limited Availability Packs**

69. The False Limited Availability Packs indicate that a particular pack can only be purchased a finite number of times within the server. For example, text underneath a pack advertisement may say "Only 1 remaining!" These advertisements create a sense of

artificial scarcity whereby players are pressured into purchasing packs containing valuable items to enhance their accounts, ostensibly to simultaneously deprive competitors from accessing the same packs.



70.      However, Defendants' representations as to the scarcity of the packs are false. Other players are also able to purchase these packs even if another player buys all

1   of the supposedly remaining packs. Furthermore, the player who purchased the False

2   Limited Availability Pack is often offered the same pack to purchase again, especially at

3   the $99.99 pricing tier.

4   71.   Defendants intentionally designed the packs to mislead players into believing

5   that the packs were limited in availability. Defendants knowingly added a message to

6   players communicating an artificial scarcity in order to induce them to purchase the packs

7   immediately.

8   72.   Plaintiffs all reasonably relied on the textual advertisements of supposed

9   scarcity accompanying the ad copy as a material consideration in purchasing those packs.

10  Had the Plaintiffs known the packs were not actually scarce or limited, they would not have

11  purchased the False Limited Availability Packs.

12  **Unfair Practice of Double-Charging and Purchase Banning**

13  73.   Aside from the deceptive marketing of packs, Defendants have engaged in

14  other unfair and oppressive conduct towards players making in-app purchases in SOS.

15  74.   Defendants often processed duplicative payments for the same packs. All

16  Plaintiffs purchased some quantity of packs for which they were charged twice instead of

17  only once.

18  75.   Defendants denied Plaintiffs' refund requests for any duplicative charges of

19  their in-app purchases. When Plaintiffs Angela Prado and Staci Turner sought refunds for

20  the charges through the Apple Store or Google Play Store, Defendants "purchase banned"

21  them from SOS if they were successful in obtaining the refunds. "Purchase banned"

22  players are unable to make any subsequent in-app purchases within SOS. This effectively

23  destroys the ability of those players to meaningfully compete in the game, even when those

24  players have spent tens of thousands of U.S. dollars, often forcing the players off the game.

25  76.   The practice of "purchase banning" any players who successfully obtain

26  refunds for duplicative charges from the App store is widely practiced by Defendants.

27  Defendants therefore attempt to coerce players into accepting these phantom charges by

28  effectively holding their entire accounts hostage, into which players have often invested

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   significant real money and time.

2       77.     All Plaintiffs were double charged for some of their in-app purchases on SOS.

3   Plaintiffs Angela Prado and Staci Turner were subsequently purchase banned in SOS after

4   obtaining some refunds back from the App store.

5                              **CLASS ALLEGATIONS**

6       78.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3),

7   on behalf of themselves and the following proposed "Global Class":

8       All persons, within the applicable statute of limitations, who purchased
9       False Strikethrough Packs, False Percentage Packs, False Limited Time
10      Availability packs, or any packs in which they were double-charged, and/or
        such subclasses as the Court may deem appropriate.

11      79.     Plaintiff Angela Prado also brings this action on behalf of herself and on

12  behalf of the following subclass (the "California Class"):

13      All persons in California, within the applicable statute of limitations, who
        purchased False Strikethrough Packs, False Percentage Packs, False
14      Limited Time Availability packs, or any packs in which they were double-
15      charged, and/or such subclasses as the Court may deem appropriate.

16      80.     Plaintiff Staci Turner also brings this action on behalf of herself and on behalf

17  of the following subclass (the "Ohio Class"):

18      All persons in Ohio, within the applicable statute of limitations, who
        purchased False Strikethrough Packs, False Percentage Packs, False
19      Limited Time Availability packs, or any packs in which they were double-
        charged, and/or such subclasses as the Court may deem appropriate.

20      81.     Excluded from the proposed Classes are Defendants and their employees,

21  officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and

22  the judicial officers and their immediate family members and associated court staff

23  assigned to this case, as well as all persons who make a timely election to be excluded

24  from the proposed class.

25      82.     Certification of Plaintiffs' claims for class-wide treatment is appropriate

26  because Plaintiffs can prove the elements of their claims on a class-wide basis using the

27  same evidence they would use to prove those elements in individual actions alleging the

28

1  same claims.

