**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (admitted *pro hac vice*)
kate@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (admitted *pro hac vice*)
rafi@pollockcohen.com
Adam Pollock (admitted *pro hac vice*)
adam@pollockcohen.com
George Krebs (admitted *pro hac vice*)
gkrebs@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (*pro hac vice* forthcoming)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

*Attorneys for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| **ANGELA PRADO, STACI TURNER, KIMBERLY SURETTE, BRYAN KAUFFMAN, CYRENNA DEWHURST, DERIK NIEDERQUELL, HERIBERTO SANTANA, and PAUL MAZEY** on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **FUNPLUS INTERNATIONAL AG,** a Swiss public limited company, and **KINGSGROUP HOLDINGS**, a Cayman Islands corporation, <br><br> Defendants. | Case No. 4:22-cv-5023-YGR <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

**TABLE OF CONTENTS**

2   PRELIMINARY STATEMENT .......................................................................... 1

3   PARTIES ......................................................................................................... 4

4   JURISDICTION AND VENUE .......................................................................... 6

5   INTRADISTRICT ASSIGNMENT ..................................................................... 7

6   FACTUAL ALLEGATIONS .............................................................................. 7

7     I.    State of Survival: A Highly Profitable "Freemium App" .................. 7

8     II.   State of Survival Game Play: Microtransactions and Feedback Loops ............ 9

9     III.  Defendants' Deceptive Pack Advertisements .............................. 14

10       A.    False Strikethrough Packs .............................................. 15

11       B.    False Bonus Packs ......................................................... 17

12       C.    False Limited Availability Packs ...................................... 19

13       D.    False Popularity Packs .................................................... 21

14       E.    False Advancement Stats ............................................... 22

15       F.    Loot Boxes ..................................................................... 23

16     IV.  Double-Charging and Purchase Banning ..................................... 27

17     V.   Dark Pattern Phone Notifications ................................................. 28

18   CLASS ALLEGATIONS ................................................................................. 29

19   CALIFORNIA LAW APPLIES TO ALL CLASSES .......................................... 33

20   FIRST CLAIM FOR RELIEF .......................................................................... 34

21   SECOND CLAIM FOR RELIEF ..................................................................... 40

22   THIRD CLAIM FOR RELIEF ......................................................................... 41

23   FOURTH CLAIM FOR RELIEF ..................................................................... 43

24   FIFTH CLAIM FOR RELIEF .......................................................................... 44

25   SIXTH CLAIM FOR RELIEF .......................................................................... 45

26   SEVENTH CLAIM FOR RELIEF ................................................................... 46

27   EIGHTH CLAIM FOR RELIEF ....................................................................... 47

28   PRAYER FOR RELIEF ................................................................................. 48

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

DEMAND FOR JURY TRIAL............................................................................................51

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

ii

**FIRST AMENDED CLASS ACTION
COMPLAINT**

1    Plaintiffs Angela Prado, Staci Turner, Kimberly Surette, Bryan Kauffman, Cyrenna

2    Dewhurst, Derik Niederquell, Heriberto Santana, and Paul Mazey (collectively, "Plaintiffs"),

3    on behalf of themselves and all others similarly situated, by and through their attorneys,

4    for their First Amended Class Action Complaint against FunPlus International AG and

5    KingsGroup Holdings (collectively, "Defendants" or "FunPlus") allege, on knowledge as to

6    their own actions, the investigation of Plaintiffs' counsel, and otherwise upon information

7    and belief, as follows:

8                                    **PRELIMINARY STATEMENT**

9        1.      This is a class action lawsuit against FunPlus for falsely advertising price

10   discounts for in-game purchases and other deceptive and unfair business practices in its

11   mobile application game (or "app"), State of Survival ("SOS"). SOS is among the highest

12   grossing mobile strategy games across both Apple and Android devices, with over 100

13   million downloads and an estimated revenue in excess of $80 million per month.

14       2.      Since its 2019 inception, SOS has generated over a billion dollars in revenue

15   by offering players "microtransactions"—the ability, while in the game, to make discrete in-

16   app purchases of in-game valuables necessary to level up one's account. These in-app

17   purchases, or "packs," generally range in price from $0.99 to $99.99 each.

18       3.      However, in its direct marketing to consumers (including representations

19   made at the time of purchase), FunPlus advertises false former prices to induce players

20   into believing they must act quickly to take advantage of a limited-time sale price.

21       4.      Since SOS launched in 2019 and continuing to the present day, FunPlus

22   deceives consumers by offering specific limited-time "bonuses" that purport to massively

23   discount the price of its in-game goods. It uses strikethrough pricing and percentages to

24   trick consumers into believing they are benefitting from limited-time promotions that

25   substantially increase the value of their in-game purchases, especially in relation to

26   purchases made by competing players. These purported savings are false, however,

27   because the original pricing that these ads reference are fabricated.

28       5.      These advertisements have run for years. But at no point, let alone within

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

three months of the advertised discounts, have these in-game items ever actually been offered at a non-discounted price—*i.e.*, **without** their "limited time" discounts. In other words, FunPlus never sells these items at their "original" price. It offers false discounts from an original price that did not exist, and its players bought packs on "sale" that were the same prices they would ordinarily pay.

6.     Furthermore, the advertised "original" pricing does not reflect the prevailing market retail pricing for these virtual in-game items, which have no real-world value and whose pricing is entirely determined by FunPlus.

7.     The Federal Trade Commission ("FTC") describes these kinds of false former pricing schemes as deceptive:

> One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects.

16 C.F.R. §233.1(a).

8.     California statutory and regulatory law also expressly forbid such pricing schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

9.     Defendants' tactics to induce players to spend tens, if not hundreds of thousands of dollars each on purchases fall directly within the dark patterns—manipulative design practices—the FTC identified in its September 2022 report, *Bringing Dark Patterns*

2

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

*to Light.*[1]

10.     As the FTC Staff Report—Bringing Dark Patterns to Light explains, "SCARCITY," such as a "False Low Stock Message," "[c]reate[s] pressure to buy immediately by saying inventory is low when it isn't."

11.     "URGENCY," like a "Baseless Countdown Timer" or "False Limited Time Message" or "False Discount Claims" also "[c]reate[s] pressure to buy immediately."

12.     Defendants knew, or reasonably should have known, that their comparative price advertising is false, deceptive, misleading, and unlawful.

13.     Defendants have fraudulently concealed from and intentionally failed to disclose to Plaintiffs and the putative class members the truth about their advertised price discounts and former prices.

14.     Through this false and deceptive marketing, advertising, and pricing scheme, FunPlus has violated California law prohibiting the advertisement of goods for sale as discounted from false former prices and prohibiting misleading statements about the existence and amount of price reductions.

15.     The claims and issues asserted herein are governed by California state law. The State of California has the greatest interest in policing corporate conduct occurring within the State.

16.     Upon information and belief, the false advertisements and misleading statements emanated from the State of California, where FunPlus's key executives, subsidiaries, and offices are located.

17.     Plaintiffs, individually and on behalf of all others similarly situated, hereby seek restitution, injunctive relief, punitive damages, attorney's fees, and all other relief which the Court may deem appropriate.

//

---

[1] FTC Staff Report, *Bringing Dark Patterns to Light* (Sept. 14, 2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf [hereafter FTC Staff Report—Bringing Dark Patterns to Light].

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**PARTIES**

18.     Plaintiff Angela Prado is a resident of California. She began playing SOS in approximately October 2019. She purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes (defined below); and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications (defined below), which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases. She was also double charged for in-app purchases.

19.     Plaintiff Staci Turner is a resident of Ohio. She began playing SOS in approximately November 2019. She purchased False Strikethrough Packs, False Bonus Packs, and False Limited Availability Packs which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases. She was also double charged for in-app purchases.

20.     Plaintiff Kimberly Surette is a resident of Canada. She began playing SOS in approximately January 2021. She purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications, which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases. She was also double charged for in-app purchases.

21.     Plaintiff Paul Mazey is a resident of England. He began playing SOS in approximately February 2020. He purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications, which he otherwise would not have purchased had he known about the deceptive advertising which he reasonably relied upon in making those purchases.

22.     Plaintiff Bryan Kauffman is a resident of Pennsylvania. He began playing SOS in approximately November 2020. He purchased False Strikethrough Packs, False

4

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  Bonus Packs, and False Limited Availability Packs; and purchased packs after viewing

2  False Advancement Stats and Dark Pattern Phone Notifications, which he otherwise would

3  not have purchased had he known about the deceptive advertising which he reasonably

4  relied upon in making those purchases.

5       23.     Plaintiff Cyrenna Dewhurst is a resident of New York. She began playing

6  SOS in approximately February 2021. She purchased False Strikethrough Packs, False

7  Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes;

8  and purchased packs after viewing False Advancement Stats and Dark Pattern Phone

9  Notifications, which she otherwise would not have purchased had she known about the

10  deceptive advertising which she reasonably relied upon in making those purchases. She

11  was also charged for in-app purchases that she never received in-game.