2      83.    This action meets all applicable standards of Fed. R. Civ. P. 23 for class

3  certification, in that Plaintiffs can demonstrate the elements delineated below.

4      84.    **Numerosity.** The members of the proposed Classes are so numerous and

5  geographically dispersed that individual joinder of all proposed class members is

6  impracticable. *See* Fed. R. Civ. P. 23(a)(1). While Plaintiffs believe that there are hundreds

7  of thousands of members of the proposed Classes, the precise number of class members

8  is unknown, but may be ascertained from Defendants' books and records. On information

9  and belief, Defendants maintain a list of users that includes personal information for the

10  user including their email addresses, whether they have made in-app purchases, and

11  which in-app purchases they have made.

12      85.    Applying a reasonable and prudent person standard to the users of State of

13  Survival under the same or similar circumstances, each user would qualify to be a class

14  member requesting the right to cancel and get refunds on their in-app purchases. Any

15  reasonable and prudent person under the same or similar circumstances wants to have

16  the flexibility to disaffirm an in-app purchase that was made while believing that the packs

17  they purchased were part of a sale or promotion but, in reality, were not.

18      86.    **Commonality and Predominance.** This action involves common questions

19  of law and fact, which predominate over any questions affecting individual class members.

20  *See* Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

21      a.    Whether Defendants engaged in the conduct alleged in this

22  Complaint;

23      b.    Whether Defendants violated the applicable statutes alleged herein;

24      c.    Whether Defendants designed, advertised, marketed, distributed,

25  sold, or otherwise placed State of Survival into the stream of commerce in the United

26  States;

27      d.    Whether Defendants' conduct emanated from the State of California;

28      e.    Whether Plaintiffs and the class members are injured and harmed

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  directly by Defendants' false advertising designed to entice users into making in-app

2  purchases they otherwise would not have made;

3          f.      Whether Plaintiffs and the class members are entitled to damages due

4  to Defendants' conduct as alleged in this Complaint, and if so, in what amounts; and

5          g.      Whether Plaintiffs and members of the Classes are entitled to

6  equitable relief, including, but not limited to, restitution or injunctive relief as requested in

7  this Complaint.

8      87.   **Typicality.** Plaintiffs' claims are typical of the putative class members' claims

9  because, among other things, all such class members were comparably injured through

10  Defendants' wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3).

11  Defendants' creation and display of its misleading advertisements is uniform for all

12  Plaintiffs and class members.

13      88.   **Adequacy.** Plaintiffs are adequate proposed class representatives because

14  their interests do not conflict with the interests of the other members of the proposed

15  Classes they seek to represent, because they have retained counsel competent and

16  experienced in complex class action litigation, and because they intend to prosecute this

17  action vigorously. The interests of the proposed Classes will be fairly and adequately

18  protected by Plaintiffs and their counsel. *See* Fed. R. Civ. P. 23(a)(4).

19      89.   **Declaratory and Injunctive Relief.** Defendants have acted or refused to act

20  on grounds generally applicable to Plaintiffs and the other members of the proposed

21  Classes, thereby making appropriate final injunctive relief and declaratory relief, as

22  described below, with respect to the proposed Classes as a whole. *See* Fed. R. Civ. P.

23  23(b)(2). Defendants' wrongful conduct alleged herein is grounded in the creation and

24  dissemination of their pack offerings in-game, which are displayed uniformly. Plaintiffs' and

25  the class members' injuries are real, immediate, and ongoing. Plaintiffs and class members

26  seek injunctive and declaratory relief from Defendants.

27      90.   **Superiority.** A class is superior to any other available means for the fair and

28  efficient adjudication of this controversy, and no unusual difficulties are likely to be

1  encountered in the management of this class action. The damages or other financial

2  detriment suffered by Plaintiffs and putative class members are relatively small compared

3  to the burden and expense that would be required to individually litigate their claims against

4  Defendants, so it would be impracticable for members of the proposed Classes to

5  individually seek redress for Defendants' wrongful conduct.

6      91.    Applying the principles of equity or balance of equities, expecting an

7  individual Plaintiff who is at a disadvantage with limited resources and spending capacity,

8  and with minimal negotiating power, if any, to litigate claims against Defendants,

9  multibillion-dollar corporations that have immense resources and deep pockets, would be

10  unfair. Class actions are a necessary and essential means to provide for public interest

11  litigations with checks and balances to curtail deceptive practices by powerful private

12  corporations, including Defendants.