12       24.     Plaintiff Derik Niederquell is a resident of Washington. He began playing

13  SOS in approximately May 2020. He purchased False Strikethrough Packs, False Bonus

14  Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes; and

15  purchased packs after viewing False Advancement Stats and Dark Pattern Phone

16  Notifications, which he otherwise would not have purchased had he known about the

17  deceptive advertising which he reasonably relied upon in making those purchases.

18       25.     Plaintiff Heriberto Santana is a resident of California. He began playing SOS

19  in approximately January 2021. He purchased False Strikethrough Packs, False

20  Percentage Packs, False Limited Availability Packs, False Popularity Packs, and Loot

21  Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern

22  Phone Notifications, which he otherwise would not have purchased had he known about

23  the deceptive advertising which he reasonably relied upon in making those purchases. He

24  was also double charged for in-app purchases.

25       26.     FunPlus was founded in California, apparently with the name Halfquest, and

26  has since gone through various iterations of names including "FunPlus" and "KingsGroup."

27  On information and belief, FunPlus has offices in San Francisco, San Mateo, and Irvine,

28  California. Its high-level executives are also located in California, including: (a) Yitao Guan,

a resident of Menlo Park and FunPlus International's co-founder and Chief Technology Officer; (b) Yingwu Zhong (a/k/a Andy Zhong), a resident of San Francisco and co-founder and Chief Executive Officer; (c) Jeremy Horn, a resident of Los Angeles and VP Head of Innovation; (d) Wei Wang, a resident of Irvine and Chief Creative Officer; and (e) Michael Tong, a resident of San Francisco and Chief Strategy Officer.

27.     Defendant FunPlus International AG ("FunPlus International") is a Swiss public limited company. FunPlus International was previously known as (i) KingsGroup Europe SA, (ii) KingsGroup International AG, and (iii) KingsGroup International SA. Its directors include Yingwu Zhong (a/k/a Andy Zhong).

28.     Defendant KingsGroup Holdings is a Cayman Islands corporation. Yingwu Zhong (a/k/a Andy Zhong) is one of its two directors.

29.     Defendants have operated through an opaque corporate structure. On information and belief, Defendants conduct business or have conducted business through (i) Funplus Interactive USA Inc. d/b/a FunPlus Interactive USA LLC, a Delaware company with its principal place of business in San Francisco, California; and (ii) Imagendary USA, LLC f/k/a FunPlus Interactive USA LLC f/k/a KingsGroup USA, LLC, a Delaware company, with its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Defendants.

31.     This Court has personal jurisdiction over Defendants because they have offices and key executives in this District, committed the tortious acts alleged herein in this District, regularly conduct business in this District, and have extensive contacts with this forum.

32.     Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a

1    substantial part of the events or omissions giving rise to the claim occurred in this District.

2         33.    In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1), in

3    that Defendants reside in this District and are subject to this Court's personal jurisdiction.

4         34.    In the alternative, venue is proper in this District under §1391(b)(3), to the

5    extent there is no district in which an action may otherwise be brought under 28 U.S.C.

6    §1391(b)(1) – (2), because Defendants are subject to this Court's personal jurisdiction.

7                        **INTRADISTRICT ASSIGNMENT**

8         35.    Because a substantial part of the events which give rise to Plaintiffs' claims

9    occurred in San Francisco and San Mateo counties, pursuant to Local Civil Rule 3-2, this

10   case has already been assigned to the Oakland Division through its assignment to the

11   Hon. Yvonne Gonzalez Rogers.

12                          **FACTUAL ALLEGATIONS**

13   **I.    State of Survival: A Highly Profitable "Freemium App"**

14        36.    SOS is a mobile application strategy game developed and operated by

15   Defendants and available on iPhone and Android devices through the Apple App Store

16   and Google Play platforms. It is a zombie-themed, post-apocalyptic survival game.

17        37.    Since its creation in 2019, SOS has consistently ranked among the most

18   downloaded mobile game apps on the Apple and Android app stores. By 2021, the game

19   had been downloaded over 100 million times and has generated over $1 billion in revenue.

20        38.    SOS belongs to a category of apps known as "freemium" apps. A freemium

21   app is one in which users do not have to pay to play a fully functional game—the game is

22   free to download and start playing.

23        39.    The term freemium is a misnomer, as users are given multiple purchase

24   opportunities, known as microtransactions or in-app purchases ("IAPs"), to augment their

25   playing experience. Users can buy in-game currency, weapons, garments, and even time.

26        40.    The popularity of freemium apps featuring in-app purchases has

27   skyrocketed. In 2022, 97% of apps in the Google Play app store were free-to-download.[2]

28   _____

[2] https://www.statista.com/statistics/263797/number-of-applications-for-mobile-phones.

Case No. 4:22-cv-5023-YGR                              7                **FIRST AMENDED CLASS ACTION**
                                                                        **COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    Even so, in-app purchases accounted for 48.2% of mobile app earnings.[3] SOS has

2    generated over one billion dollars since its creation.

3        41.    Because users can try the app for free, freemium apps acquire new users

4    more rapidly than purchase-to-play apps. Enabling microtransactions at various points

5    throughout game play allows users time to develop app loyalty and engagement before

6    having to pay anything. The continued microtransactions also remove the upper limit of

7    user spending.[4]

8        42.    Most of freemium app revenue is generated by big-spending "whales." In

9    2017, just 6% of customers on Apple's App Store accounted for 88% of all spending on

10   games.[5]

11       43.    SOS has generated well over a billion dollars in revenue since its inception.

12   It generates this revenue by offering players "microtransactions," or discrete in-app

13   purchases that allow players to advance in the game. These purchases include building

14   materials, hero "badges," speed-ups, and other valuables. An "in-app purchase" refers to

15   a financial transaction initiated from within the mobile application itself. The most common

16   form of in-app purchase is for bundled groups of resources, or "packs," generally ranging

17   in price from $0.99 to $99.99 each.

18       44.    Players engage in "microtransactions" to purchase items that are necessary

19   to progress their account further and maintain competitiveness with other players. This

20   business model contrasts with that of many other popular free apps which offer only non-

21   essential or cosmetic items for purchase. Because SOS offers in-app purchases that

22   advance one's account in direct proportion to the amount of money spent by a player, and

23   confer advantages not reasonably attainable by in-game labor alone, it is most accurately

24   classified as a "Pay to Win" mobile game.

25       45.    In other words, a player who spends money in the game will be more

26

27   [3] https://www.businessofapps.com/guide/in-app-purchases.
     [4] Savannah Wei Shi, et al., *From Minnows to Whales: An Empirical Study of Purchase*
28   *Behavior in Freemium Social Games*, Int'l J. of Elec. Com. (2015).
     [5] *Epic Games, Inc., v. Apple Inc.*, 559 F. Supp. 3d 898, 954 (N.D. Cal. 2021).

powerful in relation to players who choose not to spend money in the game. The game leverages this by bombarding players with advertisements and invitations to buy additional packs and resources whenever they reach a point in the game where their progress has stalled. In this way, the game's model is designed to create a sense of urgency around the purchase of in-game resources, and SOS further capitalizes on this sense of urgency by suggesting that purchases are limited-time offerings made available at a substantial discount.

46.     The strategies described above to induce players to spend upwards of hundreds of thousands of dollars each are a few of the many deceitful tactics, known as "dark patterns," employed within SOS. "Dark patterns" refer to "a[ny] user interface carefully crafted to trick users into doing things they might not otherwise do," causing players to "engage accidently or unwittingly in monetization activities thereby generating more income for the developer."[6]

47.     As the computer and behavioral scientist Chris Lewis writes, "[t]hese dark patterns violate user expectations by encouraging them to give up or jeopardize some resource to an extent that they were not expecting (time, money, social capital)."[7]

48.     Indeed, and as further described below, many of SOS's tactics to induce players to spend over a billion dollars on a "free game" fall directly within the dark patterns the FTC identified in its September 2022 report, *Bringing Dark Patterns to Light*.[8]

**II.     State of Survival Game Play: Microtransactions and Feedback Loops**

49.     Once a player creates an account, they are placed automatically into a specific "State," or server, along with several thousand players who also created their accounts at a similar period in time. Thereafter, they can begin upgrading the level of their "Headquarters" within their settlement, and the buildings within it. They do this to

---

[6] Dan Fitton, Janet C Read, *Creating a Framework to Support the Critical Consideration of Dark Design Aspects in Free-to-Play Apps*, Assoc. for Computing Machinery 407 (2019), available at https://dl.acm.org/doi/pdf/10.1145/3311927.3323136.
[7] Lewis, *supra* note 17 (internal quotations omitted).
[8] FTC Staff Report—Bringing Dark Patterns to Light.

Case No. 4:22-cv-5023-YGR                    **FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  strengthen their combat abilities and therefore maintain a competitive position among other

2  players in the server.