13     92.    There is no special interest in class members individually controlling the

14  prosecution of separate actions. And even if class members could afford individual

15  litigation, the court system could not. Individualized litigation creates a potential for

16  inconsistent or contradictory judgments, and it increases the delay and expense to all

17  parties and the court system. By contrast, the class action device presents far fewer

18  management difficulties and provides the benefits of single adjudication, economy of scale,

19  and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

20              **CALIFORNIA LAW APPLIES TO ALL CLASSES**

21     93.    California's substantive laws apply to every class member, regardless of

22  where the class member resides.

23     94.    California's substantive laws may be constitutionally applied to the claims of

24  Plaintiffs and the Classes under the Due Process Clause, 14th Amend. §1, and the Full

25  Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant

26  contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all

27  class members, thereby creating state interests that ensure that the choice of California

28  state law is not arbitrary or unfair.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

95.     FunPlus and its various operating entities were founded in California. FunPlus maintains offices in California, and its co-founders and key executives reside in California. On information and belief, Defendants' principal places of business are located in California. FunPlus conducts substantial business in California. Therefore, California has an interest in regulating Defendants' conduct under its laws.

96.     FunPlus's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

97.     California is also the state from which Defendants' alleged misconduct and false statements emanated. This conduct similarly injured and affected Plaintiffs and all other class members.

98.     The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Classes, and California has a greater interest in applying its laws here than any other interested state.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Business & Professional Code §17200 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

99.     Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

100.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

101.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

102.    A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the

1  harm to the alleged victims.

2      103.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive

3  members of the consuming public.

4      104.   Defendants have violated the "unlawful" prong under the UCL and have

5  engaged in "unfair, deceptive, untrue or misleading" advertising.

6      105.   The Federal Trade Commission Act prohibits "unfair or deceptive acts or

7  practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false

8  advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing

9  schemes—similar to Defendants' False Strikethrough Packs and False Percentage Packs

10 in all material respects—as deceptive practices that would violate the FTC Act.

11     106.   16 C.F.R.§233.1 states:

12     (a)    One of the most commonly used forms of bargain advertising is to
       offer a reduction from the advertiser's own former price for an article. If the
13     former price is the actual, bona fide price at which the article was offered to
       the public on a regular basis for a reasonably substantial period of time, it
14     provides a legitimate basis for the advertising of a price comparison. Where
       the former price is genuine, the bargain being advertised is a true one. If,
15     on the other hand, the former price being advertised is not bona fide but
       fictitious—for example, where an artificial, inflated price was established for
16     the purpose of enabling the subsequent offer of a large reduction—the
       "bargain" being advertised is a false one; the purchaser is not receiving the
17     unusual value he expects. In such a case, the "reduced" price is, in reality,
       probably just the seller's regular price.
18
       (b)    A former price is not necessarily fictitious merely because no sales
19     at the advertised price were made. The advertiser should be especially
       careful, however, in such a case, that the price is one at which the product
20     was openly and actively offered for sale, for a reasonably substantial period
       of time, in the recent, regular course of his business, honestly and in good
21     faith—and, of course, not for the purpose of establishing a fictitious higher
       price on which a deceptive comparison might be based. And the advertiser
22     should scrupulously avoid any implication that a former price is a selling,
       not an asking price (for example, by use of such language as, "Formerly
23     sold at $_____"), unless substantial sales at that price were actually made.
24
       107.   California law also prohibits false former pricing schemes. Cal. Bus. & Prof.
25
26 Code §17501, entitled "Value determinations; Former price advertisements," states:

27     For the purpose of this article the worth or value of any thing advertised is
28     the prevailing market price, wholesale if the offer is at wholesale, retail if the

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

108.    As further detailed in the Second Claim for Relief below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id.* §(a)(13)

109.    The False Strikethrough Packs, False Percentage Packs, and False Limited Availability Packs violate the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and (a)(13).

110.    The False Percentage Packs misrepresent the existence of a sale whereby players can allegedly purchase more items and resources from a pack than they normally could for the same price.

111.    Defendants' use of the False Percentage Packs violates 15 U.S.C. §45(a)(1), 15 U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations, Section 233.