3       50.    The purpose of the game is to advance the strength of one's settlement by

4  upgrading buildings, locating and upgrading heroes, and training a large number of strong

5  troops. The players join large allegiances of other players that compete for dominance

6  within the State through various in-game events.

7       51.    In order to progress past a certain level in the game, it is necessary to

8  purchase in-app "packs" that contain the required items to level up one's account in the

9  game. These essential items require spending real money, as they are otherwise only

10 available in insufficient amounts through in-game labor alone.

11      52.    After a few days of playing and regularly making upgrades, the cost to

12 acquire the materials needed to make subsequent upgrades increases exponentially.

13      53.    In other words, SOS is made up of feedback loops—the output of the system

14 becomes the input for the next iteration of the system. Meaning that every action made in

15 the game gives the user access to future actions, giving users a sense of player progress

16 and motivation.

17      54.    At the beginning of the game the time between input and output is immediate

18 and allows the user to complete the next action right away. But as the user performs more

19 actions and levels up in the game, the time between input and output increases. There

20 comes a point in the game where the user can no longer advance due to the time required

21 to complete the next action. At this point, without making an in-app purchase, the user is

22 at a standstill.

23      55.    Because users are so accustomed to short wait times or using the speed up,

24 skip, or coin (spending in-game resources) features, by the time this standstill occurs (that

25 is, if no additional purchases are made) a user is predisposed to make in-app purchases.[9]

26      56.    For example, in SOS, to upgrade one's Headquarters to level 2 costs 3,000

27

───────────────

28 [9] Chris Lewis, Irresistible Apps: Motivational Design Patterns for Apps, Games, and Web-based Communities (1st ed. 2014).

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

wood, one of the many in-game resources that players acquire. The upgrade is completed instantly. But to upgrade one's Headquarters from level 29 to level 30 requires 290 **million** wood—nearly 1,000,000% of the amount needed for the initial upgrade. Upgrading to level 30 also requires 290 million food, 81.1 million metal, and 23.2 million gas (all additional in-game resources). Once initiated, this upgrade takes 948 hours to complete, unless players purchase construction speed-up boosters.

57.     If a player does not make any purchases in the game, it would require close to **16 months** of playing two hours each day, 365 days a year, to gather the necessary resources to upgrade their Headquarters to level 30. And this is considered to be the first priority upgrade for players; in other words, a player who manages to upgrade their Headquarters to level 30 has only just begun.

58.     Defendants build off the compulsive feedback loops that their game intentionally creates to induce Plaintiffs and other players to spend upwards of hundreds of thousands of dollars each.[10] SOS reminds players that instead of devoting countless hours to progress in the game, they can simply purchase packs. The game designs these upgrades to lure players into spending money on resources.

59.     These upgrades all cost gameplayers significant, real currency. The packs necessary for these upgrades are generally offered at the following prices: $99.99, $49.99, $19.99, $9.99, $4.99, $1.99, and $0.99. The advertisements for a particular pack at

---

[10] SOS also employs compulsion loops, a sinister-sounding term for a simple process. To create a compulsion loop, game developers make users anticipate a reward, such as a more powerful sword or the prospect of traveling to a new game area. Next, users are given a challenge, such as killing monsters or solving a puzzle. By completing the challenge, the user earns their anticipated reward, which in turn presents or unlocks more challenges for yet more rewards (*e.g.*, the new game area includes a new quest giver). Compulsion loops can lead to compulsive behavior. Adrian Hon, *You've Been Played: How Corporations, Governments, and Schools Use Games to Control Us All*, p. 144. SOS likewise employs treatmills, a refinement of compulsion loops, where incremental gains are constantly doled out, with the intention of engaging players indefinitely. Treatmills are designed to ensure the game occupies an enormous amount of a user's time, stays relevant as long as possible, and as a result maximizes the time where a user might refer the game to a friend. Games can easily consume hundreds of hours of users' time by incrementally unlocking a few more secrets and a few more power-ups after every loop. *Id.* at 152.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

different pricing levels usually have similar graphical advertisements but contain varying amounts of items in proportion to their price.

60.    To acquire the resources necessary to reach Headquarters level 30, a player would need to spend approximately $1,400 on packs. However, this cost is never made clear to the player because Defendants know that players would not be willing to pay $1,400 if they were aware of the total cost up front. After all, these are players who specifically selected a free-to-play game instead of spending $20 to $60 on a traditional video game that is available for one-time purchase, and with similar mechanics.

61.    Knowing this, Defendants instead leverage the incremental upgrade system to spread this total cost over 29 separate upgrades, all while keeping consumers in the dark. There is no in-game mechanism to review one's purchase history or the total amount one has spent. Upgrade costs are only shown for those upgrades for which the player is currently eligible, meaning Defendants hide the explosive exponential costs of in-game upgrades until the game's players have already invested months of time and money into the game.

62.    Once players are fully invested, Defendants then use packs to create a false sense of urgency and scarcity to pressure them into making several dozen smaller purchases over a period of days, weeks, or months.

63.    In other words, at no point are players told it will cost them $1,400 to upgrade their Headquarters to level 30. Instead, they are bombarded with an endless series of advertisements urgently offering limited-time sales, each providing the opportunity to purchase just the incremental resources needed at the time to reach the next level of upgrade.

64.    Defendants follow this model intentionally to foster dangerous consumer behaviors that ultimately result in more purchases at the expense of its players.

65.    Research into these microtransactions and human behavior shows a critical link between microtransaction purchases and problem gaming behavior (*i.e.*, behavior

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

associated with gambling addiction) that forms with high frequency purchases.[11] Of note, "[b]oth classical and operant conditioning theories suggest that more frequent events or quicker pay out frequencies could increase the likelihood of problematic microtransaction purchase behavior and problem gambling symptoms through reinforcement."[12]

66.     Thus, by luring players into making several smaller, time-sensitive purchases of purportedly high-value packs, Defendants specifically intend to foster addictive behaviors by luring consumers into dangerous spending habits.

67.     As a result of Defendants' predatory monetization schemes and false advertising, numerous players, like Plaintiffs, end up spending tens of thousands—if not hundreds of thousands—of dollars on SOS.

68.     As an editorial in the Society for the Study of Addiction has observed:

> Predatory monetization schemes in video games are purchasing systems that disguise or withhold the long-term cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.
> . . .
> Game monetization schemes have become increasingly sophisticated and have been featured more prominently within popular on-line games. In our view, some of these schemes could be considered predatory. Predatory monetization schemes typically involve in-game purchasing systems that disguise or withhold the true long-term cost of the activity until players are already financially and psychologically committed. Such schemes are designed to encourage repeated player spending using tactics or elements that may involve, either singularly or in combination, limited disclosure of the product; intrusive and unavoidable solicitations; and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play. Such strategies may exploit inequalities in information between purchaser and provider, such as when the industry uses knowledge of the player's game-related preferences, available funds and/or playing and spending habits, to present offers predetermined to maximize the likelihood of eliciting player spending.[13]

---

[11] Erin Gibson, *et. al.*, The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review, 131 Computers in Human Behavior 107219 (2022).

[12] *Id.*

[13] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286.

69.     Plaintiffs were victims of Defendants' highly addictive predatory monetization scheme. For instance, as Plaintiff Paul Mazey, who spent approximately $46,000 as a result of Defendants' predatory tactics, shared in an article on Vice.com:[14]

> As Mazey rose up the ranks and became the joint leader of a clan, taking on the responsibility of planning events, he started to dedicate 12 hours a day to the game and think about it constantly. That he could play *State of Survival* on his phone made it all the harder to put it away for any significant period of time.

> "***The addiction, it just progressively became worse and worse and worse,***" said Mazey. "You feel ***compelled*** to be on the game all the time."

> Outside of the game, his life became materially worse. He became withdrawn, and it started to affect his work life, relationship, and sex life. His appetite suffered, as did his sleep. "I was just so absorbed and addicted," he said. "***All I could think of was a game. That's how my mind was. My mind felt like it was controlled.***"

### III.     Defendants' Deceptive Pack Advertisements

70.     Layered on top of its predatory and addictive monetization schemes, SOS relies on six primary categories of deceptive pack advertisements within SOS: (a) packs that offer the illusion of price discounts through the strikethrough graphics, hereafter referred to as "False Strikethrough Packs"; (b) packs that falsely advertise that a pack contains extra value by containing an extra percentage increase value relative to normal versions of the same pack, hereafter referred to as "False Bonus Packs"; (c) packs that falsely allege the limited availability of purchases, hereafter referred to as "False Limited Availability Packs"; (d) packs that falsely represent their popularity, hereafter referred to as "False Popularity Packs"; (e) graphics that falsely represent how far other players have advanced, hereafter referred to as "False Advancement Stats"; and (f) items that "randomly" generate an in-game prize once purchased, hereafter referred to as "Loot Boxes." Any deceptively advertised pack can belong to more than one of these categories simultaneously or may be deceptive for a separate reason outside of the ones belonging

---

[14] Vice, *'Game of Thrones: Conquest' and 'State of Survival' Players Say They Felt Addicted and Pressured To Spend* (Oct. 20, 2022), available at https://www.vice.com/en/article/g5vmyw/game-of-thrones-conquest-and-state-of-survival-players-say-they-felt-addicted-and-pressured-to-spend.