112.    Defendants also violated and continue to violate Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false discounts from purported former prices that were, in fact, not the prevailing market prices within three months preceding the publication and dissemination of advertisements containing the false former prices.

113.    Defendants have also violated the "unfair" prong of the UCL by falsely representing that its consumers received a discount from a referenced "original" former price of its False Strikethrough Packs where, in fact, Defendants set an arbitrary price for the goods contained in these packs and then falsely pretended the packs had ever been

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   offered for sale without their supposed discount.

2       114.   Additionally, Defendants have violated the "unfair" prong of the UCL by

3   falsely representing that its False Percentage Packs contained unique and specific

4   increases in items or resources when, in fact, they contained the same resources and in-

5   game items as they always do.

6       115.   Defendants have also violated the "unfair" prong of the UCL by double-

7   charging players for purchased packs and then penalizing players for seeking and

8   obtaining refunds for these double purchases, thereby deterring players from obtaining

9   refunds to which they are entitled.

10       116.   Defendants have also violated the "unfair" prong of the UCL by engaging in

11   predatory practices designed to foster gambling addiction in consumers, in that they: (a)

12   deploy their microtransactions in a way specifically designed to ensnare players into

13   addictive spending habits; (b) falsely create a sense of urgency, scarcity, and value in order

14   to secure addictive high frequency microtransactions; and (c) use incremental cost step-

15   ups to prevent players from realizing the true cost of the game and how much they have

16   spent. Defendants' goals in engaging in these practices are far outweighed by the harm

17   they cause.

18       117.   These acts and practices are unfair because they were likely to cause

19   consumers to falsely believe that Defendants were offering value, discounts, or bargains

20   from the prevailing market value or worth of the products sold that do not, in fact, exist. As

21   a result, purchasers (including Plaintiffs) reasonably understood that they were receiving

22   valuable price reductions on purchases of in-game items. This, in turn, has induced

23   reasonable purchasers to buy such products from Defendants that they would not have

24   otherwise purchased.

25       118.   The gravity of the harm to Plaintiffs and members of the Classes resulting

26   from these unfair acts and practices outweighs any conceivable reasons, justifications, or

27   motives that Defendants may have had for engaging in such deceptive acts and practices.

28       119.   Additionally, Defendants have violated the "fraudulent" prong of the UCL

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    because their marketing and advertising materials included false "original" prices for its

2    False Strikethrough Packs, and because these same materials also suggested that the

3    offers in the False Percentage Packs and False Limited Availability Packs were unique,

4    limited, and would no longer be available at those price points following the conclusion of

5    its sale events. In actuality, the packs never contained the limited time deals or discounts

6    they purported to offer.

7         120.    Defendants' acts and practices deceived Plaintiffs and the Classes at large.

8    Specifically, Plaintiffs and the Classes relied on these misleading and deceptive

9    representations regarding the limited-time bonuses they could expect to receive in the

10    packs. Each of these representations and deceptions played a substantial role in Plaintiffs'

11    decisions to purchase the packs, and Plaintiffs would not have done so in the absence of

12    such representations.

13         121.    Plaintiffs and the Classes never received the benefit of their bargains with

14    Defendants, in that the "discounted" resources offered for sale in the packs did not give

15    them the anticipated competitive edge against their opponents. Competitors could simply

16    purchase packs at the same false sale pricing, or with the same number of items, or the

17    same pack availability notwithstanding representation that these were limited time offers.

18         122.    Similarly, players who purchased the False Percentage Packs and the False

19    Strikethrough Packs defensively (to protect against becoming overpowered by opponents

20    who they believed had been able to take advantage of the purportedly limited-time

21    bonuses) were deprived of the benefit of their bargains, because the threat itself was a

22    fabrication. There was never a risk of falling behind due to a player's failure to purchase

23    items at their discounted price, because the price was always discounted.