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  to the three main categories.

2  **A.    False Strikethrough Packs**

3      71.    Defendants use false reference pricing schemes to increase sales because

4  they know these reference prices influence purchasing decisions, as consumers want

5  bargains. Fake discounting and false reference prices are widely recognized to be powerful

6  tools in convincing customers to make purchases, and this issue has been studied

7  repeatedly. As one research study from the Harvard Business School summarized:

8      Taken together, evidence from our analysis of observational transaction
9      data and our laboratory experiment suggests that fake prices provide
        sellers with a powerful tool to enhance demand, but one that may come at
10      the expense of misleading consumers about products' true initial selling
        prices. Consumers take initial prices as signals of product quality and rate
11      offers as being better deals the higher these initial prices are with respect
        to present selling prices. Accordingly, fake prices have the highest influence
12      on purchase likelihood for less-informed consumers.
13      . . .
        By definition, a fake price offers a fake discount—a discount that does not
14      represent a decrease from some previous selling price but, rather, the
        difference between the current selling price and a fake introductory price.
15      There is much existing literature on the impact of discounts on consumer
        behavior beyond . . .[15]
16

17      72.    SOS's False Strikethrough Packs display an advertised price for which the



18
19
20
21
22
23
24
25
26

27  ―――――――――――――――

[15] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business
    School Working Paper (2018), available at
28  https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-
    ffba637617d9.pdf.

pack is currently offered. Above that green arrow is a significantly higher price struck through with a red line. The advertisements suggest that the pack was formerly offered at the higher price but is now heavily discounted.



73.    However, these packs were in fact never offered at the advertised former reference price.

74.    There are dozens of False Strikethrough Packs sold at multiple pricing tiers, including: "Crates of Choice," packs that purport to offer "Crazy Rebates from your Choice of Crates" offered across the $4.99, $9.99, and $19.99 pricing tiers. None of these packs were ever offered at the former reference prices.

75.    Defendants had actual knowledge that the False Strikethrough Packs contained false or misleading representations as to their former prices. Defendants designed and promoted these advertisements from 2019 until present day, as the practice of offering these deceptive packs continues.

76.    The price at which a pack is obtained is a material consideration when reasonable players, including Plaintiffs, decide to make purchases. Players seek to maximize the amount of items obtained from the pack for the lowest cost. Defendants deceive players into taking advantage of alleged discounts so that players believe they may achieve a competitive advantage on the mistaken belief that other players may have to pay the substantially higher non-discounted price for the same number of items.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

77. Plaintiffs and the Classes reasonably relied on the "strikethrough" pricing when purchasing numerous False Strikethrough Packs. Had Plaintiffs known the "strikethrough" pricing was false, Plaintiffs would not have purchased many of the False Strikethrough Packs that they purchased.

78. If Plaintiffs and the Classes could ever have reasonably realized that the False Strikethrough Packs were never sold at the original reference price, such realization would have occurred only after enough game play that Defendants would have already achieved their goal of establishing addictive spending habits. Thus, to the extent Plaintiffs or any of the Classes continued to make purchases after developing an understanding that the packs were never offered at the original price, this was the calculated and intended result that Defendants sought when engaging in this deceptive and unfair practice in the first place.

### B.      False Bonus Packs

79. The False Bonus Packs also falsely advertise that a pack possesses extra value by containing a specific percentage increase in items or resources relative to normal versions of the same pack. The false percentage is indicated by a large and attention-grabbing bubble in the pack's graphical advertisement that contains a quantitative claim regarding the increase in value of this pack relative to packs which are not on sale.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108



80.     For example, the Darts Mega Bundle pack is offered with a graphical image of a red bubble containing "1550%"—indicating to a reasonable consumer that this specific pack is discounted because it contains a 1550% increase in the value or quantity of items contained within it when compared to a Darts Mega Bundle without such a representation.

81.     Defendants intentionally designed the packs to mislead players into believing that the packs represented a sale value, including both a false original reference price and an illusory increase in value, to induce those players to purchase the packs. Defendants knowingly took those ordinary item packs and simply placed a percentage graphic on the ad copies without altering anything else.

82.     Defendants have been promoting these False Bonus Packs from 2019 until

FIRST AMENDED CLASS ACTION
COMPLAINT

1   present day, as the practice continues.

2        83.    Plaintiffs all reasonably relied on the percentage graphics on the False Bonus

3   Packs as a material consideration in purchasing those packs. Had the Plaintiffs known the

4   packs were not actually on sale in the manner represented (*i.e.*, by containing an increase

5   in the value or quantity of items contained within the packs when compared to a pack

6   without such a representation), they would not have purchased the False Bonus Packs.

7        **C.     False Limited Availability Packs**

8        84.    The False Limited Availability Packs indicate that a particular pack can only

9   be purchased a finite number of times within the server. For example, text underneath a

10  pack advertisement may say "Only 1 remaining!" These advertisements create a sense of

11  artificial scarcity whereby players are pressured into purchasing packs containing valuable

12  items to enhance their accounts, ostensibly to simultaneously deprive competitors from

13  accessing the same packs.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108



85.    Other times, Defendants use graphics stating "Expires soon" with a countdown timer to create a false sense of scarcity with its users.



86.    However, Defendants' representations as to the scarcity of the packs are false. Other players are also able to purchase these packs even if another player buys all of the supposedly remaining packs. Furthermore, the player who purchased the False Limited Availability Pack is frequently offered the same pack to purchase again, especially at the $99.99 pricing tier.

87.    Defendants intentionally designed the packs to mislead players into believing that the packs were limited in availability. Defendants knowingly added a message to

20

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  players communicating an artificial scarcity and urgency in order to induce them to

2  purchase the packs immediately.

3      88.    These false and deceptive tactics of scarcity and urgency are effective dark

4  patterns.

5      89.    As the FTC explained, "SCARCITY" includes variants such as the "False Low

6  Stock Message" (*e.g.*, "*Only 1 left in stock—order soon*"), which falsely claim inventory is

7  low.  This message "[c]reate[s] pressure to buy immediately." [16]

8      90.    "URGENCY" includes variants such as the "Baseless Countdown Timer"

9  ("*Offer ends in 00:59:48*"), which shows a clock that goes away or resets when it times out;

10  "False Limited Time Message" ("*Deal ends soon*"), which presents a meaningless deadline

11  that resets when reached; or "False Discount Claims" ("*Sale*"). All of these variants create

12  pressure to buy immediately.

13      91.    Plaintiffs all reasonably relied on the textual advertisements of supposed

14  scarcity accompanying the ad copy as a material consideration in purchasing those packs.

15  Had the Plaintiffs known the packs were not actually scarce or limited, they would not have

16  purchased the False Limited Availability Packs.

17          **D.    False Popularity Packs**

18      92.    The False Popularity Packs fabricate the popularity of their advertised packs

19  to induce players to purchase them. Text directly above the items for sale falsely indicates

20  how many players have already purchased this item. The FTC describes these as False

21  Activity Messages, a type of "SOCIAL PROOF," where the designer makes "false claims

22  about others' activity on a site or interest in a product."[17]

23

24

25

26

27

---

[16]FTC Staff Report—Bringing Dark Patterns to Light.
[17] FTC Staff Report—Bringing Dark Patterns to Light.

93.    By misrepresenting and artificially inflating the number of purchasers of the False Popularity Packs, Defendants make players believe that others have a competitive advantage as compared to players who do not purchase these packs.



### E.    False Advancement Stats

94.    Defendants also induce players to purchase packs by falsely representing how many other players have advanced in a game-specific event.

95.    Players, seeing that others have moved ahead in the game, are induced to purchasing additional packs because of the False Advancement Stats to regain their competitive advantage.

96.    For instance, during the Helicopter and Airplane events, Defendants falsely misrepresented the average progression of States in the event to induce individuals in each State to purchase packs to catch up with other players.

97.    At one point during the Helicopter event, Defendants misrepresented that the level of the average *player* had reached level 103, when actually the highest average *State* had progressed to Level 103, and not a single player had even advanced past level 101.



22

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

### F.   Loot Boxes

98.   Amplifying the addictive features of SOS, Defendants also entice players to purchase Loot Boxes.

99.   The use of Loot Boxes within SOS and other freemium games encourages further and unregulated problem gambling behavior[18] by providing players with the opportunity to purchase items that yield randomized awards—mirroring gambling through uncertainty in the outcomes of spending.

100.   Loot Boxes allow players to purchase virtual "chances" to win rare in-game items, but most players win only common virtual items, which can often be purchased for far less than what the players spend on a "chance" at rare in-game loot.

101.   While this may sound similar to traditional gambling games, Loot Boxes contain only virtual items and not physical objects, and therefore are generally not subject to laws that typically apply to gambling activities.