24         123.    As a result of these violations under each of the fraudulent, unfair, and

25    unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of

26    Plaintiffs and members of the proposed Classes. Specifically, FunPlus has been unjustly

27    enriched by obtaining revenues and profits that it would not otherwise have obtained

28    absent its false, misleading, and deceptive conduct

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

124.    Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all class members, and to enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiffs, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## SECOND CLAIM FOR RELIEF

### Violation of California's False Advertising Law ("FAL")

### Cal. Business & Professional Code §17500 *et seq.*

### (By Plaintiffs, individually and on behalf of All Classes)

125.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

126.    The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

127.    Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

128.    The False Strikethrough Packs and the False Percentage Packs misrepresent the existence of a sale whereby players can allegedly purchase packs at a discounted price, or with an increased percentage of items or resources. The False Limited Availability Packs misrepresent the exclusive nature, and therefore competitive value, of the packs.

129.    Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all class members, and to

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  prevent Defendants from continuing to violate the FAL, and/or from violating the FAL in the
2  future. Otherwise, Plaintiffs, the class members, and members of the general public may
3  be irreparably harmed and/or denied an effective and complete remedy if such an order is
4  not granted.

**THIRD CLAIM FOR RELIEF**

**Violation of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §1750 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

9   130.   Plaintiffs incorporate by reference all allegations in this Complaint and restate
10  them as if fully set forth herein.

11   131.   Plaintiffs and the other class members are consumers within the meaning of
12  Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ.
13  Code §§1761(e) and 1770.

14   132.   Defendants are "persons" within the meaning of Cal. Civ. Code §§1761(c)
15  and 1770 and they sell "goods or services" within the meaning of Cal. Civ. Code §§1761(b)
16  and 1770.

17   133.   SOS and the in-app purchases are a "good" or "service" within the meaning
18  of Cal. Civ. Code. §§1761(a) and (b).

19   134.   Defendants have violated §1770(a)(13)'s proscription against making false
20  or misleading statements of fact concerning reasons for, existence of, or amounts of, price
21  reductions by misrepresenting the existence of discounts via False Strikethrough Packs,
22  misrepresenting the existence of special sales through their False Percentage Packs, and
23  misrepresenting the exclusive nature, and therefore competitive value, of the packs
24  through their False Limited Availability Packs.

25   135.   Plaintiffs and the other class members suffered actual damages as a direct
26  and proximate result of the Defendants' actions, concealment, and/or omissions in the
27  advertising, marketing, and promotion of its bait apps, in violation of the CLRA, as
28  evidenced by the substantial sums Defendants pocketed.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    136.    Plaintiffs, on behalf of themselves and the class members, demand judgment

2    against Defendants for injunctive relief and attorney's fees.

**FOURTH CLAIM FOR RELIEF**

**Violations of Ohio Consumer Sales Practices Act**

**Ohio Rev. Code §1345.01, *et seq*.**

**(By Plaintiff Staci Turner, individually and on behalf of the Ohio Class)**

7    137.    Plaintiff Staci Turner, individually and on behalf of the Ohio Class,

8    incorporates by reference all allegations in this Complaint and restates them as if fully set

9    forth herein.

10    138.    Staci Turner, the Ohio class members, and Defendants are persons within

11    the meaning of Ohio Rev. Code § 1345.01(B). Defendants are suppliers as defined by

12    Ohio Rev. Code § 1345.01(C).

13    139.    Staci Turner and the Ohio class members are "consumers" as that term is

14    defined in Ohio Rev. Code § 1345.01(D), and their purchases of the False Strikethrough

15    Packs, False Percentage Packs, and False Limited Availability Packs are "consumer

16    transactions" within the meaning of Ohio Rev. Code § 2345.01(A).

17    140.    Ohio Rev. Code 1345.02 (the "Ohio CSPA") prohibits unfair or deceptive acts

18    or practices in connection with a consumer transaction. The Ohio CSPA prohibits a supplier

19    from: (i) representing that goods have characteristics, uses or benefits which the goods do

20    not have; (ii) representing that their goods are of a particular quality or grade that the

21    product is not; and (iii) representing that the subject of a consumer transaction has been

22    supplied in accordance with a previous representation, if it has not.

23    141.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

24    deceive reasonable consumers, including Staci Turner and the Ohio Class.

25    142.    Defendants' violations present a continuing risk to Staci Turner and the Ohio

26    Class, and the general public. Defendants' unlawful acts and practices complained of

27    herein affect the public interest.

28    143.    Pursuant to Ohio Rev. Code § 1345.09, Plaintiff Staci Turner and the Ohio

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual

2   damages – trebled, and any attorney's fees, costs, and any other just and proper relief, to

3   the extent available under the Ohio CSPA.