102.   Loot Boxes are classified as a type of "monetary dark pattern" and as such SOS, "a video game that employs loot boxes[,] is just utilizing the 'monetized rivalries' dark pattern"—the exploitation of user competitiveness which encourages players to spend money they would not otherwise spend, in order to achieve status.[19]

103.   Further, academic literature on the subjects of predatory monetization and addiction to loot-box-microtransactions suggests that there is a link between chance-based gambling and player behavior on these apps. Studies in psychology show that loot box consumption mimics gambling as it involves the betting and spending of real currency for unpredictable in-game rewards, with the ambiguity of the valuation for in-game vs. real-world currency making this a habit that is easy to fall into.[20]

---

[18]  Matthew E. Perks, "Regulating In-Game Monetization: Implications of Regulation on Games Production," (2021), available at https://www.jstor.org/stable/pdf/j.ctv1hp5hqw.14.pdf?refreqid=excelsior%3Ae35b9894f003556c7dff9d435726e0dc&ab_segments=0%2Fbasic_search_gsv2%2Fcontrol&origin=acceptTC=1, p. 221.

[19] Lewis, *supra* note 17.

[20]  Tom Brock, Mark Johnson, *The Gamblification of Digital Games*, 21 J. Consumer Culture (2021) available at

Case No. 4:22-cv-5023-YGR

**FIRST AMENDED CLASS ACTION COMPLAINT**

104.   The similarities between gambling and Loot Boxes are especially dangerous for individuals who are already problem gamblers, as the high degree of likeness to other forms of gambling may cause them "to spend large amounts of money on buying loot boxes in games, just as they would spend large amounts of money on other forms of gambling."[21]

105.   This is particularly problematic because studies have repeatedly confirmed that problematic and pathological gambling habits develop at a higher rate among those who participate in virtual, online gambling activities.[22]

106.   Additionally, younger individuals (those under 30 and, in particular, those under 18) are particularly susceptible to developing problematic gambling pathologies, including gambling addiction.[23]

107.   SOS, which is marketed to individuals 13 and older, leverages these predispositions to foster addiction and other pathological behaviors with its chance-based loot box system.

108.   Upon information and belief, Defendants are aware of the addictive nature of Loot Boxes and have designed SOS specifically to leverage consumer psychology in an effort to maximize consumer addiction and promote virtual gambling.

109.   Examples of just a few of the Loot Boxes offered for sale in the SOS game are shown below.

---

https://journals.sagepub.com/doi/full/10.1177/1469540521993904.

[21] David Zendle, Paul Cairns, *Video Game Loot Boxes are Linked to Problem Gambling: Results of a Large-scale Survey*, PLOS ONE (2018), available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0206767.

[22] *See, e.g.*, Brunelle, Leclerc, Cousineau, Dufour, Gendron, & Martin, *Internet gambling, substance use, and delinquent behavior: An adolescent deviant behavior involvement pattern*, 26 Psych of Addictive Behaviors 365-70 (2012), available at https://doi.org/10.1037/a0027079.

[23] *See* Kristjansdottir *et al*, *Internet gambling and problem gaming among 13 to 18 year old adolescents in Iceland*, 9 Int'l J. Mental Health & Addiction 257 (2011), available at https://doi.org/10.1007/s11469-010-9280-7; *Gainsbury et al*, The Impact of Internet Gambling on Gambling Problems: A Comparison of Moderate-Risk and Problem Internet and Non-Internet Gamblers, 27(4) Psychology of Addictive Behaviors (2013), available at https://psycnet.apa.org/fulltext/2013-05953-001.pdf.







25

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

26

**FIRST AMENDED CLASS ACTION
COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

## IV.        Double-Charging and Purchase Banning

110.    Aside from the deceptive marketing of packs, Defendants have engaged in other unfair and oppressive conduct towards players making in-app purchases in SOS.

111.    Defendants denied some Plaintiffs' refund requests for any duplicative charges of their in-app purchases. When Plaintiffs Angela Prado and Staci Turner sought refunds for the charges through the Apple Store or Google Play Store, Defendants "purchase banned" them from SOS if they were successful in obtaining the refunds. "Purchase banned" players are unable to make any subsequent in-app purchases within SOS. This effectively destroys the ability of those players to meaningfully compete in the game, even when those players have spent tens of thousands of U.S. dollars, often forcing the players off the game.

112.    The practice of "purchase banning" any players who successfully obtain refunds for duplicative charges from an app store is widely practiced by Defendants. Defendants therefore attempt to coerce players into accepting these phantom charges by effectively holding their entire accounts hostage, in which players have often invested significant real money and time.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

113.   Plaintiffs Angela Prado, Staci Turner, and Kimberly Surette were double charged for some of their in-app purchases on SOS.

114.   Plaintiffs Angela Prado and Staci Turner were subsequently purchase banned in SOS after obtaining some refunds back from the App store.

**V.     Dark Pattern Phone Notifications**

115.   Lastly, to extract even more money from its users, Defendants systematically badger players with notifications advertising packs for purchase. Notifications include text that falsely creates urgency and scarcity (hereafter, "Dark Pattern Phone Notifications").

116.   For example, the notification in the following screenshot states, "Final Hope Supplies...about to run out," and routinely happens three times a day.



117.   Teeing off the social pressures to induce spending, Defendants also send users notifications stating, "Your Settlement needs you!"



118.   Defendants specifically time these notifications to coincide with the end of event cycles, at the expiration of allegedly "limited time" sales, and at other times designed to trick players into believing they must act immediately to take advantage of special purchase pricing.

119.   Defendants customize and tailor these notifications, such that not every player receives the same notification. Rather, without ever informing players that they are doing so or providing them any way to opt out, Defendants use information gathered from players' phones, purchases, and in-game activities to customize notifications.

120.   This onslaught ensures that even after players successfully disengage from the game to resume other activities, the game itself constantly reminds players to return by creating false senses of urgency, maximizing the game's addictive nature.

121.   Because these notifications are designed around key purchasing timelines—specifically the expiration of allegedly limited-time offerings and the conclusion of events—Defendants' use of these notifications continues to tie the addictive nature of the game directly to players' in-game purchases.

## CLASS ALLEGATIONS

122.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of themselves and the following proposed "Global Class":

> All persons, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

123.   Plaintiffs Angela Prado and Heriberto Santana also bring this action on behalf of themselves and on behalf of the following subclass (the "California Class"):

> All persons in California, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

124.   Plaintiff Staci Turner also brings this action on behalf of herself and on behalf of the following subclass (the "Ohio Class"):

> All persons in Ohio, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

125.   Plaintiffs Kimberly Surette and Paul Mazey also bring this action on behalf of themselves and on behalf of the following subclass (the "International Class"):

29

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

All persons residing outside the United States, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

126.   Plaintiff Bryan Kauffman also brings this action on behalf of himself and on behalf of the following subclass (the "Pennsylvania Class"):

All persons in Pennsylvania, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

127.   Plaintiff Cyrenna Dewhurst also brings this action on behalf of herself and on behalf of the following subclass (the "New York Class"):

All persons in New York, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, and/or such subclasses as the Court may deem appropriate.

128.   Plaintiff Derik Niederquell also brings this action on behalf of himself and on behalf of the following subclass (the "Washington Class"):

All persons in Washington, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

129.   Excluded from the proposed Classes are Defendants and their employees, officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed class.

130.   Certification of Plaintiffs' claims for class-wide treatment is appropriate

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    because Plaintiffs can prove the elements of their claims on a class-wide basis using the

2    same evidence they would use to prove those elements in individual actions alleging the

3    same claims.

4          131.    This action meets all applicable standards of Fed. R. Civ. P. 23 for class

5    certification, in that Plaintiffs can demonstrate the elements delineated below.

6          132.    **Numerosity.** The members of the proposed Classes are so numerous and

7    geographically dispersed that individual joinder of all proposed class members is

8    impracticable. *See* Fed. R. Civ. P. 23(a)(1). While Plaintiffs believe that there are hundreds

9    of thousands of members of the proposed Classes, the precise number of class members

10   is unknown, but may be ascertained from Defendants' books and records. On information

11   and belief, Defendants maintain a list of users that includes personal information for the

12   user including their email addresses, whether they have made in-app purchases, and

13   which in-app purchases they have made.

14         133.    Applying a reasonable and prudent person standard to the users of State of

15   Survival under the same or similar circumstances, each user would qualify to be a class

16   member requesting the right to cancel and get refunds on their in-app purchases. Any

17   reasonable and prudent person under the same or similar circumstances wants to have

18   the flexibility to disaffirm an in-app purchase that was made while believing that the packs

19   they purchased were part of a sale or promotion but, in reality, were not.

20         134.    **Commonality and Predominance.** This action involves common questions

21   of law and fact, which predominate over any questions affecting individual class members.