**FIFTH CLAIM FOR RELIEF**

**Fraud**

**(By Plaintiffs, individually and on behalf of All Classes)**

7   144.   Plaintiffs incorporate by reference all allegations in this Complaint and restate

8   them as if fully set forth herein.

9   145.   Defendants represented to all Plaintiffs that various purchased packs were

10  on sale in that they were offered at a lower price than normal, that certain packs were

11  offered with an increased percentage of items and resources compared to their normal

12  counterparts, and that pack purchases were only available in limited quantities.

13  146.   These representations were false because the packs were never offered at

14  higher prices, the increased percentage versions of the packs were identical to their normal

15  counterparts, and the packs were not actually available in scarce quantities to other players

16  in the State or to the individual player making the purchases.

17  147.   Defendants designed the graphical images on the advertisements in a way

18  that intentionally attracted Plaintiffs to the enticing but false claims regarding existence of

19  sales, item and resource bonuses, and artificial scarcity.

20  148.   Plaintiffs reasonably relied upon the claims made in the advertisements in

21  deciding to purchase the aforementioned packs.

22  149.   Upon purchasing the packs, Plaintiffs were harmed because, had Plaintiffs

23  known the claims were false, they would not have made those purchases.

24  150.   Plaintiffs' reliance on Defendants' misrepresentations in its pack

25  advertisements was a substantial factor in causing harm to Plaintiffs.

26  151.   Defendants' conduct has therefore caused and is causing immediate and

27  irreparable injury to Plaintiffs and the class members and will continue to both damage

28  Plaintiffs and the class members and deceive the public unless enjoined by this Court.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendants as follows:

(a)    Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Classes, and designating Plaintiffs' counsel as class counsel;

(b)    Awarding Plaintiffs and the class members compensatory damages and actual damages in an amount exceeding $5,000,000, to be determined by proof;

(c)    Awarding Plaintiffs and the class members appropriate relief, including actual and statutory damages;

(d)    For punitive damages;

(e)    For civil penalties;

(f)    For declaratory and equitable relief, including a declaration that Defendants violated and have continued to violate California's UCL, the FAL, and the CLRA and an injunction requiring Defendants to comport with California Business & Professions Code §§ 17200, *et seq*., and restitution and disgorgement;

(g)    For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

(h)    Awarding Plaintiffs and the class members the costs of prosecuting this action, including expert witness fees;

(i)    Awarding Plaintiffs' and the class members' reasonable attorney's fees and costs as allowable by law;

(j)    Awarding Plaintiffs and the class members reasonable attorney's fees pursuant to Cal. Civ. Proc. Code 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorney's fees;

(k)    Awarding Plaintiffs and the class members reasonable attorney's fees and costs, as well as injunctive relief, pursuant to the CLRA;

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1      (l)     Awarding pre-judgment and post-judgment interest; and

2      (m)    Granting any other relief as this Court may deem just and proper.

3

4  Respectfully Submitted,

5  DATED: September 2, 2022          **KRONENBERGER ROSENFELD, LLP**

6

7                                  By:   s/ Karl S. Kronenberger

8                                            Karl S. Kronenberger

9

10              **POLLOCK COHEN LLP**

11             Raphael Janove
rafi@pollockcohen.com

12             Adam Pollock
adam@pollockcohen.com

13             111 Broadway, Ste. 1804
New York, NY 10006

14             Telephone: (212) 337-5361
*pro hac vice* forthcoming

15             **JAY KUMAR LAW**

16             Jay Kumar
jay@jaykumarlaw.com

17             73 W. Monroe Street, Suite 100
Chicago, IL 60603

18             Telephone: (312) 767-7903
*pro hac vice* forthcoming

19

20             *Attorneys for Plaintiffs and the Proposed Classes*

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**DEMAND FOR JURY TRIAL**

Plaintiffs, by and through his undersigned counsel, hereby demands a trial by jury for all questions of fact that can be decided by a jury in the above-entitled action.

Respectfully Submitted,

DATED: September 2, 2022

**KRONENBERGER ROSENFELD, LLP**

By:   s/ Karl S. Kronenberger
         Karl S. Kronenberger

Attorneys for Plaintiffs and the Proposed Classes