22   *See* Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

23              a.   Whether Defendants engaged in the conduct alleged in this First Amended

24                   Complaint;

25              b.   Whether Defendants violated the applicable statutes alleged herein;

26              c.   Whether Defendants designed, advertised, marketed, distributed, sold, or

27                   otherwise placed State of Survival into the stream of commerce in the United

28                   States;

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

d.   Whether Defendants' conduct emanated from the State of California;

e.   Whether Plaintiffs and the class members are injured and harmed directly by Defendants' false advertising designed to entice users into making in-app purchases they otherwise would not have made;

f.   Whether Plaintiffs and the class members are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts; and

g.   Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

135.   **Typicality.** Plaintiffs' claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Defendants' wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3). Defendants' creation and display of its misleading advertisements is uniform for all Plaintiffs and class members.

136.   **Adequacy.** Plaintiffs are adequate proposed class representatives because their interests do not conflict with the interests of the other members of the proposed Classes they seek to represent, because they have retained counsel competent and experienced in complex class action litigation, and because they intend to prosecute this action vigorously. The interests of the proposed Classes will be fairly and adequately protected by Plaintiffs and their counsel. *See* Fed. R. Civ. P. 23(a)(4).

137.   **Declaratory and Injunctive Relief.** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the proposed Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the proposed Classes as a whole. *See* Fed. R. Civ. P. 23(b)(2). Defendants' wrongful conduct alleged herein is grounded in the creation and dissemination of their pack offerings in-game, which are displayed uniformly. Plaintiffs' and the class members' injuries are real, immediate, and ongoing. Plaintiffs and class members

1  seek injunctive and declaratory relief from Defendants.

2  138.  **Superiority.** A class is superior to any other available means for the fair and
3  efficient adjudication of this controversy, and no unusual difficulties are likely to be
4  encountered in the management of this class action. The damages or other financial
5  detriment suffered by Plaintiffs and putative class members are relatively small compared
6  to the burden and expense that would be required to individually litigate their claims against
7  Defendants, so it would be impracticable for members of the proposed Classes to
8  individually seek redress for Defendants' wrongful conduct.

9  139.  Applying the principles of equity or balance of equities, expecting an
10 individual Plaintiff who is at a disadvantage with limited resources and spending capacity,
11 and with minimal negotiating power, if any, to litigate claims against Defendants,
12 multibillion-dollar corporations that have immense resources and deep pockets, would be
13 unfair. Class actions are a necessary and essential means to provide for public interest
14 litigations with checks and balances to curtail deceptive practices by powerful private
15 corporations, including Defendants.

16 140.  There is no special interest in class members individually controlling the
17 prosecution of separate actions. And even if class members could afford individual
18 litigation, the court system could not. Individualized litigation creates a potential for
19 inconsistent or contradictory judgments, and it increases the delay and expense to all
20 parties and the court system. By contrast, the class action device presents far fewer
21 management difficulties and provides the benefits of single adjudication, economy of scale,
22 and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

23  **CALIFORNIA LAW APPLIES TO ALL CLASSES**

24 141.  California's substantive laws apply to every class member, regardless of
25 where the class member resides.

26 142.  California's substantive laws may be constitutionally applied to the claims of
27 Plaintiffs and the Classes under the Due Process Clause, 14th Amend. §1, and the Full
28 Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all

2  class members, thereby creating state interests that ensure that the choice of California

3  state law is not arbitrary or unfair.

4      143.   FunPlus and its various operating entities were founded in California.

5  FunPlus maintains offices in California, and its co-founders and key executives reside in

6  California. On information and belief, Defendants' principal places of business are located

7  in California. FunPlus conducts substantial business in California. Therefore, California has

8  an interest in regulating Defendants' conduct under its laws.

9      144.   FunPlus's decision to reside in California and avail itself of California's laws,

10  and to engage in the challenged conduct from and emanating out of California, renders the

11  application of California law to the claims herein constitutionally permissible.

12      145.   California is also the state from which Defendants' alleged misconduct and

13  false statements emanated. This conduct similarly injured and affected Plaintiffs and all

14  other class members.

15      146.   The application of California laws to the Classes is also appropriate under

16  California's choice of law rules because California has significant contacts to the claims of

17  Plaintiffs and the proposed Classes, and California has a greater interest in applying its

18  laws here than any other interested state.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Business & Professional Code §17200 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

23      147.   Plaintiffs incorporate by reference all allegations in this First Amended

24  Complaint and restate them as if fully set forth herein.

25      148.   The UCL defines unfair business competition to include any "unlawful, unfair

26  or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading"

27  advertising. Cal. Bus. & Prof. Code §17200.

28      149.   A business act or practice is "unlawful" under the UCL if it violates any other

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

law or regulation.

150.   A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

151.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

152.   Defendants have violated the "unlawful" prong under the UCL and have engaged in "unfair, deceptive, untrue or misleading" advertising.

153.   The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes—similar to Defendants' False Strikethrough Packs and False Bonus Packs in all material respects—as deceptive practices that would violate the FTC Act.

154.   16 C.F.R.§233.1 states:

(a)   One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b)   A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

155.   California law also prohibits false former pricing schemes. Cal. Bus. & Prof.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

Code §17501, entitled "Value determinations; Former price advertisements," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

156.    As further detailed in the Second Claim for Relief below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id.* §(a)(13).

157.    The False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, False Advancement Stats, Loot Boxes, and Dark Pattern Phone Notifications violate the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and (a)(13).

158.    The False Bonus Packs and Dark Pattern Phone Notifications misrepresent the existence of a sale whereby players can allegedly purchase more items and resources from a pack than they normally could for the same price.

159.    Defendants' use of the False Bonus Packs and Dark Pattern Phone Notifications violates 15 U.S.C. §45(a)(1), 15 U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations, Section 233.

160.    Defendants also violated and continue to violate Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false discounts from purported former prices that were, in fact, not the prevailing market prices within three months preceding the publication and dissemination of advertisements containing the false former prices.

1    161.   Defendants have also violated the "unfair" prong of the UCL by falsely

2    representing that its consumers received a discount from a referenced "original" former

3    price of its False Strikethrough Packs where, in fact, Defendants set an arbitrary price for

4    the goods contained in these packs and then falsely pretended the packs had ever been

5    offered for sale without their supposed discount.

6    162.   Additionally, Defendants have violated the "unfair" prong of the UCL by

7    falsely representing that its False Bonus Packs contained unique and specific increases in

8    items or resources when, in fact, they contained the same resources and in-game items

9    as they always do.

10   163.   Defendants have also violated the "unfair" prong of the UCL by fabricating

11   the popularity of their False Popularity Packs when, in fact, the number of players who

12   have allegedly purchased that item is fictitious.

13   164.   Defendants have further violated the "unfair" prong of the UCL by falsely

14   representing how many other players have advanced in a game-specific event, and as a

15   result induced players to regain their competitive advantage by purchasing packs, when,

16   in fact, those False Advancement Stats are fictitious.

17   165.   Defendants have also violated the "unfair" prong of the UCL by double-

18   charging players for purchased packs and then penalizing players for seeking and

19   obtaining refunds for these double purchases, thereby deterring players from obtaining

20   refunds to which they are entitled.

21   166.   Defendants have also violated the "unfair" prong of the UCL by engaging in

22   predatory practices designed to foster gambling addiction in consumers, in that they: (a)

23   deploy their microtransactions in a way specifically designed to ensnare players into

24   addictive spending habits; (b) falsely create a sense of urgency, scarcity, and value in order

25   to secure addictive high frequency microtransactions, such as by deploying Loot Boxes,

26   which exploit user competitiveness and foster addiction; and (c) use incremental cost step-

27   ups to prevent players from realizing the true cost of the game and how much they have

28   spent. Defendants' goals in engaging in these practices are far outweighed by the harm

37   **FIRST AMENDED CLASS ACTION COMPLAINT**

1   they cause.

2      167.   Defendants have also violated the "unfair" prong of the UCL by engaging in

3   predatory practices designed to foster gambling addiction in consumers through their use

4   of Dark Pattern Phone Notifications, in that they: (a) target players with deceptive

5   messaging even when they are not playing the game; (b) create a false sense of urgency

6   that lures players back to the game, even after they attempt to transition to other activities;

7   and (c) presents notifications as generic when, in fact, they are targeted advertisements

8   tailored to maximize player spending based on each player's unique characteristics.

9   Defendants' goals in engaging in these practices are far outweighed by the harm they

10   cause.

11      168.   These acts and practices are unfair because they were likely to cause

12   consumers to falsely believe that Defendants were offering value, discounts, or bargains

13   from the prevailing market value or worth of the products sold that do not, in fact, exist. As

14   a result, purchasers (including Plaintiffs) reasonably understood that they were receiving

15   valuable price reductions on purchases of in-game items. This, in turn, has induced

16   reasonable purchasers to buy such products from Defendants that they would not have

17   otherwise purchased.

18      169.   The gravity of the harm to Plaintiffs and members of the Classes resulting

19   from these unfair acts and practices outweighs any conceivable reasons, justifications, or

20   motives that Defendants may have had for engaging in such deceptive acts and practices.

21      170.   Additionally, Defendants have violated the "fraudulent" prong of the UCL

22   because their marketing and advertising materials included false "original" prices for its

23   False Strikethrough Packs, and because these same materials also suggested that the

24   offers in the False Bonus Packs and False Limited Availability Packs were unique, limited,

25   and would no longer be available at those price points following the conclusion of its sale

26   events. In actuality, the packs never contained the limited-time deals or discounts they

27   purported to offer.

28      171.   Defendants' acts and practices deceived Plaintiffs and the Classes at large.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   Specifically, Plaintiffs and the Classes relied on these misleading and deceptive

2   representations regarding the limited-time bonuses they could expect to receive in the

3   packs. Each of these representations and deceptions played a substantial role in Plaintiffs'

4   decisions to purchase the packs, and Plaintiffs would not have done so in the absence of

5   such representations.

6       172.   Plaintiffs and the Classes never received the benefit of their bargains with

7   Defendants, in that the "discounted" resources offered for sale in the packs did not give

8   them the anticipated competitive edge against their opponents. Competitors could simply

9   purchase packs at the same false sale pricing, or with the same number of items, or the

10  same pack availability notwithstanding representation that these were limited-time offers.

11      173.   Similarly, players who purchased the False Bonus Packs and the False

12  Strikethrough Packs defensively (to protect against becoming overpowered by opponents

13  who they believed had been able to take advantage of the purportedly limited-time

14  bonuses) were deprived of the benefit of their bargains, because the threat itself was a

15  fabrication. There was never a risk of falling behind due to a player's failure to purchase

16  items at their discounted price, because the price was always discounted.

17      174.   As a result of these violations under each of the fraudulent, unfair, and

18  unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of

19  Plaintiffs and members of the proposed Classes. Specifically, Defendants have been

20  unjustly enriched by obtaining revenues and profits that they would not otherwise have

21  obtained absent their false, misleading, and deceptive conduct.

22      175.   Through their unfair acts and practices, Defendants have improperly

23  obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this

24  Court cause Defendants to restore this money to Plaintiffs and all class members, and to

25  enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future.

26  Otherwise, Plaintiffs, the class members, and members of the general public may be

27  irreparably harmed and/or denied an effective and complete remedy if such an order is not

28  granted.

**SECOND CLAIM FOR RELIEF**

**Violation of California's False Advertising Law ("FAL")**

**Cal. Business & Professional Code §17500 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

176.    Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

177.    The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

178.    Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

179.    The False Strikethrough Packs and the False Bonus Packs misrepresent the existence of a sale whereby players can allegedly purchase packs at a discounted price, or with an increased percentage of items or resources. The False Limited Availability Packs misrepresent the exclusive nature, and therefore competitive value, of the packs. The False Popularity Packs misrepresent how many competitors have actually purchased any pack.

180.    Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all class members, and to prevent Defendants from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiffs, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

//

//

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**THIRD CLAIM FOR RELIEF**

**Violation of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §1750 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

181.   Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

182.   Plaintiffs and the other class members are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

183.   Defendants are "persons" within the meaning of Cal. Civ. Code §§1761(c) and 1770, and they sell "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

184.   SOS and the in-app purchases are a "good" or "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b).

185.   Defendants have violated Cal. Civ. Code. §1770(a)(5)'s proscription against representing that goods have characteristics, uses, benefits, or quantities that they do not have. The False Limited Availability Packs represent that they have the benefit of conferring a competitive advantage, and the False Advancement Stats represent that those who purchase packs have the benefit of maintaining a competitive advantage, but those benefits are illusory.

186.   Defendants have violated Cal. Civ. Code. §1770(a)(9)'s proscription against advertising goods or services with intent not to sell them as advertised. The False Bonus Packs falsely advertise that a pack of goods has extra value by containing a significant increase in items or resources relative to normal versions of the same pack. The False Limited Availability Packs falsely indicate that a particular pack can only be purchased a finite number of times by competing players.

187.   Defendants have violated Cal. Civ. Code. §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or

41

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1   amounts of, price reductions by misrepresenting the existence of discounts via False

2   Strikethrough Packs, misrepresenting the existence of special sales through their False

3   Bonus Packs, and misrepresenting the exclusive nature, and therefore competitive value,

4   of the packs through their False Limited Availability Packs.

5       188.   Defendants have violated Cal. Civ. Code. §1770(a)(14)'s proscription against

6   representing that the purchase conferred rights or obligations that it did not have. The False

7   Limited Availability Packs falsely represent that the purchase confers the right of a

8   competitive advantage, which it does not. False Advancement Stats, which induce players

9   to purchase packs, falsely represent that the purchase confers the right to maintain a

10  competitive advantage, which it does not.

11      189.   Defendants have violated Cal. Civ. Code. §1770(a)(16)'s proscription against

12  representing that the subject of a transaction has been supplied in accordance with a

13  previous representation when it has not by misrepresenting that the purchasers have

14  received a competitive advantage in the game by purchasing "sale" and "limited

15  availability" items.

16      190.   Defendants have violated Cal. Civ. Code. §1770(a)(17)'s proscription against

17  representing that the consumer will receive an economic benefit, if the earning of the

18  benefit is contingent on an event to occur subsequent to the consummation of the

19  transaction, by misrepresenting that the purchaser of False Limited Availability Packs

20  would receive an economic benefit (*i.e.*, more goods than other players) and therefore a

21  competitive advantage as compared to players who did not take advantage of limited-

22  availability sales. The economic benefit is contingent on other players not purchasing those

23  same packs, but there is not actually a limited supply of packs.

24      191.   On September 23, 2022, Plaintiffs, through counsel, sent a CLRA demand to

25  Defendants that provided notice of Defendants' violation of the CLRA and demanded that

26  it correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive

27  practices complained of herein. The letter also stated that if Defendants refused to do so,

28  Plaintiffs would seek damages in this action pursuant to the CLRA.

1    192.    Defendants failed to rectify the problems associated with the actions detailed

2    above. Thus, pursuant to Cal. Civ. Code. §1782, Plaintiffs now seek actual, punitive, and

3    statutory damages, as appropriate, against Defendants pursuant to the CLRA.

4    193.    Plaintiffs and the other class members suffered actual damages as a direct

5    and proximate result of the Defendants' actions, concealment, and/or omissions in the

6    advertising, marketing, and promotion of its bait apps, in violation of the CLRA, as

7    evidenced by the substantial sums Defendants pocketed.

8    194.    Plaintiffs, on behalf of themselves and the class members, demand judgment

9    against Defendants for injunctive relief and attorney's fees.

10    195.    Additionally, Plaintiffs, on behalf of themselves and the class members, seek

11    compensatory damages for losses sustained as a result of Defendants' actions.

12    196.    Additionally, Plaintiffs, on behalf of themselves and the class members, seek

13    enhanced and punitive damages as authorized under the CLRA.

**FOURTH CLAIM FOR RELIEF**

**Fraud**

**(By Plaintiffs, individually and on behalf of All Classes)**

17    197.    Plaintiffs incorporate by reference all allegations in this First Amended

18    Complaint and restate them as if fully set forth herein.

19    198.    Defendants represented to all Plaintiffs that various purchased packs were

20    on sale in that they were offered at a lower price than normal, that certain packs were

21    offered with an increased percentage of items and resources compared to their normal

22    counterparts, that pack purchases were only available in limited quantities, and that certain

23    packs were purchased by many other players.

24    199.    These representations were false because the packs were never offered at

25    higher prices, the increased percentage versions of the packs were identical to their normal

26    counterparts, the packs were not actually available in scarce quantities to other players in

27    the State or to the individual player making the purchases, and the stated number of other

28    players that had purchased the packs was fictitious.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    200.    Defendants    intentionally    designed    the    graphical    images    on    the
2    advertisements to attract Plaintiffs to the enticing but false claims regarding the existence
3    of sales, item and resource bonuses, and artificial scarcity.

4    201.    Plaintiffs reasonably relied upon the claims made in the advertisements in
5    deciding to purchase the aforementioned packs.

6    202.    Upon purchasing the packs, Plaintiffs were harmed because, had Plaintiffs
7    known the claims were false, they would not have made those purchases.

8    203.    Plaintiffs'    reliance    on    Defendants'    misrepresentations    in    its    pack
9    advertisements was a substantial factor in causing harm to Plaintiffs.

10    204.    Defendants' conduct has therefore caused and is causing immediate and
11    irreparable injury to Plaintiffs and the class members and will continue to both damage
12    Plaintiffs and the class members and deceive the public unless enjoined by this Court.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

### (By Plaintiffs, individually and on behalf of All Classes)

16    205.    Plaintiffs incorporate by reference all allegations in this First Amended
17    Complaint and restate them as if fully set forth herein.

18    206.    Defendants misrepresented the value of the items or resources purchased
19    in the False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs,
20    False Popularity Packs, Loot Boxes, any packs purchased after viewing False
21    Advancement Stats or Dark Pattern Phone Notifications, or any packs for which Plaintiffs
22    were double charged.

23    207.    Plaintiffs spent tens, if not hundreds, of thousands of dollars each on items
24    and resources, induced by Defendants.

25    208.    It would be unfair for Defendants to keep the money spent without
26    compensating Plaintiffs.

27    //

28    //

44

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**SIXTH CLAIM FOR RELIEF**

**Violation of 73 Pa. Stat. Ann. §201-3**

**(By Bryan Kauffman, individually and on behalf of the Pennsylvania Class)**

209. Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

210. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 Pa. Stat. Ann. §201-3.

211. Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of SOS and the in-app purchases constitute "trade and commerce" under 73 Pa. Stat. Ann. §201-2(3).

212. Defendants have violated §201-2(4)(v)'s proscription against representing that goods have characteristics, uses, benefits, or quantities that they do not have. The False Limited Availability Packs represent that they have the benefit of conferring a competitive advantage, and the False Advancement Stats represent that those who purchase packs have the benefit of maintaining a competitive advantage, but those benefits are illusory.

213. Defendants have violated §201-2(4)(ix)'s proscription against advertising goods or services with intent not to sell them as advertised. The False Bonus Packs falsely advertise that a pack of goods has extra value by containing a significant increase in items or resources relative to normal versions of the same pack. The False Limited Availability Packs falsely indicate that a particular pack can only be purchased a finite number of times by competing players.

214. Defendants have violated §201-2(4)(xi)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts via False Strikethrough Packs, misrepresenting the existence of special sales through their False Bonus Packs, and misrepresenting the exclusive nature, and therefore competitive value, of the packs

45

**FIRST AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  through their False Limited Availability Packs.

2  215.  Defendant's deceptive acts and practices, and misrepresentations and

3  omissions, have deceived Plaintiff, and those same business practices have deceived or

4  are likely to deceive members of the consuming public and the other members of the Class.

5  216.  As a direct and proximate result of Defendants' acts and practices, Plaintiff

6  and the other Pennsylvania Class members have suffered ascertainable loss and actual

7  damages.

**SEVENTH CLAIM FOR RELIEF**

**Violation of N.Y. Gen. Bus. Law §§349 & 350**

**(By Cyrenna Dewhurst, individually and on behalf of the New York Class)**

11  217.  Plaintiffs incorporate by reference all allegations in this First Amended

12  Complaint and restate them as if fully set forth herein.

13  218.  Plaintiff Cyrenna Dewhurst hereby brings this Claim, under New York

14  General Business Law §§349 & 350, against Defendants on behalf of herself and the New

15  York Class.

16  219.  Defendants' conduct was misleading, deceptive, unlawful, fraudulent, and

17  unfair by virtue of offering False Strikethrough Packs, False Bonus Packs, False Limited

18  Availability Packs, False Popularity Packs, and Loot Boxes as in-app purchases for sale.

19  220.  Defendants caused to be disseminated through New York State and

20  elsewhere, through advertising, marketing, and other publications, statements that were

21  untrue and misleading, and which it knew were untrue and misleading.

22  221.  Defendants' misrepresentations were material and substantially uniform in

23  content, presentation, and impact upon consumers at large. Consumers were and continue

24  to be exposed to Defendants' material misrepresentations.

25  222.  Plaintiff and the New York Class members have been injured by Defendants'

26  deceptive acts or practices.

27  223.  Plaintiff and the New York Class members have no adequate remedy at law.

28  224.  Defendants' conduct has caused and is causing immediate and irreparable

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  injury to Plaintiff and the New York Class and will continue to both damage Plaintiff and

2  the New York Class and deceive the public unless enjoined by this Court.

3      225.   Any person who has been injured by reason of any violation of NY GBL §349

4  may bring an action in his or her own name to enjoin such unlawful acts or practices, an

5  action to recover their actual damages or $50, whichever is greater, or both such actions.

6  The court may, in its discretion, increase the award of damages to an amount not

7  exceeding three times the actual damages, in addition to $1,000 per violation, if the court

8  finds that a defendant willfully or knowingly violated this section. The court may award

9  reasonable attorney's fees to a prevailing plaintiff.

10      226.   Pursuant to NY GBL §350(e) Plaintiff and the New York Class seek

11  monetary damages (including actual damages, or $500, whichever is greater, and

12  minimum, punitive, or treble and/or statutory damages pursuant to NY GBL §350(a1)),

13  injunctive relief, restitution, and disgorgement of all monies obtained by means of

14  Defendants' unlawful conduct, interest, and attorney's fees and costs.

**EIGHTH CLAIM FOR RELIEF**

**Violation of Washington's Consumer Protection Act (RCW 19.86.020)**

**(By Plaintiff Derik Niederquell, individually and on behalf of the Washington Class)**

18      227.   Plaintiffs incorporate by reference all allegations in this First Amended

19  Complaint and restate them as if fully set forth herein.

20      228.   Plaintiff Derik Niederquell hereby brings this Claim, under Washington's

21  Consumer Protection Act, Revised Code of Washington ("RCW") 19.86.020, against

22  Defendants on behalf of himself and the Washington Class.

23      229.   Defendants engage in acts and practices that had or have the capacity to

24  deceive substantial portions of the public, during trade or commerce.

25      230.   Defendants' marketing of its False Strikethrough Packs, False Bonus Packs,

26  False Limited Availability Packs, False Popularity Packs, False Advancement Stats, and

27  Loot Boxes had and have the capacity to deceive substantial portions of the public because

28  Defendants' advertisements create the illusion of sales and/or discounts with respect to

1  their False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs,
2  False Popularity Packs, False Advancement Stats, and Loot Boxes.

3      231.   Defendants' deceptive advertising acts and practices significantly affected
4  the public interest as thousands of consumers made purchases based on the
5  representations in the advertisements.

6      232.   Defendants' practices brought injury to Plaintiff and the Washington Class in
7  that they made purchases they otherwise would not have made.

8      233.   There is causation between the deceptive advertising and the injury suffered
9  by Plaintiff and the Washington Class because, if not for Defendants' deceptive claims
10  made in the advertisements of False Strikethrough Packs, False Bonus Packs, False
11  Limited Availability Packs, False Popularity Packs, False Advancement Stats, and Loot
12  Boxes, Plaintiff and the Washington Class would not have purchased those packs.

13      234.   Defendants' conduct has therefore caused and is causing immediate and
14  irreparable injury to Plaintiff and the Washington Class members, and will continue to both
15  damage Plaintiff and the Washington Class members and deceive the public unless
16  enjoined by this Court.

## PRAYER FOR RELIEF

18      **WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray
19  for relief and judgment against Defendants as follows:

20      (a)   Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil
21             Procedure, appointing Plaintiffs as representatives of the Classes, and
22             designating Plaintiffs' counsel as class counsel;

23      (b)   Awarding Plaintiffs and the class members compensatory damages and
24             actual damages in an amount exceeding $5,000,000, to be determined by
25             proof;

26      (c)   Awarding Plaintiffs and the class members appropriate relief, including actual
27             and statutory damages;

28      (d)   For punitive damages;

48

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

(e)   For civil penalties;

(f)   For declaratory and equitable relief, including a declaration that Defendants violated and have continued to violate California's UCL, the FAL, and the CLRA and an injunction requiring Defendants to comport with California Business & Professions Code §§17200, *et seq*., and restitution and disgorgement;

(g)   For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

(h)   Awarding Plaintiffs and the class members the costs of prosecuting this action, including expert witness fees;

(i)   Awarding Plaintiffs' and the class members' reasonable attorney's fees and costs as allowable by law;

(j)   Awarding Plaintiffs and the class members reasonable attorney's fees pursuant to Cal. Civ. Proc. Code §1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorney's fees;

(k)   Awarding Plaintiffs and the class members reasonable attorney's fees and costs, as well as injunctive relief, pursuant to the CLRA;

(l)   Awarding pre-judgment and post-judgment interest; and

(m)   Granting any other relief as this Court may deem just and proper.

Respectfully Submitted,

DATED: March 10, 2023                   **KRONENBERGER ROSENFELD, LLP**

By:   ___s/ Karl S. Kronenberger_____
                Karl S. Kronenberger

**POLLOCK COHEN LLP**
Raphael Janove (admitted *pro hac vice*)
rafi@pollockcohen.com

49

**FIRST AMENDED CLASS ACTION COMPLAINT**

Adam Pollock (admitted *pro hac vice*)
adam@pollockcohen.com
George Krebs (admitted *pro hac vice*)
gkrebs@pollockcohen.com
111 Broadway, Ste. 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903
*pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Classes*

**DEMAND FOR JURY TRIAL**

Plaintiffs, by and through their undersigned counsel, hereby demand a trial by jury for all questions of fact that can be decided by a jury in the above-entitled action.

Respectfully Submitted,

DATED: March 10, 2023                    **KRONENBERGER ROSENFELD, LLP**

By:  ___s/ Karl S. Kronenberger_____
                    Karl S. Kronenberger

Attorneys for Plaintiffs and the Proposed Classes