**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (admitted *pro hac vice*)
kate@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**                          **JAY KUMAR LAW**
Raphael Janove (admitted *pro hac vice*)       Jay Kumar (*pro hac vice* forthcoming)
rafi@pollockcohen.com                          jay@jaykumarlaw.com
Adam Pollock (admitted *pro hac vice*)         73 W. Monroe Street, Suite 100
adam@pollockcohen.com                          Chicago, IL 60603
George Krebs (admitted *pro hac vice*)         Telephone: (312) 767-7903
gkrebs@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| **ANGELA PRADO, STACI TURNER, KIMBERLY SURETTE, BRYAN KAUFFMAN, CYRENNA DEWHURST, DERIK NIEDERQUELL, HERIBERTO SANTANA, and PAUL MAZEY** on behalf of themselves and all others similarly situated, | Case No. 4:22-cv-5023-YGR **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| **FUNPLUS INTERNATIONAL AG,** a Swiss public limited company, and **KINGSGROUP HOLDINGS**, a Cayman Islands corporation, | |
| Defendants. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

PARTIES ................................................................................................................... 4

JURISDICTION AND VENUE ..................................................................................... 11

DIVISIONAL ASSIGNMENT ...................................................................................... 12

FACTUAL ALLEGATIONS ......................................................................................... 12

    A.  State of Survival: A Highly Profitable "Freemium App" ................................ 12

    B.  State of Survival Game Play: Microtransactions and Feedback Loops ........... 14

    C.  Defendants' Deceptive Pack Advertisements ............................................. 19

        1.    False Strikethrough Packs .............................................................. 20

        2.    False Bonus Packs.......................................................................... 22

        3.    False Limited Availability Packs ........................................................ 24

        4.    False Popularity Packs .................................................................... 26

        5.    False Advancement Stats ................................................................ 27

        6.    Loot Boxes ................................................................................... 27

    D.  Double-Charging and Purchase Banning .................................................... 31

    E.  Dark Pattern Phone Notifications .............................................................. 32

    F.  Device Takeover and Privacy Violations ..................................................... 33

CLASS ALLEGATIONS ............................................................................................. 35

CALIFORNIA LAW APPLIES TO ALL CLASSES .......................................................... 39

FIRST CLAIM FOR RELIEF........................................................................................ 40

SECOND CLAIM FOR RELIEF ................................................................................... 46

THIRD CLAIM FOR RELIEF ....................................................................................... 47

FOURTH CLAIM FOR RELIEF ................................................................................... 49

FIFTH CLAIM FOR RELIEF ....................................................................................... 50

SIXTH CLAIM FOR RELIEF ....................................................................................... 51

SEVENTH CLAIM FOR RELIEF ................................................................................. 52

EIGHTH CLAIM FOR RELIEF.................................................................................... 52

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  NINTH CLAIM FOR RELIEF ........................................................................... 53

2  TENTH CLAIM FOR RELIEF .......................................................................... 54

3  ELEVENTH CLAIM FOR RELIEF ................................................................... 54

4  TWELFTH CLAIM FOR RELIEF ..................................................................... 57

5  THIRTEENTH CLAIM FOR RELIEF ............................................................... 58

6  FOURTEENTH CLAIM FOR RELIEF.............................................................. 59

7  FIFTEENTH CLAIM FOR RELIEF .................................................................. 60

8  PRAYER FOR RELIEF ................................................................................... 61

9  DEMAND FOR JURY TRIAL........................................................................... 63

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Plaintiffs Angela Prado, Staci Turner, Kimberly Surette, Bryan Kauffman, Cyrenna
2   Dewhurst, Derik Niederquell, Heriberto Santana, and Paul Mazey (collectively, "Plaintiffs"),
3   on behalf of themselves and all others similarly situated, by and through their attorneys,
4   for their First Amended Class Action Complaint against FunPlus International AG and
5   KingsGroup Holdings (collectively, "Defendants" or "FunPlus") allege, on knowledge as to
6   their own actions, the investigation of Plaintiffs' counsel, and otherwise upon information
7   and belief, as follows:

8   **PRELIMINARY STATEMENT**

9   1.    This is a class action lawsuit against FunPlus for falsely advertising price
10   discounts for in-game purchases and other deceptive and unfair business practices in its
11   mobile application game (or "app"), State of Survival ("SOS"). SOS is among the highest
12   grossing mobile strategy games across both Apple and Android devices, with over 100
13   million downloads and an estimated revenue in excess of $80 million per month.

14   2.    Since its 2019 inception, SOS has generated over a billion dollars in revenue
15   by offering players "microtransactions"—the ability, while in the game, to make discrete in-
16   app purchases of in-game valuables necessary to level up one's account. These in-app
17   purchases, or "packs," generally range in price from $0.99 to $99.99 each.

18   3.    However, in its direct marketing to consumers (including representations
19   made at the time of purchase), FunPlus advertises false former prices to induce players
20   into believing they must act quickly to take advantage of a limited-time sale price.

21   4.    Since SOS launched in 2019 and continuing to the present day, FunPlus
22   deceives consumers by offering specific limited-time "bonuses" that purport to massively
23   discount the price of its in-game goods. It uses strikethrough pricing and percentages to
24   trick consumers into believing they are benefitting from limited-time promotions that
25   substantially increase the value of their in-game purchases, especially in relation to
26   purchases made by competing players. These purported savings are false, however,
27   because the original pricing that these ads reference are fabricated.

28   5.    These advertisements have run for years. But at no point, let alone within

1
**SECOND AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1   three months of the advertised discounts, have these in-game items ever actually been

2   offered at a non-discounted price—*i.e.*, **without** their "limited time" discounts. In other

3   words, FunPlus never sells these items at their "original" price. It offers false discounts

4   from an original price that did not exist, and its players bought packs on "sale" that were

5   the same prices they would ordinarily pay.

6       6.      Furthermore, the advertised "original" pricing does not reflect the prevailing

7   market retail pricing for these virtual in-game items, which have no real-world value and

8   whose pricing is entirely determined by FunPlus.

9       7.      The Federal Trade Commission ("FTC") describes these kinds of false former

10  pricing schemes as deceptive:

> One of the most commonly used forms of bargain advertising is to offer a
> reduction from the advertiser's own former price for an article. If the former
> price is the actual, bona fide price at which the article was offered to the
> public on a regular basis for a reasonably substantial period of time, it
> provides a legitimate basis for the advertising of a price comparison. Where
> the former price is genuine, the bargain being advertised is a true one. If,
> on the other hand, the former price being advertised is not bona fide but
> fictitious – for example, where an artificial, inflated price was established for
> the purpose of enabling the subsequent offer of a large reduction – the
> "bargain" being advertised is a false one; the purchaser is not receiving the
> unusual value he expects.

18  16 C.F.R. §233.1(a).

19      8.      California statutory and regulatory law also expressly forbid such pricing

20  schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

> No price shall be advertised as a former price of any advertised thing,
> unless the alleged former price was the prevailing market price as above
> defined within three months next immediately preceding the publication of
> the advertisement or unless the date when the alleged former price did
> prevail is clearly, exactly and conspicuously stated in the advertisement.

25      9.      Defendants' tactics to induce players to spend tens, if not hundreds of

26  thousands of dollars each on purchases fall directly within the dark patterns—manipulative

27  design practices—the FTC identified in its September 2022 report, *Bringing Dark Patterns*

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   *to Light.*[1]

2         10.     As the FTC Staff Report—Bringing Dark Patterns to Light explains,

3   "SCARCITY," such as a "False Low Stock Message," "[c]reate[s] pressure to buy

4   immediately by saying inventory is low when it isn't."

5         11.     "URGENCY," like a "Baseless Countdown Timer" or "False Limited Time

6   Message" or "False Discount Claims" also "[c]reate[s] pressure to buy immediately."

7         12.     Defendants knew, or reasonably should have known, that their comparative

8   price advertising is false, deceptive, misleading, and unlawful.

9         13.     Defendants have fraudulently concealed from and intentionally failed to

10  disclose to Plaintiffs and the putative class members the truth about their advertised price

11  discounts and former prices.

12        14.     Through this false and deceptive marketing, advertising, and pricing scheme,

13  FunPlus has violated California law prohibiting the advertisement of goods for sale as

14  discounted from false former prices and prohibiting misleading statements about the

15  existence and amount of price reductions.

16        15.     The claims and issues asserted herein are governed by California state law.

17  The State of California has the greatest interest in policing corporate conduct occurring

18  within the State.

19        16.     Upon information and belief, the false advertisements and misleading

20  statements emanated from the State of California, where FunPlus's key executives,

21  subsidiaries, and offices are located.

22        17.     Plaintiffs, individually and on behalf of all others similarly situated, hereby

23  seek restitution, injunctive relief, punitive damages, attorney's fees, and all other relief

24  which the Court may deem appropriate.

25  //

26  _____

27  [1] FTC Staff Report, *Bringing Dark Patterns to Light* (Sept. 14, 2022), available at
    https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%
    209.14.2022%20-%20FINAL.pdf [hereafter FTC Staff Report—Bringing Dark Patterns to

28  Light].

Case No. 4:22-cv-5023-YGR                            **SECOND AMENDED CLASS ACTION**
                                    3                **COMPLAINT**

**PARTIES**

18.     Plaintiff Angela Prado is a resident of California. She began playing SOS in approximately October 2019. She purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes (defined below); and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications (defined below), which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases. She was also double charged for in-app purchases. She quit playing SOS on September 27th, 2022 and subsequently never logged into the game. At no point was she solicited to agree to any Terms of Service during her time playing the game.

19.     Plaintiff Staci Turner is a resident of Ohio. She began playing SOS in approximately November 2019. She purchased False Strikethrough Packs, False Bonus Packs, and False Limited Availability Packs which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases. She was also double charged for in-app purchases. She opted out of the arbitration clause of the Terms of Service via email to FunPlus on February 21st, 2023. After opting out, she also quit SOS and subsequently never logged into the game.

20.     Plaintiff Kimberly Surette is a resident of Canada. She began playing SOS in approximately January 2021. She purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications, which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases. She was also double charged for in-app purchases. She declined to agree to the entire Terms of Service and Privacy Policy on November 14th, 2022 after viewing a solicitation prompt from FunPlus via the game's official channel on the social media mobile application Discord.  She has logged in to the game on some occasions after this date.

4
**SECOND AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

21.     Plaintiff Paul Mazey is a resident of England. He began playing SOS in approximately February 2020. He purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications, which he otherwise would not have purchased had he known about the deceptive advertising which he reasonably relied upon in making those purchases. He quit SOS around July 2022 and subsequently never logged into the game. At no point was he solicited to agree to any Terms of Service during his time playing the game.

22.     Plaintiff Bryan Kauffman is a resident of Pennsylvania. He began playing SOS in approximately November 2020. He purchased False Strikethrough Packs, False Bonus Packs, and False Limited Availability Packs; and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications, which he otherwise would not have purchased had he known about the deceptive advertising which he reasonably relied upon in making those purchases. He is currently still playing SOS.

23.     Plaintiff Cyrenna Dewhurst is a resident of New York. She began playing SOS in approximately February 2021. She purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications, which she otherwise would not have purchased had she known about the deceptive advertising which she reasonably relied upon in making those purchases. She was also charged for in-app purchases that she never received in-game. She is currently still playing SOS.

24.     Plaintiff Derik Niederquell is a resident of Washington. He began playing SOS in approximately May 2020. He purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, and Loot Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern Phone Notifications, which he otherwise would not have purchased had he known about the deceptive advertising which he reasonably relied upon in making those purchases. He quit

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   playing SOS on approximately September 11, 2022 and subsequently never logged into

2   the game. At no point was he solicited to agree to any Terms of Service during his time

3   playing the game.

4          25.     Plaintiff Heriberto Santana is a resident of California. He began playing SOS

5   in approximately January 2021. He purchased False Strikethrough Packs, False

6   Percentage Packs, False Limited Availability Packs, False Popularity Packs, and Loot

7   Boxes; and purchased packs after viewing False Advancement Stats and Dark Pattern

8   Phone Notifications, which he otherwise would not have purchased had he known about

9   the deceptive advertising which he reasonably relied upon in making those purchases. He

10  was also double charged for in-app purchases. He quit playing SOS on or about January

11  2023.

12         26.     FunPlus was founded in Silicon Valley, California, apparently with the name

13  Halfquest, and has since gone through various iterations of names including "FunPlus" and

14  "KingsGroup." On information and belief, FunPlus has offices in San Francisco, San Mateo,

15  and Irvine, California. It purportedly moved its headquarters from Silicon Valley to Zug

16  Switzerland in December 2022.[2] Its past and/or present high-level executives are also

17  located in California, including: (a) Yitao Guan, a resident of Menlo Park and FunPlus

18  International's co-founder and Chief Technology Officer; (b) Andy Zhong a/k/a Yingwu

19  Zhong, a resident of San Francisco and co-founder and Chief Executive Officer; (c) Jeremy

20  Horn, a resident of Los Angeles and VP Head of Innovation; (d) Wei Wang, a resident of

21  Irvine and Chief Creative Officer; (e) Michael Tong, a resident of San Francisco and Chief

22  Strategy Officer; (f) James Kavanagh, a resident of Cambria, California and its former,

23  Chief Financial Officer;  (g) Qi Lu, a San Francisco resident and "Founding team member"

24  of FunPlus from October 2009 to March 2018; (h) Jonathan Xu, a Belmont, California

25  resident and former CTO; and (i) Chris Petrovic, FunPlus's Chief Business Officer, and

26  resident of Sonoma, California (who also formerly was a licensed attorney by the California

27

28  [2] https://www.20min.ch/story/darum-ist-der-state-of-survival-entwickler-nach-zug-
    gezogen-797164499556

1 | state bar).

2      27.    Other key high-level of employees also include California residents, such as

3 (k) ZeHong Yin, a San Francisco resident and Principal Architect of game development; (l)

4 Jing Xu, a Riverside, California resident and Senior Marketing Consultant; (m) Eddie Hsu,

5 a San Francisco resident and former Senior Product Manager; (n) Leanne Zhu, a San

6 Francisco resident and Tax Director; (o) Mike Ouye, a San Francisco resident and the

7 former Vice President, Growth & General Manager; (p) Josh Burns, a San Francisco

8 resident and the Senior Director, Business Development for the North American Market.

9      28.    Defendant FunPlus International AG ("FunPlus International") is a Swiss

10 public limited company. FunPlus International was previously known as (i) KingsGroup

11 Europe SA, (ii) KingsGroup International AG, and (iii) KingsGroup International SA. Its

12 directors include Yingwu Zhong (a/k/a Andy Zhong).

13      29.    Defendant KingsGroup Holdings is a Cayman Islands corporation. Yingwu

14 Zhong (a/k/a Andy Zhong), a California resident, is one of its two directors. FunPlus has

15 claimed that "KingsGroup Games is a key part of @FunPlusGames" and credits it for

16 creating State of Survival, King of Avalon, and Guns of Glory. KingsGroup Holdings has

17 also listed Irvine, California as its address in connection with trademark applications, such

18 as for its registered trademark "Imagendary Studios."

19      30.    Both the Google Play store and the Apple App Store have listed "KingsGroup

20 Holdings" from at least 2019 through 2022 as the creator and purveyor of State of Survival,

21 such as illustrated by the images below:

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108



31.     Up until February 2, 2022, on the load screen for the game, only a KingsGroup logo appeared. After that day, the load screen used both a KingsGroup and FunPlus logo. A game moderator explained the change to players on the discord app stating that "Nothing changed in the game itself, we've just decided to make our parent brand, FunPlus, more visible."



32.     Receipts for in-app purchases have listed KingsGroup Holdings as the entity

the receipts were "purchased from," as illustrated below:

| PURCHASED FROM | PURCHASED FROM |
|---|---|
| KingsGroup Holdings | KingsGroup Holdings |
| Fuli Wang | Fuli Wang |
| 15/F., BOC Group Life Assurance Tower,136 Des | 15/F., BOC Group Life Assurance Tower,136 Des |
| Voeux Road Central | Voeux Road Central |
| Hong Kong | Hong Kong |

**SECOND AMENDED CLASS ACTION COMPLAINT**

33.     Receipts have referenced KingsGroup associated with a California address, even as recent as December 2022:



34.     Defendants have also explained to users that "KingsGroup Studio is part of the broader FunPlus group. In order to harmonize all our games and services under the FunPlus brand, we decided to update all player accounts to FunPlus."

35.     Defendants removed the KingsGroup logo from the game launch screen on or about August 1, 2023.

36.     Defendants have operated through an opaque corporate structure. On information and belief, Defendants conduct business or have conducted business—and employed the individuals listed above—through the businesses listed in the preceding paragraphs as well as (i) Funplus Interactive USA Inc. d/b/a FunPlus Interactive USA LLC, a Delaware company with its principal place of business in San Francisco, California; (ii) Imagendary USA, LLC f/k/a FunPlus Interactive USA LLC f/k/a KingsGroup USA, LLC, a Delaware company, with its principal place of business in San Francisco, California; (iii) KingsGroup America AG, a Switzerland corporation; (iv) KingsGroup USA, LLC, a Delaware company with its principal place of business in San Mateo, California; and other various entities that use the phrases FunPlus or Kings Group, such as (v) FunPlus

10   **SECOND AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  International Ltd.; (vi) KingsGroup International AG; (vii) KingsGroup International SA; (viii)

2  KingsGroup America AG; as well as other related entities, such as (ix) Xterio Stiftung,

3  which ostensibly employs Yitao Guan,[3] the co-founder and CEO of FunPlus, who is also a

4  California resident, and also employs Jeremy Horn, FunPlus's VP of Head of Innovation

5  who is also a California resident.

6      37.    On information and belief, Defendants' games, including State of Survival,

7  King of Avalon, and Guns of Glory, have been downloaded by numerous California

8  residents and California gamers have made in-app purchases well in excess of millions of

9  dollars given the size of the California population and that Defendants have netted billions

10  in revenue from these games, which have been downloaded hundreds of millions of times.

11  Discovery will reveal the extent of the substantial California-based revenue Defendants

12  have made and the massive numbers of consumers in California who have downloaded

13  Defendants' games.

14      38.    Defendants are and at all relevant times were alter egos of one another, in

15  that they failed to maintain separate corporate identities, failed to observe corporate

16  formalities, and hold themselves out to the public as interchangeable.

17  **JURISDICTION AND VENUE**

18      39.    This Court has jurisdiction over this action under the Class Action Fairness

19  Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because

20  the aggregate claims of the putative class members exceed $5 million, exclusive of interest

21  and costs, and at least one of the members of the proposed classes is a citizen of a

22  different state than Defendants.

23      40.    This Court has personal jurisdiction over Defendants because they have

24  offices and key executives in this District, committed the tortious acts alleged herein in this

25  District, regularly conduct business in this District, and have extensive contacts with this

26  forum.

27      [3] https://www.businesswire.com/news/home/20220830005332/en/Game-Publisher-and-

28  Developer-Xterio-Raises-40M-Led-by-FunPlus-FTX-Ventures-Makers-Fund-XPLA-and-More-to-Create-the-Next-Great-Cross-platform-Web3-Franchises

Case No. 4:22-cv-5023-YGR       11      **SECOND AMENDED CLASS ACTION COMPLAINT**

1    41.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a

2  substantial part of the events or omissions giving rise to the claim occurred in this District.

3    42.    In addition, venue is proper in this District under 28 U.S.C. §1391(b)(1), in

4  that Defendants reside in this District and are subject to this Court's personal jurisdiction.

5    43.    In the alternative, venue is proper in this District under §1391(b)(3), to the

6  extent there is no district in which an action may otherwise be brought under 28 U.S.C.

7  §1391(b)(1) – (2), because Defendants are subject to this Court's personal jurisdiction.

8                            **DIVISIONAL ASSIGNMENT**

9    44.    Because a substantial part of the events which give rise to Plaintiffs' claims

10  occurred in San Francisco and San Mateo counties, pursuant to Local Civil Rule 3-2, this

11  case has already been assigned to the Oakland Division through its assignment to the

12  Hon. Yvonne Gonzalez Rogers.

13                             **FACTUAL ALLEGATIONS**

14  **A.     State of Survival: A Highly Profitable "Freemium App"**

15    45.    SOS is a mobile application strategy game developed and operated by

16  Defendants and available on iPhone and Android devices through the Apple App Store

17  and Google Play platforms. It is a zombie-themed, post-apocalyptic survival game.

18    46.    Since its creation in 2019, SOS has consistently ranked among the most

19  downloaded mobile game apps on the Apple and Android app stores. By 2021, the game

20  had been downloaded over 100 million times and has generated over $1 billion in revenue.

21    47.    SOS belongs to a category of apps known as "freemium" apps. A freemium

22  app is one in which users do not have to pay to play a fully functional game—the game is

23  free to download and start playing.

24    48.    The term freemium is a misnomer, as users are given multiple purchase

25  opportunities, known as microtransactions or in-app purchases ("IAPs"), to augment their

26  playing experience. Users can buy in-game currency, weapons, garments, and even time.

27    49.    The popularity of freemium apps featuring in-app purchases has

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  skyrocketed. In 2022, 97% of apps in the Google Play app store were free-to-download.[4]

2  Even so, in-app purchases accounted for 48.2% of mobile app earnings.[5] SOS has

3  generated over one billion dollars since its creation.

4        50.    Because users can try the app for free, freemium apps acquire new users

5  more rapidly than purchase-to-play apps. Enabling microtransactions at various points

6  throughout game play allows users time to develop app loyalty and engagement before

7  having to pay anything. The continued microtransactions also remove the upper limit of

8  user spending.[6]

9        51.    Most of freemium app revenue is generated by big-spending "whales." In

10  2017, just 6 percent of customers on Apple's App Store accounted for 88 percent of all

11  spending on games.[7]

12        52.    SOS has generated well over a billion dollars in revenue since its inception.

13  It generates this revenue by offering players "microtransactions," or discrete in-app

14  purchases that allow players to advance in the game. These purchases include building

15  materials, hero "badges," speed-ups, and other valuables. An "in-app purchase" refers to

16  a financial transaction initiated from within the mobile application itself. The most common

17  form of in-app purchases are for bundled groups of resources, or "packs," generally ranging

18  in price from $0.99 to $99.99 each.

19        53.    Players engage in "microtransactions" to purchase items that are necessary

20  to progress their account further and maintain competitiveness with other players. This

21  business model contrasts with that of many other popular free apps which offer only non-

22  essential or cosmetic items for purchase. Because SOS offers in-app purchases that

23  advance one's account in direct proportion to the amount of money spent by a player, and

24  confer advantages not reasonably attainable by in-game labor alone, it is most accurately

25

26  _____

[4] https://www.statista.com/statistics/263797/number-of-applications-for-mobile-phones.

27  [5] https://www.businessofapps.com/guide/in-app-purchases.

[6] Savannah Wei Shi, et al., *From Minnows to Whales: An Empirical Study of Purchase*

28  *Behavior in Freemium Social Games*, Int'l J. of Elec. Com. (2015).

[7] *Epic Games, Inc., v. Apple Inc.*, 559 F. Supp. 3d 898, 954 (N.D. Cal. 2021).

Case No. 4:22-cv-5023-YGR         **SECOND AMENDED CLASS ACTION**

                         13        **COMPLAINT**

1   classified as a "Pay to Win" mobile game.

2       54.    In other words, a player who spends money in the game will be more

3   powerful in relation to players who choose not to spend money in the game. The game

4   leverages this by bombarding players with advertisements and invitations to buy additional

5   packs and resources whenever they reach a point in the game where their progress has

6   stalled. In this way, the game's model is designed to create a sense of urgency around the

7   purchase of in-game resources, and SOS further capitalizes on this sense of urgency by

8   suggesting that purchases are limited-time offerings made available at a substantial

9   discount.

10      55.    The tactics described above are a few of the many deceitful tactics, known

11  as "dark patterns," employed within SOS. "Dark patterns" refer to "a[ny] user interface

12  carefully crafted to trick users into doing things they might not otherwise do," causing

13  players to "engage accidently or unwittingly in monetization activities thereby generating

14  more income for the developer."[8]

15      56.    As the computer and behavioral scientist Chris Lewis writes, "[t]hese dark

16  patterns violate user expectations by encouraging them to give up or jeopardize some

17  resource to an extent that they were not expecting (time, money, social capital)."[9]

18      57.    Indeed, as further described below, many of SOS's tactics to induce players

19  to spend over a billion dollars on a "free game" fall directly within the dark patterns the FTC

20  identified in its September 2022 report, *Bringing Dark Patterns to Light*.[10]

21      **B.    State of Survival Game Play: Microtransactions and Feedback Loops**

22      58.    Once a player creates an account, they are placed automatically into a

23  specific "State," or server, along with several thousand players who also created their

24  accounts at a similar period in time. Thereafter, they are able to begin upgrading the level

---

[8] Dan Fitton, Janet C Read, *Creating a Framework to Support the Critical Consideration of Dark Design Aspects in Free-to-Play Apps*, Assoc. for Computing Machinery 407 (2019), available at https://dl.acm.org/doi/pdf/10.1145/3311927.3323136.

[9] Lewis, *supra* note 11 (internal quotations omitted).

[10] FTC Staff Report—Bringing Dark Patterns to Light.

**SECOND AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  of their "Headquarters" within their settlement, and the buildings within it. They do this to

2  strengthen their combat abilities and therefore maintain a competitive position among other

3  players in the server.

4      59.    The purpose of the game is to advance the strength of one's settlement by

5  upgrading buildings, locating and upgrading heroes, and training a large number of strong

6  troops. The players join large allegiances of other players that compete for dominance

7  within the State through various in-game events.

8      60.    In order to progress past a certain level in the game, it is necessary to

9  purchase in-app "packs" that contain the required items to level up one's account in the

10  game. These essential items require spending real money, as they are otherwise only

11  available in insufficient amounts through in-game labor alone.

12      61.    After a few days of playing and regularly making upgrades, the cost to

13  acquire the materials needed to make subsequent upgrades increases exponentially.

14      62.    In other words, SOS is made up of feedback loops—the output of the system

15  becomes the input for the next iteration of the system. Meaning that every action made in

16  the game gives the user access to future actions, giving users a sense of player progress

17  and motivation.

18      63.    At the beginning of the game the time between input and output is immediate

19  and allows the user to complete the next action right away. But as the user performs more

20  actions and levels up in the game, the time between input and output increases. There

21  comes a point in the game where the user can no longer advance due to the time required

22  to complete the next action. At this point, without making an in-app purchase, the user is

23  at a standstill.

24      64.    Because users are so accustomed to short wait times or using the speed up,

25  skip, or coin (spending in-game resources) features, by the time this standstill occurs (that

26  is, if no additional purchases are made) a user is predisposed to make in-app purchases.[11]

27

28  ───────────────
[11] Chris Lewis, Irresistible Apps: Motivational Design Patterns for Apps, Games, and
Web-based Communities (1st ed. 2014).

**SECOND AMENDED CLASS ACTION
COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

65.     For example, in SOS, to upgrade one's Headquarters to level 2 costs 3,000 wood, one of the many in-game resources that players acquire. The upgrade is completed instantly. But to upgrade one's Headquarters from level 29 to level 30 requires 290 ***million*** wood—nearly 1,000,000% of the amount needed for the initial upgrade. Upgrading to level 30 also requires 290 million food, 81.1 million metal, and 23.2 million gas (all additional in-game resources). Once initiated, this upgrade takes 948 hours to complete, unless players purchase construction speed-up boosters.

66.     If a player does not make any purchases in the game, it would require close to ***16 months*** of playing two hours each day, 365 days a year, to gather the necessary resources to upgrade their Headquarters to level 30. And this is considered to be the first priority upgrade for players; in other words, a player who manages to upgrade their Headquarters to level 30 has only just begun.

67.     Defendants build off the compulsive feedback loops that their game intentionally creates to induce Plaintiffs and other players to spend upwards of hundreds of thousands of dollars each.[12] SOS reminds players that instead of devoting countless hours to progress in the game, they can simply purchase packs. The game designs these upgrades to lure players into spending money on resources.

68.     These upgrades all cost gameplayers significant, real currency. The packs necessary for these upgrades are generally offered at the following prices: $99.99, $49.99,

---

[12] SOS also employs compulsion loops, a sinister-sounding term for a simple process. To create a compulsion loop, game developers make users anticipate a reward, such as a more powerful sword or the prospect of traveling to a new game area. Next, users are given a challenge, such as killing monsters or solving a puzzle. By completing the challenge, the user earns their anticipated reward, which in turn presents or unlocks more challenges for yet more rewards (*e.g.*, the new game area includes a new quest giver). Compulsion loops can lead to compulsive behavior. Adrian Hon, *You've Been Played: How Corporations, Governments, and Schools Use Games to Control Us All*, p. 144. SOS likewise employs treatmills, a refinement of compulsion loops, where incremental gains are constantly doled out, with the intention of engaging players indefinitely. Treatmills are designed to ensure the game occupies an enormous amount of a user's time, stays relevant as long as possible, and as a result maximizes the time where a user might refer the game to a friend. Games can easily consume hundreds of hours of users' time by incrementally unlocking a few more secrets and a few more power-ups after every loop. *Id.* at 152.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

$19.99, $9.99, $4.99, $1.99, and $0.99. The advertisements for a particular pack at different pricing levels usually have similar graphical advertisements but contain varying amounts of items in proportion to their price.

69.     To acquire the resources necessary to reach Headquarters level 30, a player would need to spend approximately $1,400 on packs. However, this cost is never made clear to the player because Defendants know that players would not be willing to pay $1,400 if they were aware of the total cost up front. After all, these are players who specifically selected a free-to-play game instead of spending $20 to $60 on a traditional video game that is available for one-time purchase, and with similar mechanics.

70.     Knowing this, Defendants instead leverage the incremental upgrade system to spread this total cost over 29 separate upgrades, all while keeping consumers in the dark. There is no in-game mechanism to review one's purchase history or the total amount one has spent. Upgrade costs are only shown for those upgrades for which the player is currently eligible, meaning Defendants hide the explosive exponential costs of in-game upgrades until the game's players have already invested months of time and money into the game.

71.     Once players are fully invested, Defendants then use packs to create a false sense of urgency and scarcity to pressure them into making several dozen smaller purchases over a period of days, weeks, or months.

72.     In other words, at no point are players told it will cost them $1,400 to upgrade their Headquarters to level 30. Instead, they are bombarded with an endless series of advertisements urgently offering limited-time sales, each providing the opportunity to purchase just the incremental resources needed at the time to reach the next level of upgrade.

73.     Defendants follow this model intentionally to foster dangerous consumer behaviors that ultimately result in more purchases at the expense of its players.

74.     Research into these microtransactions and human behavior shows a critical link between microtransaction purchases and problem gaming behavior (*i.e.*, behavior

17

**SECOND AMENDED CLASS ACTION COMPLAINT**

associated with gambling addiction) that forms with high frequency purchases.[13] Of note, "[b]oth classical and operant conditioning theories suggest that more frequent events or quicker pay out frequencies could increase the likelihood of problematic microtransaction purchase behavior and problem gambling symptoms through reinforcement."[14]

75.     Thus, by luring players into making several smaller, time-sensitive purchases of purportedly high-value packs, Defendants specifically intend to foster addictive behaviors by luring consumers into dangerous spending habits.

76.     As a result of Defendants' predatory monetization schemes and false advertising, numerous players, like Plaintiffs, spend tens of thousands—if not hundreds of thousands—of dollars on SOS.

77.     As an editorial in the Society for the Study of Addiction has observed:

> Predatory monetization schemes in video games are purchasing systems that disguise or withhold the long-term cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.
> . . .
> Game monetization schemes have become increasingly sophisticated and have been featured more prominently within popular on-line games. In our view, some of these schemes could be considered predatory. Predatory monetization schemes typically involve in-game purchasing systems that disguise or withhold the true long-term cost of the activity until players are already financially and psychologically committed. Such schemes are designed to encourage repeated player spending using tactics or elements that may involve, either singularly or in combination, limited disclosure of the product; intrusive and unavoidable solicitations; and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play. Such strategies may exploit inequalities in information between purchaser and provider, such as when the industry uses knowledge of the player's game-related preferences, available funds and/or playing and spending habits, to present offers predetermined to maximize the likelihood of eliciting player spending.[15]

---

[13] Erin Gibson, *et. Al.*, The relationship between videogame micro-transactions and problem gaming and gambling: A systematic review, 131 Computers in Human Behavior 107219 (2022).
[14] *Id.*
[15] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

78.     Plaintiffs were victims of Defendants' highly addictive predatory monetization scheme. For instance, as Plaintiff Paul Mazey, who spent approximately $46,000 as a result of Defendants' predatory tactics, shared in an article on Vice.com:[16]

> As Mazey rose up the ranks and became the joint leader of a clan, taking on the responsibility of planning events, he started to dedicate 12 hours a day to the game and think about it constantly. That he could play *State of Survival* on his phone made it all the harder to put it away for any significant period of time.
>
> "***The addiction, it just progressively became worse and worse and worse,***" said Mazey. "You feel ***compelled*** to be on the game all the time."
>
> Outside of the game, his life became materially worse. He became withdrawn, and it started to affect his work life, relationship, and sex life. His appetite suffered, as did his sleep. "I was just so absorbed and addicted," he said. **"*All I could think of was a game. That's how my mind was. My mind felt like it was controlled.*"**

## C.     Defendants' Deceptive Pack Advertisements

79.     Building off of its predatory and addictive monetization schemes, SOS relies on six primary categories of deceptive pack advertisements within SOS: (a) packs that offer the illusion of price discounts through the strikethrough graphics, hereafter referred to as "False Strikethrough Packs"; (b) packs that falsely advertise that a pack contains extra value by containing an extra percentage increase value relative to normal versions of the same pack, hereafter referred to as "False Bonus Packs"; (c) packs that falsely allege the limited availability of purchases, hereafter referred to as "False Limited Availability Packs"; (d) packs that falsely represent their popularity, hereafter referred to as "False Popularity Packs"; (e) graphics that falsely represent how far other players have advanced, hereafter referred to as "False Advancement Stats"; and (f) items that "randomly" generate an in-game prize once purchased, hereafter referred to as "Loot Boxes." Any deceptively advertised pack can belong to more than one of these categories simultaneously or may be deceptive for a separate reason outside of the ones belonging to the three main

---

[16] Vice, *'Game of Thrones: Conquest' and 'State of Survival' Players Say They Felt Addicted and Pressured To Spend* (Oct. 20, 2022), available at https://www.vice.com/en/article/g5vmyw/game-of-thrones-conquest-and-state-of-survival-players-say-they-felt-addicted-and-pressured-to-spend.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    categories.

2                      **1. False Strikethrough Packs**

3          80.    Defendants use false reference pricing schemes to increase sales because

4    they know these reference prices influence purchasing decisions, as consumers want

5    bargains. Fake discounting and false reference prices are widely recognized to be powerful

6    tools in convincing customers to make purchases, and this issue has been studied

7    repeatedly. As one research study from the Harvard Business School summarized:

8           Taken together, evidence from our analysis of observational transaction
9           data and our laboratory experiment suggests that fake prices provide
            sellers with a powerful tool to enhance demand, but one that may come at
10          the expense of misleading consumers about products' true initial selling
            prices. Consumers take initial prices as signals of product quality and rate
11          offers as being better deals the higher these initial prices are with respect
            to present selling prices. Accordingly, fake prices have the highest influence
12          on purchase likelihood for less-informed consumers.
13          . . .
            By definition, a fake price offers a fake discount—a discount that does not
14          represent a decrease from some previous selling price but, rather, the
            difference between the current selling price and a fake introductory price.
15          There is much existing literature on the impact of discounts on consumer
            behavior beyond . . .[17]
16

17          81.    SOS's False Strikethrough Packs display an advertised price for which the

18   pack is currently offered. Above that green arrow is a significantly higher price struck

19   through with a red line. The advertisements suggest that the pack was formerly offered at

20   the higher price but is now heavily discounted.

21

22

23

24

25

26   _____

27   [17] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business
     School Working Paper (2018), available at
28   https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-
     ffba637617d9.pdf.



82.    However, these packs were in fact never offered at the advertised former reference price.

83.    There are dozens of False Strikethrough Packs sold at multiple pricing tiers, including: "Crates of Choice," packs that purport to offer "Crazy Rebates from your Choice of Crates" offered across the $4.99, $9.99, and $19.99 pricing tiers. None of these packs were ever offered at the former reference prices.

84.    Defendants had actual knowledge that the False Strikethrough Packs contained false or misleading representations as to their former prices. Defendants designed and promoted these advertisements from 2019 until present day, as the practice

21

1   of offering these deceptive packs continues.

2       85.     The price at which a pack is obtained is a material consideration when

3   reasonable players, including Plaintiffs, decide to make purchases. Players seek to

4   maximize the amount of items obtained from the pack for the lowest cost. Defendants

5   deceive players into taking advantage of alleged discounts so that players believe they

6   may achieve a competitive advantage on the mistaken belief that other players may have

7   to pay the substantially-higher non-discounted price for the same number of items.

8       86.     Plaintiffs and the Classes reasonably relied on the "strikethrough" pricing

9   when purchasing numerous False Strikethrough Packs. Had Plaintiffs known the

10  "strikethrough" pricing was false, Plaintiffs would not have purchased many of the False

11  Strikethrough Packs that they purchased.

12      87.     If Plaintiffs and the Classes could ever have reasonably realized that the

13  False Strikethrough Packs were never sold at the original reference price, such realization

14  would have occurred only after enough game play that Defendants would have already

15  achieved their goal of establishing addictive spending habits. Thus, to the extent Plaintiffs

16  or any of the Classes continued to make purchases after developing an understanding that

17  the packs were never offered at the original price, this was the calculated and intended

18  result that Defendants sought when engaging in this deceptive and unfair practice in the

19  first place.

20              **2.  False Bonus Packs**

21      88.     The False Bonus Packs also falsely advertise that a pack possesses extra

22  value by containing a specific percentage increase in items or resources relative to normal

23  versions of the same pack. The false percentage is indicated by a large and attention-

24  grabbing bubble in the pack's graphical advertisement that contains a quantitative claim

25  regarding the increase in value of this pack relative to packs which are not on sale.

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108



89.     For example, the Darts Mega Bundle pack is offered with a graphical image of a red bubble containing "1550%"—indicating to a reasonable consumer that this specific pack is discounted because it contains a 1550% increase in the value or quantity of items contained within it when compared to a Darts Mega Bundle without such a representation.

90.     Defendants intentionally designed the packs to mislead players into believing that the packs represented a sale value, including both a false original reference price and an illusory increase in value, to induce those players to purchase the packs. Defendants knowingly took those ordinary item packs and simply placed a percentage graphic on the ad copies without altering anything else.

91.     Defendants have been promoting these False Bonus Packs from 2019 until

23

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    present day, as the practice continues.

2        92.    Plaintiffs all reasonably relied on the percentage graphics on the False Bonus

3    Packs as a material consideration in purchasing those packs. Had the Plaintiffs known the

4    packs were not actually on sale in the manner represented (i.e., by containing an increase

5    in the value or quantity of items contained within the packs when compared to a pack

6    without such a representation), they would not have purchased the False Bonus Packs.

7            **3.  False Limited Availability Packs**

8        93.    The False Limited Availability Packs indicate that a particular pack can only

9    be purchased a finite number of times within the server. For example, text underneath a

10   pack advertisement may say "Only 1 remaining!" These advertisements create a sense of

11   artificial scarcity whereby players are pressured into purchasing packs containing valuable

12   items to enhance their accounts, ostensibly to simultaneously deprive competitors from

13   accessing the same packs.

14



Kronenberger Rosenfeld

150 Post Street, Suite 520 San Francisco, CA 94108

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    94.    Other times, Defendants use graphics stating "Expires soon" with a
16 countdown timer to create a false sense of scarcity with its users.

17
18
19
20

21    95.    However, Defendants' representations as to the scarcity of the packs are
22 false. Other players are also able to purchase these packs even if another player buys all
23 of the supposedly remaining packs. Furthermore, the player who purchased the False
24 Limited Availability Pack is frequently offered the same pack to purchase again, especially
25 at the $99.99 pricing tier.

26    96.    Defendants intentionally designed the packs to mislead players into believing
27 that the packs were limited in availability. Defendants knowingly added a message to
28 players communicating an artificial scarcity and urgency in order to induce them to

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    purchase the packs immediately.

2        97.    These false and deceptive tactics of scarcity and urgency are effective dark

3    patterns.

4        98.    As the FTC explained, "SCARCITY" includes variants such as the "False Low

5    Stock Message" (e.g. "*Only 1 left in stock—order soon*"), which falsely claim inventory is

6    low.  This message "[c]reate[s] pressure to buy immediately." [18]

7        99.    "URGENCY" includes variants such as the "Baseless Countdown Timer"

8    ("*Offer ends in 00:59:48*"), which shows a clock that goes away or resets when it times out,

9    "False Limited Time Message" ("*Deal ends soon*"), which presents a meaningless deadline

10   that resets when reached, or "False Discount Claims" ("*Sale*"). All of these variants create

11   pressure to buy immediately.

12       100.   Plaintiffs all reasonably relied on the textual advertisements of supposed

13   scarcity accompanying the ad copy as a material consideration in purchasing those packs.

14   Had the Plaintiffs known the packs were not actually scarce or limited, they would not have

15   purchased the False Limited Availability Packs.

16                    **4.  False Popularity Packs**

17       101.   The False Popularity Packs fabricate the popularity of their advertised packs

18   to induce players to purchase them. Text directly above the items for sale falsely indicate

19   how many players have already purchased this item. The FTC describes these as False

20   Activity Messages, a type of "SOCIAL PROOF", where the designer makes "false claims

21   about others' activity on a site or interest in a product."[19]

22       102.   By misrepresenting and artificially inflating the number of purchasers of the

23   False Popularity Packs, Defendants make players believe that others have a competitive

24   advantage as compared to players who do not purchase these packs.

25

26

27

28   [18]FTC Staff Report—Bringing Dark Patterns to Light.
     [19] FTC Staff Report—Bringing Dark Patterns to Light.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108



### 5. False Advancement Stats

103.    Defendants also induce players to purchase packs by falsely representing how many other players have advanced in a game-specific event.

104.    Players, seeing that others have moved ahead in the game, are induced to purchasing additional packs because of the False Advancement Stats to regain their competitive advantage.

105.    For instance, during the Helicopter and Airplane events, Defendants falsely misrepresented the average progression of States in the event to induce individuals in each State to purchase packs to catch up with other players.

106.    At one point during the Helicopter event, Defendants misrepresented that the level of the average player had reached level 103, when the highest average State had progressed to Level 103 even when not a single player had even advanced past level 101.

### 6. Loot Boxes



107.    Amplifying the addictive features of SOS, Defendants also entice players to purchase "loot boxes."

1    108.   The use of "loot boxes" within SOS and other freemium games encourages

2    further and unregulated problem gambling behavior[20] by providing players with the

3    opportunity to purchase items that yield randomized awards—mirroring gambling through

4    uncertainty in the outcomes of spending.

5    109.   Loot boxes allow players to purchase virtual "chances" to win rare in-game

6    items, but most players win only common virtual items, which can often be purchased for

7    far less than what the players spend on a "chance" at rare in-game loot.

8    110.   While this may sound similar to traditional gambling games, because loot

9    boxes contain only virtual items and not physical objects, they are generally not subject to

10   laws that typically apply to gambling activities.

11   111.   Loot boxes are classified as a type of "monetary dark pattern" and as such

12   SOS, "a video game that employs loot boxes[,] is just utilizing the 'monetized rivalries' dark

13   pattern"—the exploitation of user competitiveness which encourages players to spend

14   money they would not otherwise spend, in order to achieve status.[21]

15   112.   Further, academic literature on the subjects of predatory monetization and

16   addiction to loot-box-microtransactions suggests that there is a link between chance-based

17   gambling and player behavior on these apps. Studies in psychology show that loot box

18   consumption mimics gambling as it involves the betting and spending of real currency for

19   unpredictable in-game rewards, with the ambiguity of the valuation for in-game vs. real-

20   world currency making this a habit that is easy to fall into.[22]

21   113.   The similarities between gambling and loot boxes are especially dangerous

22   for individuals who are already problem gamblers as the high degree of likeness to other

23

24   _____

[20]  Matthew E. Perks, "Regulating In-Game Monetization: Implications of Regulation on
Games Production," (2021), available at

25   https://www.jstor.org/stable/pdf/j.ctv1hp5hqw.14.pdf?refreqid=excelsior%3Ae35b9894f00

26   3556c7dff9d435726e0dc&ab_segments=0%2Fbasic_search_gsv2%2Fcontrol&origin=a
cceptTC=1, p. 221.

27   [21]  Lewis, *supra* note 11.

[22]  Tom Brock, Mark Johnson, *The Gamblification of Digital Games*, 21 J. Consumer

28   Culture (2021) available at
https://journals.sagepub.com/doi/full/10.1177/1469540521993904.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  forms of gambling may cause them "to spend large amounts of money on buying loot boxes

2  in games, just as they would spend large amounts of money on other forms of gambling."[23]

3       114.   This is particularly problematic, because studies have repeatedly confirmed

4  that problematic and pathological gambling habits develop at a higher rate among those

5  who participate in virtual, online gambling activities.[24]

6       115.   Additionally, younger individuals (those under 30 and, in particular, those

7  under 18) are particularly susceptible to developing problematic gambling pathologies,

8  including gambling addiction.[25]

9       116.   SOS, which is marketed to individuals 13 and older, leverages these

10  predispositions to foster addiction and other pathological behaviors with its chance-based

11  loot box system.

12       117.   Upon information and belief, Defendants are aware of the addictive nature of

13  loot boxes and have designed SOS specifically to leverage consumer psychology in an

14  effort to maximize consumer addiction and promote virtual gambling.

15       118.   Examples of just a few of the loot boxes offered for sale in the SOS game

16  are shown below.

17

18

19

20

21

---

22  [23] David Zendle, Paul Cairns, *Video Game Loot Boxes are Linked to Problem Gambling: Results of a Large-scale Survey*, PLOS ONE (2018), available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0206767.

23

24  [24] *See, e.g.*, Brunelle, Leclerc, Cousineau, Dufour, Gendron, & Martin, *Internet gambling, substance use, and delinquent behavior: An adolescent deviant behavior involvement pattern*, 26 Psych of Addictive Behaviors 365-70 (2012), available at https://doi.org/10.1037/a0027079.

25

26  [25] *See* Kristjansdottir *et al*, *Internet gambling and problem gaming among 13 to 18 year old adolescents in Iceland*, 9 Int'l J. Mental Health & Addiction 257 (2011), available at https://doi.org/10.1007/s11469-010-9280-7; *Gainsbury et al*, The Impact of Internet Gambling on Gambling Problems: A Comparison of Moderate-Risk and Problem Internet and Non-Internet Gamblers, 27(4) Psychology of Addictive Behaviors (2013), available at https://psycnet.apa.org/fulltext/2013-05953-001.pdf.

27

28

Case No. 4:22-cv-5023-YGR                    **SECOND AMENDED CLASS ACTION COMPLAINT**





SECOND AMENDED CLASS ACTION
COMPLAINT

### D.    Double-Charging and Purchase Banning

119.   Aside from the deceptive marketing of packs, Defendants have engaged in other unfair and oppressive conduct towards players making in-app purchases in SOS.

120.   Defendants denied some Plaintiffs' refund requests for any duplicative charges of their in-app purchases. When Plaintiffs Angela Prado and Staci Turner sought refunds for the charges through the Apple Store or Google Play Store, Defendants "purchase banned" them from SOS if they were successful in obtaining the refunds. "Purchase banned" players are unable to make any subsequent in-app purchases within SOS. This effectively destroys the ability of those players to meaningfully compete in the game, even when those players have spent tens of thousands of U.S. dollars, often forcing the players off the game.

121.   The practice of "purchase banning" any players who successfully obtain refunds for duplicative charges from an app store is widely practiced by Defendants. Defendants therefore attempt to coerce players into accepting these phantom charges by effectively holding their entire accounts hostage, into which players have often invested significant real money and time.

**SECOND AMENDED CLASS ACTION COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

122.   Plaintiffs Angela Prado, Staci Turner, and Kimberly Surette were double charged for some of their in-app purchases on SOS.

123.   Plaintiffs Angela Prado and Staci Turner were subsequently purchase banned in SOS after obtaining some refunds back from the App store.

**E.   Dark Pattern Phone Notifications**

124.   Lastly, to extract even more money from its users, Defendants systematically badger players with notifications advertising packs for purchase. Notifications include text that falsely creates urgency and scarcity (hereafter, "Dark Pattern Phone Notifications").

125.   For example, the notification in the following screenshot states, "Final Hope Supplies...about to run out," and routinely happens three times a day.



126.   Teeing off the social pressures to induce spending, Defendants also send users notifications stating, "Your Settlement needs you!"



127.   Defendants specifically time these notifications to coincide with the end of event cycles, at the expiration of allegedly "limited time" sales, and at other times designed to trick players into believing they must act immediately to take advantage of special purchase pricing.

128.   Defendants customize and tailor these notifications, such that not every player receives the same notification. Rather, without ever informing players that they are doing so or providing them any way to opt out, Defendants use information gathered from players' phones, purchases, and in-game activities to customize notifications.

129.   This onslaught ensures that even after players successfully disengage from the game to resume other activities, the game itself constantly reminds players to return by creating false senses of urgency, maximizing the game's addictive nature.

130.   Because these notifications are designed around key purchasing timelines, specifically the expiration of allegedly limited-time offerings and the conclusion of events, Defendants' use of these notifications continues to tie the addictive nature of the game directly to players' in-game purchases.

**F.   Device Takeover and Privacy Violations**

131.   As though the various false advertisements present in the game were not sufficient to infringe on consumers' rights, Defendants employ one additional, particularly insidious mechanism for not only tracking and monitoring player activity, but turning players' own devices against them.

132.   Throughout the relevant time period, whenever a player installed SOS on their phone, unbeknownst to the player, Defendants began monitoring their user data in ways which it failed to disclose or obtain permission for.

133.   In the Google Play Store and Apple App Store, Defendants represent to users that there is "no data shared with third parties" and "no data collected" with respect to State of Survival.

134.   However, this is not true.

135.   Defendants, in fact, collect a wealth of data about users, but take steps to conceal this fact from their players.

136.   Perusing the game folder on one's phone does not reveal any record of these surreptitious data-collection methods.

137.   However, when users connect their devices to a computer, they are then able to see a logfile contained within an internal storage folder, usually named "com.kingsgroup.sos" or something similar.

138.   The only documents contained within this folder (at least that players can see) are logfiles; specifically, "agorasdk.log."

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

139.    This file is added to the phone directory on the date when the user first installs State of Survival. If the user subsequently deletes State of Survival, this file remains on the phone, and reinstallations result in the creation of new iterations of this file (e.g. "agorasdk_1.log").

140.    These logfiles reveal that not only were Defendants collecting user data, but these efforts were extensive, intrusive, and entirely at odds with their representations to users that they do not collect **any** such data.

141.    Not only do these logfiles suggest that Defendants gather analytics to share with third parties, but they suggest that Defendants actually **create audio and video recordings without players' knowledge or consent**.

142.    To give just a few examples of the sorts of entries contained in the logfiles:

    a.  Entries initiating a "remote render" for an "incoming video stream," then detailing when the first frame arrives for to commence the "remote stream," and confirming that "local video" has been enabled;

    b.  Entries noting "audio routing changed to speakerphone;"

    c.  Entries detailing efforts "to enable video;"

    d.  Entries detailing efforts to have the resulting files "store[d] for FunPlus;" and

    e.  Entries indicating the transmittal of data across various IP international addresses from around the world.

143.    In other words, Defendants have not only collected data about Plaintiffs and the putative class without their knowledge or consent (and in the face of promises to the contrary by Defendants), but they have also transmitted Plaintiffs' data to unknown third parties, as these logfiles demonstrate.

144.    Defendants then attempted to hide these logfiles from users so that users would not be aware of what they had done, making them inaccessible to all but the most tech-savvy of users.

145.    In summary, Defendants have violated Plaintiffs' rights to data privacy, have effectively caused Plaintiffs' own devices to spy on them, and have attempted to conceal

34

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  their wrongful conduct in an effort to evade detection and to allow them to continue to

2  collect data from unsuspecting users.

3      146.   Upon information and belief, Defendants violated the privacy rights by

4  surreptitiously tracking, recording, and transmitting data about all players who have played

5  SOS during the applicable time period; accordingly, each and every Plaintiff and putative

6  class member has also suffered invasions of privacy.

7                              **CLASS ALLEGATIONS**

8      147.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3),

9  on behalf of themselves and the following proposed "Global Class":

> All persons, within the applicable statute of limitations, who purchased
> False Strikethrough Packs, False Bonus Packs, False Limited Time
> Availability Packs, False Popularity Packs, Loot Boxes, any packs after
> viewing False Advancement Stats or Dark Pattern Phone Notifications, or
> any packs in which they were double-charged or purchase banned, and/or
> such subclasses as the Court may deem appropriate.

14     148.   Plaintiffs Angela Prado and Heriberto Santana also bring this action on behalf

15 of themselves and on behalf of the following subclass (the "California Class"):

> All persons in California, within the applicable statute of limitations, who
> purchased False Strikethrough Packs, False Bonus Packs, False Limited
> Time Availability Packs, False Popularity Packs, Loot Boxes, any packs
> after viewing False Advancement Stats or Dark Pattern Phone Notifications,
> or any packs in which they were double-charged or purchase banned,
> and/or such subclasses as the Court may deem appropriate.

20     149.   Plaintiff Staci Turner also brings this action on behalf of herself and on behalf

21 of the following subclass (the "Ohio Class"):

> All persons in Ohio, within the applicable statute of limitations, who
> purchased False Strikethrough Packs, False Bonus Packs, False Limited
> Time Availability Packs, False Popularity Packs, Loot Boxes, any packs
> after viewing False Advancement Stats or Dark Pattern Phone Notifications,
> or any packs in which they were double-charged or purchase banned,
> and/or such subclasses as the Court may deem appropriate.

26     150.   Plaintiffs Kimberly Surette and Paul Mazey also bring this action on behalf of

27 themselves and on behalf of the following subclass (the "International Class"):

28     All persons residing outside the United States, within the applicable statute

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

151.    Plaintiff Bryan Kauffman also brings this action on behalf of himself and on behalf of the following subclass (the "Pennsylvania Class"):

All persons in Pennsylvania, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

152.    Plaintiff Cyrenna Dewhurst also brings this action on behalf of herself and on behalf of the following subclass (the "New York Class"):

All persons in New York, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, and/or such subclasses as the Court may deem appropriate.

153.    Plaintiff Derik Niederquell also brings this action on behalf of himself and on behalf of the following subclass (the "Washington Class"):

All persons in Washington, within the applicable statute of limitations, who purchased False Strikethrough Packs, False Bonus Packs, False Limited Time Availability Packs, False Popularity Packs, Loot Boxes, any packs after viewing False Advancement Stats or Dark Pattern Phone Notifications, or any packs in which they were double-charged or purchase banned, and/or such subclasses as the Court may deem appropriate.

154.    Excluded from the proposed Classes are Defendants and their employees, officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed class.

155.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the

**SECOND AMENDED CLASS ACTION COMPLAINT**

1  same evidence they would use to prove those elements in individual actions alleging the

2  same claims.

3      156.   This action meets all applicable standards of Fed. R. Civ. P. 23 for class

4  certification, in that Plaintiffs can demonstrate the elements delineated below.

5      157.   **Numerosity.** The members of the proposed Classes are so numerous and

6  geographically dispersed that individual joinder of all proposed class members is

7  impracticable. *See* Fed. R. Civ. P. 23(a)(1). While Plaintiffs believe that there are hundreds

8  of thousands of members of the proposed Classes, the precise number of class members

9  is unknown, but may be ascertained from Defendants' books and records. On information

10  and belief, Defendants maintain a list of users that includes personal information for the

11  user including their email addresses, whether they have made in-app purchases, and

12  which in-app purchases they have made.

13      158.   Applying a reasonable and prudent person standard to the users of State of

14  Survival under the same or similar circumstances, each user would qualify to be a class

15  member requesting the right to cancel and get refunds on their in-app purchases. Any

16  reasonable and prudent person under the same or similar circumstances wants to have

17  the flexibility to disaffirm an in-app purchase that was made while believing that the packs

18  they purchased were part of a sale or promotion but, in reality, were not.

19      159.   **Commonality and Predominance.** This action involves common questions

20  of law and fact, which predominate over any questions affecting individual class members.

21  *See* Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

22          a.  Whether Defendants engaged in the conduct alleged in this First Amended

23              Complaint;

24          b.  Whether Defendants violated the applicable statutes alleged herein;

25          c.  Whether Defendants designed, advertised, marketed, distributed, sold, or

26              otherwise placed State of Survival into the stream of commerce in the United

27              States;

28          d.  Whether Defendants' conduct emanated from the State of California;

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

e. Whether Plaintiffs and the class members are injured and harmed directly by Defendants' false advertising designed to entice users into making in-app purchases they otherwise would not have made;

f. Whether Plaintiffs and the class members are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts; and

g. Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

160.    **Typicality.** Plaintiffs' claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Defendants' wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3). Defendants' creation and display of its misleading advertisements is uniform for all Plaintiffs and class members.

161.    **Adequacy.** Plaintiffs are adequate proposed class representatives because their interests do not conflict with the interests of the other members of the proposed Classes they seek to represent, because they have retained counsel competent and experienced in complex class action litigation, and because they intend to prosecute this action vigorously. The interests of the proposed Classes will be fairly and adequately protected by Plaintiffs and their counsel. *See* Fed. R. Civ. P. 23(a)(4).

162.    **Declaratory and Injunctive Relief.** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the proposed Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the proposed Classes as a whole. *See* Fed. R. Civ. P. 23(b)(2). Defendants' wrongful conduct alleged herein is grounded in the creation and dissemination of their pack offerings in-game, which are displayed uniformly. Plaintiffs' and the class members' injuries are real, immediate, and ongoing. Plaintiffs and class members seek injunctive and declaratory relief from Defendants.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    163.  **Superiority.** A class is superior to any other available means for the fair and

2    efficient adjudication of this controversy, and no unusual difficulties are likely to be

3    encountered in the management of this class action. The damages or other financial

4    detriment suffered by Plaintiffs and putative class members are relatively small compared

5    to the burden and expense that would be required to individually litigate their claims against

6    Defendants, so it would be impracticable for members of the proposed Classes to

7    individually seek redress for Defendants' wrongful conduct.

8    164.  Applying the principles of equity or balance of equities, expecting an

9    individual Plaintiff who is at a disadvantage with limited resources and spending capacity,

10   and with minimal negotiating power, if any, to litigate claims against Defendants,

11   multibillion-dollar corporations that have immense resources and deep pockets, would be

12   unfair. Class actions are a necessary and essential means to provide for public interest

13   litigations with checks and balances to curtail deceptive practices by powerful private

14   corporations, including Defendants.

15   165.  There is no special interest in class members individually controlling the

16   prosecution of separate actions. And even if class members could afford individual

17   litigation, the court system could not. Individualized litigation creates a potential for

18   inconsistent or contradictory judgments, and it increases the delay and expense to all

19   parties and the court system. By contrast, the class action device presents far fewer

20   management difficulties and provides the benefits of single adjudication, economy of scale,

21   and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

22                        **CALIFORNIA LAW APPLIES TO ALL CLASSES**

23   166.  California's substantive laws apply to every class member, regardless of

24   where the class member resides.

25   167.  California's substantive laws may be constitutionally applied to the claims of

26   Plaintiffs and the Classes under the Due Process Clause, 14th Amend. §1, and the Full

27   Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant

28   contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   class members, thereby creating state interests that ensure that the choice of California

2   state law is not arbitrary or unfair.

3       168.   FunPlus and its various operating entities were founded in California.

4   FunPlus maintains offices in California, and its co-founders and key executives reside in

5   California. On information and belief, Defendants' principal places of business are located

6   in California. FunPlus conducts substantial business in California. Therefore, California has

7   an interest in regulating Defendants' conduct under its laws.

8       169.   FunPlus's decision to reside in California and avail itself of California's laws,

9   and to engage in the challenged conduct from and emanating out of California, renders the

10  application of California law to the claims herein constitutionally permissible.

11      170.   California is also the state from which Defendants' alleged misconduct and

12  false statements emanated. This conduct similarly injured and affected Plaintiffs and all

13  other class members.

14      171.   The application of California laws to the Classes is also appropriate under

15  California's choice of law rules because California has significant contacts to the claims of

16  Plaintiffs and the proposed Classes, and California has a greater interest in applying its

17  laws here than any other interested state.

**FIRST CLAIM FOR RELIEF**

18

**Violation of California's Unfair Competition Law ("UCL")**

19

**Cal. Business & Professional Code §17200 *et seq.***

20

**(By Plaintiffs, individually and on behalf of All Classes)**

21

22      172.   Plaintiffs incorporate by reference all allegations in this First Amended

23  Complaint and restate them as if fully set forth herein.

24      173.   The UCL defines unfair business competition to include any "unlawful, unfair

25  or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading"

26  advertising. Cal. Bus. & Prof. Code §17200.

27      174.   A business act or practice is "unlawful" under the UCL if it violates any other

28  law or regulation.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

175.    A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

176.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

177.    Defendants have violated the "unlawful" prong under the UCL and have engaged in "unfair, deceptive, untrue or misleading" advertising.

178.    The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC Regulations describe false former pricing schemes—similar to Defendants' False Strikethrough Packs and False Bonus Packs in all material respects—as deceptive practices that would violate the FTC Act.

179.    16 C.F.R.§233.1 states:

(a)    One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.
(b)    A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $__._____"), unless substantial sales at that price were actually made.

180.    California law also prohibits false former pricing schemes. Cal. Bus. & Prof. Code §17501, entitled "Value determinations; Former price advertisements," states:

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

181.   As further detailed in the Second Claim for Relief below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id.* §(a)(13).

182.   The False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs, False Popularity Packs, False Advancement Stats, Loot Boxes, and Dark Pattern Phone Notifications violate the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and (a)(13).

183.   The False Bonus Packs and Dark Pattern Phone Notifications misrepresent the existence of a sale whereby players can allegedly purchase more items and resources from a pack than they normally could for the same price.

184.   Defendants' use of the False Bonus Packs and Dark Pattern Phone Notifications violates 15 U.S.C. §45(a)(1), 15 U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations, Section 233.

185.   Defendants also violated and continue to violate Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false discounts from purported former prices that were, in fact, not the prevailing market prices within three months preceding the publication and dissemination of advertisements containing the false former prices.

186.   Defendants have also violated the "unfair" prong of the UCL by falsely

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  representing that its consumers received a discount from a referenced "original" former

2  price of its False Strikethrough Packs where, in fact, Defendants set an arbitrary price for

3  the goods contained in these packs and then falsely pretended the packs had ever been

4  offered for sale without their supposed discount.

5       187.  Additionally, Defendants have violated the "unfair" prong of the UCL by

6  falsely representing that its False Bonus Packs contained unique and specific increases in

7  items or resources when, in fact, they contained the same resources and in-game items

8  as they always do.

9       188.  Defendants have also violated the "unfair" prong of the UCL by fabricating

10  the popularity of their False Popularity Packs when, in fact, the number of players who

11  have allegedly purchased that item is fictitious.

12       189.  Defendants have further violated the "unfair" prong of the UCL by falsely

13  representing how many other players have advanced in a game-specific event, and as a

14  result induced players to regain their competitive advantage by purchasing packs, when,

15  in fact, those False Advancement Stats are fictitious.

16       190.  Defendants have also violated the "unfair" prong of the UCL by double-

17  charging players for purchased packs and then penalizing players for seeking and

18  obtaining refunds for these double purchases, thereby deterring players from obtaining

19  refunds to which they are entitled.

20       191.  Defendants have also violated the "unfair" prong of the UCL by engaging in

21  predatory practices designed to foster gambling addiction in consumers, in that they: (a)

22  deploy their microtransactions in a way specifically designed to ensnare players into

23  addictive spending habits; (b) falsely create a sense of urgency, scarcity, and value in order

24  to secure addictive high frequency microtransactions, such as by deploying Loot Boxes,

25  which exploit user competitiveness and foster addiction; and (c) use incremental cost step-

26  ups to prevent players from realizing the true cost of the game and how much they have

27  spent. Defendants' goals in engaging in these practices are far outweighed by the harm

28  they cause.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

192.   Defendants have also violated the "unfair" prong of the UCL by engaging in predatory practices designed to foster gambling addiction in consumers through their use of Dark Pattern Phone Notifications, in that they: (a) target players with deceptive messaging even when they are not playing the game; (b) create a false sense of urgency that lures players back to the game, even after they attempt to transition to other activities; and (c) presents notifications as generic when, in fact, they are targeted advertisements tailored to maximize player spending based on each player's unique characteristics. Defendants' goals in engaging in these practices are far outweighed by the harm they cause.

193.   These acts and practices are unfair because they were likely to cause consumers to falsely believe that Defendants were offering value, discounts, or bargains from the prevailing market value or worth of the products sold that do not, in fact, exist. As a result, purchasers (including Plaintiffs) reasonably understood that they were receiving valuable price reductions on purchases of in-game items. This, in turn, has induced reasonable purchasers to buy such products from Defendants that they would not have otherwise purchased.

194.   The gravity of the harm to Plaintiffs and members of the Classes resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendants may have had for engaging in such deceptive acts and practices.

195.   Additionally, Defendants have violated the "fraudulent" prong of the UCL because their marketing and advertising materials included false "original" prices for its False Strikethrough Packs, and because these same materials also suggested that the offers in the False Bonus Packs and False Limited Availability Packs were unique, limited, and would no longer be available at those price points following the conclusion of its sale events. In actuality, the packs never contained the limited-time deals or discounts they purported to offer.

196.   Defendants' acts and practices deceived Plaintiffs and the Classes at large. Specifically, Plaintiffs and the Classes relied on these misleading and deceptive

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  representations regarding the limited-time bonuses they could expect to receive in the

2  packs. Each of these representations and deceptions played a substantial role in Plaintiffs'

3  decisions to purchase the packs, and Plaintiffs would not have done so in the absence of

4  such representations.

5       197.  Plaintiffs and the Classes never received the benefit of their bargains with

6  Defendants, in that the "discounted" resources offered for sale in the packs did not give

7  them the anticipated competitive edge against their opponents. Competitors could simply

8  purchase packs at the same false sale pricing, or with the same number of items, or the

9  same pack availability notwithstanding representation that these were limited-time offers.

10       198.  Similarly, players who purchased the False Bonus Packs and the False

11  Strikethrough Packs defensively (to protect against becoming overpowered by opponents

12  who they believed had been able to take advantage of the purportedly limited-time

13  bonuses) were deprived of the benefit of their bargains, because the threat itself was a

14  fabrication. There was never a risk of falling behind due to a player's failure to purchase

15  items at their discounted price, because the price was always discounted.

16       199.  As a result of these violations under each of the fraudulent, unfair, and

17  unlawful prongs of the UCL, Defendants have been unjustly enriched at the expense of

18  Plaintiffs and members of the proposed Classes. Specifically, Defendants have been

19  unjustly enriched by obtaining revenues and profits that they would not otherwise have

20  obtained absent their false, misleading, and deceptive conduct.

21       200.  Through their unfair acts and practices, Defendants have improperly

22  obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this

23  Court cause Defendants to restore this money to Plaintiffs and all class members, and to

24  enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future.

25  Otherwise, Plaintiffs, the class members, and members of the general public may be

26  irreparably harmed and/or denied an effective and complete remedy if such an order is not

27  granted.

28  //

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**SECOND CLAIM FOR RELIEF**

**Violation of California's False Advertising Law ("FAL")**

**Cal. Business & Professional Code §17500 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

201.   Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

202.   The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

203.   Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

204.   The False Strikethrough Packs and the False Bonus Packs misrepresent the existence of a sale whereby players can allegedly purchase packs at a discounted price, or with an increased percentage of items or resources. The False Limited Availability Packs misrepresent the exclusive nature, and therefore competitive value, of the packs. The False Popularity Packs misrepresent how many competitors have actually purchased any pack.

205.   Through their unfair acts and practices, Defendants have improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all class members, and to prevent Defendants from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiffs, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

//

//

**THIRD CLAIM FOR RELIEF**

**Violation of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §1750 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

206.    Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

207.    Plaintiffs and the other class members are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ. Code §§1761(e) and 1770.

208.    Defendants are "persons" within the meaning of Cal. Civ. Code §§1761(c) and 1770, and they sell "goods or services" within the meaning of Cal. Civ. Code §§1761(b) and 1770.

209.    SOS and the in-app purchases are a "good" or "service" within the meaning of Cal. Civ. Code. §§1761(a) and (b).

210.    Defendants have violated Cal. Civ. Code. §1770(a)(5)'s proscription against representing that goods have characteristics, uses, benefits, or quantities that they do not have. The False Limited Availability Packs represent that they have the benefit of conferring a competitive advantage, and the False Advancement Stats represent that those who purchase packs have the benefit of maintaining a competitive advantage, but those benefits are illusory.

211.    Defendants have violated Cal. Civ. Code. §1770(a)(9)'s proscription against advertising goods or services with intent not to sell them as advertised. The False Bonus Packs falsely advertise that a pack of goods has extra value by containing a significant increase in items or resources relative to normal versions of the same pack. The False Limited Availability Packs falsely indicate that a particular pack can only be purchased a finite number of times by competing players.

212.    Defendants have violated Cal. Civ. Code. §1770(a)(13)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  amounts of, price reductions by misrepresenting the existence of discounts via False

2  Strikethrough Packs, misrepresenting the existence of special sales through their False

3  Bonus Packs, and misrepresenting the exclusive nature, and therefore competitive value,

4  of the packs through their False Limited Availability Packs.

5      213.   Defendants have violated Cal. Civ. Code. §1770(a)(14)'s proscription against

6  representing that the purchase conferred rights or obligations that it did not have. The False

7  Limited Availability Packs falsely represent that the purchase confers the right of a

8  competitive advantage, which it does not. False Advancement Stats, which induce players

9  to purchase packs, falsely represent that the purchase confers the right to maintain a

10  competitive advantage, which it does not.

11      214.   Defendants have violated Cal. Civ. Code. §1770(a)(16)'s proscription against

12  representing that the subject of a transaction has been supplied in accordance with a

13  previous representation when it has not by misrepresenting that the purchasers have

14  received a competitive advantage in the game by purchasing "sale" and "limited

15  availability" items.

16      215.   Defendants have violated Cal. Civ. Code. §1770(a)(17)'s proscription against

17  representing that the consumer will receive an economic benefit, if the earning of the

18  benefit is contingent on an event to occur subsequent to the consummation of the

19  transaction, by misrepresenting that the purchaser of False Limited Availability Packs

20  would receive an economic benefit (i.e. more goods than other players) and therefore a

21  competitive advantage as compared to players who did not take advantage of limited-

22  availability sales. The economic benefit is contingent on other players not purchasing those

23  same packs, but there is not actually a limited supply of packs.

24      216.   On September 23, 2022, Plaintiffs, through counsel, sent a CLRA demand to

25  Defendants that provided notice of Defendants' violation of the CLRA and demanded that

26  it correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive

27  practices complained of herein. The letter also stated that if Defendants refused to do so,

28  Plaintiffs would seek damages in this action pursuant to the CLRA.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

217.    Defendants failed to rectify the problems associated with the actions detailed above. Thus, pursuant to Cal. Civ. Code. §1782, Plaintiffs now seek actual, punitive, and statutory damages, as appropriate, against Defendants pursuant to the CLRA.

218.    Plaintiffs and the other class members suffered actual damages as a direct and proximate result of the Defendants' actions, concealment, and/or omissions in the advertising, marketing, and promotion of its bait apps, in violation of the CLRA, as evidenced by the substantial sums Defendants pocketed.

219.    Plaintiffs, on behalf of themselves and the class members, demand judgment against Defendants for injunctive relief and attorney's fees.

220.    Additionally, Plaintiffs, on behalf of themselves and the class members, seek compensatory damages for losses sustained as a result of Defendants' actions.

221.    Additionally, Plaintiffs, on behalf of themselves and the class members, seek enhanced and punitive damages as authorized under the CLRA.

**FOURTH CLAIM FOR RELIEF**

**Fraud**

**(By Plaintiffs, individually and on behalf of All Classes)**

222.    Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

223.    Defendants represented to all Plaintiffs that various purchased packs were on sale in that they were offered at a lower price than normal, that certain packs were offered with an increased percentage of items and resources compared to their normal counterparts, that pack purchases were only available in limited quantities, and that certain packs were purchased by many other players.

224.    These representations were false because the packs were never offered at higher prices, the increased percentage versions of the packs were identical to their normal counterparts, the packs were not actually available in scarce quantities to other players in the State or to the individual player making the purchases, and the stated number of other players that had purchased the packs was fictitious.

1   225.   Defendants   intentionally   designed   the   graphical   images   on   the

2   advertisements to attract Plaintiffs to the enticing but false claims regarding the existence

3   of sales, item and resource bonuses, and artificial scarcity.

4   226.   Plaintiffs reasonably relied upon the claims made in the advertisements in

5   deciding to purchase the aforementioned packs.

6   227.   Upon purchasing the packs, Plaintiffs were harmed because, had Plaintiffs

7   known the claims were false, they would not have made those purchases.

8   228.   Plaintiffs'   reliance   on   Defendants'   misrepresentations   in   its   pack

9   advertisements was a substantial factor in causing harm to Plaintiffs.

10   229.   Defendants' conduct has therefore caused and is causing immediate and

11   irreparable injury to Plaintiffs and the class members and will continue to both damage

12   Plaintiffs and the class members and deceive the public unless enjoined by this Court.

13   **FIFTH CLAIM FOR RELIEF**

14   **Unjust Enrichment**

15   **(By Plaintiffs, individually and on behalf of All Classes)**

16   230.   Plaintiffs incorporate by reference all allegations in this First Amended

17   Complaint and restate them as if fully set forth herein.

18   231.   Defendants misrepresented the value of the items or resources purchased

19   in the False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs,

20   False   Popularity   Packs,   Loot   Boxes,   any   packs   purchased   after   viewing   False

21   Advancement Stats or Dark Pattern Phone Notifications, or any packs for which Plaintiffs

22   were double-charged.

23   232.   Plaintiffs spent tens, if not hundreds, of thousands of dollars each on items

24   and resources, induced by Defendants.

25   233.   Additionally, Defendants were surreptitiously gathering information about

26   Plaintiffs without their knowledge or consent throughout the time that these individuals

27   utilized Defendants' app.

28   234.   It   would   be   unfair   for   Defendants   to   keep   the   money   spent   without

1   compensating Plaintiffs.

2                          **SIXTH CLAIM FOR RELIEF**

3            **Violations of CIPA Cal. Penal Code §630 et seq.**

4         **(By Plaintiffs, individually and on behalf of All Classes)**

5       235.    Plaintiffs incorporate by reference all allegations in this First Amended

6   Complaint and restate them as if fully set forth herein.

7       236.    Defendants intentionally tapped and/or made an unauthorized connection to

8   Plaintiffs' communications on their devices. These include video recordings, audio

9   recordings, and written communications.

10      237.    Plaintiffs did not consent for Defendants to tap into their connections,

11  communications, or devices.

12      238.    Without consent from Plaintiffs, Defendant read, attempted to read, and/or

13  learned the contents of Plaintiffs' communications, in that the logfiles indicate Defendants

14  caused "remote streams" of videos, surreptitiously enabled device speakerphones, caused

15  devices to "save for FunPlus" records of these interactions, and then caused Plaintiffs'

16  devices to transmit such data to various third parties.

17      239.    Defendants attempted to and in fact did use this data, and communicate it to

18  third parties, such as by sending it to various third-party IP addresses, as demonstrated by

19  the logfiles.

20      240.    To the extent any third parties were involved in the execution of this scheme,

21  Defendants aided, agreed with, employed, permitted, or otherwise caused to be done the

22  unlawful acts described herein.

23      241.    These actions violate Cal. Penal Code §631(a).

24      242.    Accordingly, Defendants are liable to Plaintiffs and the putative classes for

25  their actual damages, statutory damages, exemplary damages, and injunctive relief.

26  //

27  //

28  //

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**SEVENTH CLAIM FOR RELIEF**

**Violations of California's Comprehensive Computer Data and Access Fraud Act**

**("CDAFA"), Cal. Penal Code §502**

**(By Plaintiffs, individually and on behalf of All Classes)**

243.    Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

244.    CDAFA makes it unlawful for a party to knowingly access, without permission, another's computer or device to wrongfully control or obtain data, or to make use of any data on the computer.

245.    Here, Defendants did not obtain permission, because they assured Plaintiffs and the putative class that the app did not collect consumer data.

246.    The logfiles further demonstrate that Defendants did not have permission to access Plaintiffs' devices because they suggest overrides of user settings (such as setting the device to speakerphone or remotely enabling video and audio sharing).

247.    Upon information and belief, Defendants used this data for profit, in that it was shared with third parties internationally.

248.    Plaintiffs are entitled to compensatory damages, punitive damages, and attorneys' fees to any individual harmed by these violations in accordance with Cal. Penal Code §502(e)(1), (2), and (4).

**EIGHTH CLAIM FOR RELIEF**

**Invasion of Privacy**

**(By Plaintiffs, individually and on behalf of All Classes)**

249.    Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

250.    Article I, §1 of California's Constitution confers a constitutional right to privacy.

251.    Defendants' conduct in secretly using Plaintiffs' and the putative class members' devices to surreptitiously record them and transmit that data to third parties

1  violated Plaintiffs' privacy rights.

2      252.   Plaintiffs have a right not to be recorded by their own devices without their

3  knowledge or consent.

4      253.   Defendants have intruded upon these privacy interests.

5      254.   These intrusions are a serious invasion of privacy because of the collection

6  and disclosure of audio and visual recordings, as well as general user data, particularly in

7  the face of promises that no such data would be gathered or used.

8      255.   Defendants acted with oppression, fraud, or malice in that they

9  misrepresented their data collection practices, attempted to hide the logfiles in a different

10 folder on users' devices with an unusual filepath, told users that they were not collecting

11 data when in fact they were, and took control of Plaintiffs' device functions in order to collect

12 the highly sensitive and personal data.

13     256.   Plaintiffs and the putative classes have been damaged by Defendants'

14 invasion of their privacy and are entitled to compensation in the form of actual and punitive

15 damages.

16                    **NINTH CLAIM FOR RELIEF**

17                    **Intrusion Upon Seclusion**

18          **(By Plaintiffs, individually and on behalf of All Classes)**

19     257.   incorporate by reference all allegations in this First Amended Complaint and

20 restate them as if fully set forth herein.

21     258.   Defendants intentionally intruded upon Plaintiffs' and the class members'

22 seclusion by secretly accessing their devices to record and transmit data about Plaintiffs

23 without their knowledge or permission.

24     259.   This was highly offensive in that Defendants did this despite their direct

25 promise that they did not gather or share any data, and where the gathering of this

26 information required Defendants to effectively take over Plaintiffs' devices.

27     260.   Plaintiffs never gave consent for Defendants to gather or transmit this data.

28     261.   Defendants acted with oppression, fraud, or malice in that they

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   misrepresented their data collection practices, attempted to hide the logfiles in a different

2   folder on users' devices with an unusual filepath, told users that they were not collecting

3   data when in fact they were, and took control of Plaintiffs' device functions in order to collect

4   the highly sensitive and personal data.

5       262.    Plaintiffs and the putative classes have been damaged by Defendants'

6   invasion of their privacy and are entitled to compensation in the form of actual and punitive

7   damages.

8                          **TENTH CLAIM FOR RELIEF**

9           **Violations of Federal Wiretap Act (18 U.S.C. §2510 et. seq)**

10          **(By Plaintiffs, individually and on behalf of All Classes)**

11      263.    Plaintiffs incorporate by reference all allegations in this First Amended

12   Complaint and restate them as if fully set forth herein.

13      264.    Defendants intentionally intercepted, or endeavored to intercept, Plaintiffs'

14   and the putative class members' oral communications, when they enabled remote video

15   and audio capture and transmitted copies of files so captured to unknown third parties.

16      265.    Defendants were not a party to these communications that they intercepted.

17      266.    Plaintiffs never gave consent for these claims to be so intercepted.

18      267.    Accordingly, Plaintiffs and the putative class are entitled to statutory

19   damages, along with costs and reasonable attorney's fees.

20      268.    Defendants' conduct was wanton and willful.

21      269.    Plaintiffs are therefore additionally entitled to recover punitive damages.

22                       **ELEVENTH CLAIM FOR RELIEF**

23          **Violations of Federal Wiretap Act (18 U.S.C. §2510 et. Seq)**

24   **(By Bryan Kaufmann, individually and on behalf of the Pennsylvania Class)**

25      270.    Plaintiffs incorporate by reference all allegations in this First Amended

26   Complaint and restate them as if fully set forth herein.

27      271.    Defendants intentionally intercepted, or endeavored to intercept, Plaintiff

28   Bryan Kaufmann and the Pennsylvania class and the putative class members' oral

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

communications, when they enabled remote video and audio capture and transmitted copies of files so captured to unknown third parties.

272.    The Pennsylvania Wiretapping and Electronic Surveillance Act ("WESCA") prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. §5703.

273.    Any person who intercepts, discloses or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the WESCA is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. §5725(a).

274.    "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. §5702.

275.    "Contents" when "used with respect to any wire, electronic or oral communication," is defined as "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. §5702.

276.    "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. §5702.

277.    "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. §5702.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

278.   Plaintiff's and Class members' intercepted personal information and consumer data constitute the "contents" of "electronic communication[s]" within the meaning of the WESCA. See Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121, 132 (3d Cir. 2022). There is no direct-party exception to WESCA. See id. at 129 & n.5.

279.   Defendant intentionally intercepts and procures Plaintiff's personal information without consent,

280.   Plaintiff's and the Pennsylvania class members' electronic communications are intercepted contemporaneously with their transmission.

281.   Plaintiff and the Pennsylvania class members did not consent to having their personal information wiretapped.

282.   Pursuant to 18 Pa. Cons. Stat. 5725(a), Plaintiff and the Class members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

283.   As the Third Circuit stated in Popa, the WESCA's use of the term intercept "reduces to acquiring certain communications using a device. And based on just that definition, anyone could 'intercept' communications, including people who 'acquire' a text message or chat sent directly to them." 52 F.4th at 126. The court held, "Consistent with [WESCA's] emphasis [on the protection of privacy], it applies when anyone intercepts communications—that is, takes an action to acquire them with a device. And it requires all parties—not just a party—to consent to that interception." Id. at 133. The court further made clear that "there is no sweeping direct-party exception to civil liability under the WESCA." Id. at 129 & n.5.

284.   Plaintiffs never gave consent for these claims to be so intercepted.

285.   Defendant's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class members without their consent any time Plaintiff and Class members interact with Defendant's apps. Plaintiff and Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

286.   Defendants' conduct was wanton and willful.

287.   Plaintiffs are therefore additionally entitled to recover punitive damages.

## TWELFTH CLAIM FOR RELIEF

### Violation of 73 Pa. Stat. Ann. §201-3

### (By Bryan Kauffman, individually and on behalf of the Pennsylvania Class)

288.   Plaintiffs incorporate by reference all allegations in this First Amended Complaint and restate them as if fully set forth herein.

289.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 Pa. Stat. Ann. §201-3.

290.   Defendants' design, manufacture, distribution, marketing, advertising, labeling, and sale of SOS and the in-app purchases constitute "trade and commerce" under 73 Pa. Stat. Ann. §201-2(3).

291.   Defendants have violated §201-2(4)(v)'s proscription against representing that goods have characteristics, uses, benefits, or quantities that they do not have. The False Limited Availability Packs represent that they have the benefit of conferring a competitive advantage, and the False Advancement Stats represent that those who purchase packs have the benefit of maintaining a competitive advantage, but those benefits are illusory.

292.   Defendants have violated §201-2(4)(ix)'s proscription against advertising goods or services with intent not to sell them as advertised. The False Bonus Packs falsely advertise that a pack of goods has extra value by containing a significant increase in items or resources relative to normal versions of the same pack. The False Limited Availability Packs falsely indicate that a particular pack can only be purchased a finite number of times by competing players.

293.   Defendants have violated §201-2(4)(xi)'s proscription against making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions by misrepresenting the existence of discounts via False Strikethrough Packs,

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   misrepresenting the existence of special sales through their False Bonus Packs, and

2   misrepresenting the exclusive nature, and therefore competitive value, of the packs

3   through their False Limited Availability Packs.

4       294.    Defendant's deceptive acts and practices, and misrepresentations and

5   omissions, have deceived Plaintiff, and those same business practices have deceived or

6   are likely to deceive members of the consuming public and the other members of the Class.

7       295.    As a direct and proximate result of Defendants' acts and practices, Plaintiff

8   Bryan Kaufman and the other Pennsylvania Class members have suffered ascertainable

9   loss and actual damages.

10              **THIRTEENTH CLAIM FOR RELIEF**

11          **Violation of N.Y. Gen. Bus. Law §§349 & 350**

12   **(By Cyrenna Dewhurst, individually and on behalf of the New York Class)**

13      296.    Plaintiffs incorporate by reference all allegations in this First Amended

14   Complaint and restate them as if fully set forth herein.

15      297.    Plaintiff Cyrenna Dewhurst hereby brings this Claim, under New York

16   General Business Law §§349 & 350, against Defendants on behalf of herself and the New

17   York Class.

18      298.    Defendants' conduct was misleading, deceptive, unlawful, fraudulent, and

19   unfair by virtue of offering False Strikethrough Packs, False Bonus Packs, False Limited

20   Availability Packs, False Popularity Packs, and Loot Boxes as in-app purchases for sale.

21      299.    Defendants caused to be disseminated through New York State and

22   elsewhere, through advertising, marketing, and other publications, statements that were

23   untrue and misleading, and which it knew were untrue and misleading.

24      300.    Defendants' misrepresentations were material and substantially uniform in

25   content, presentation, and impact upon consumers at large. Consumers were and continue

26   to be exposed to Defendants' material misrepresentations.

27      301.    Plaintiff and the New York Class members have been injured by Defendants'

28   deceptive acts or practices.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    302.    Plaintiff and the New York Class members have no adequate remedy at law.

2    303.    Defendants' conduct has caused and is causing immediate and irreparable

3 injury to Plaintiff and the New York Class and will continue to both damage Plaintiff and

4 the New York Class and deceive the public unless enjoined by this Court.

5    304.    Any person who has been injured by reason of any violation of NY GBL §349

6 may bring an action in his or her own name to enjoin such unlawful acts or practices, an

7 action to recover their actual damages or $50, whichever is greater, or both such actions.

8 The court may, in its discretion, increase the award of damages to an amount not

9 exceeding three times the actual damages, in addition to $1,000 per violation, if the court

10 finds that a defendant willfully or knowingly violated this section. The court may award

11 reasonable attorney's fees to a prevailing plaintiff.

12    305.    Pursuant to NY GBL §350(e) Plaintiff and the New York Class seek monetary

13 damages (including actual damages, or $500, whichever is greater, and minimum,

14 punitive, or treble and/or statutory damages pursuant to NY GBL §350(a1)), injunctive

15 relief, restitution, and disgorgement of all monies obtained by means of Defendants'

16 unlawful conduct, interest, and attorney's fees and costs.

17    **FOURTEENTH CLAIM FOR RELIEF**

18    **Violation of Washington's Consumer Protection Act (RCW 19.86.020)**

19 **(By Plaintiff Derik Niederquell, individually and on behalf of the Washington Class)**

20    306.    Plaintiffs incorporate by reference all allegations in this First Amended

21 Complaint and restate them as if fully set forth herein.

22    307.    Plaintiff Derik Niederquell hereby brings this Claim, under Washington's

23 Consumer Protection Act, Revised Code of Washington ("RCW") 19.86.020, against

24 Defendants on behalf of himself and the Washington Class.

25    308.    Defendants engage in acts and practices that had or have the capacity to

26 deceive substantial portions of the public, during trade or commerce.

27    309.    Defendants' marketing of its False Strikethrough Packs, False Bonus Packs,

28 False Limited Availability Packs, False Popularity Packs, False Advancement Stats, and

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  Loot Boxes had and have the capacity to deceive substantial portions of the public because

2  Defendants' advertisements create the illusion of sales and/or discounts with respect to

3  their False Strikethrough Packs, False Bonus Packs, False Limited Availability Packs,

4  False Popularity Packs, False Advancement Stats, and Loot Boxes.

5       310.  Defendants' deceptive advertising acts and practices significantly affected

6  the public interest as thousands of consumers made purchases based on the

7  representations in the advertisements.

8       311.  Defendants' practices brought injury to Plaintiff and the Washington Class in

9  that they made purchases they otherwise would not have made.

10       312.  There is causation between the deceptive advertising and the injury suffered

11  by Plaintiff and the Washington Class because, if not for Defendants' deceptive claims

12  made in the advertisements of False Strikethrough Packs, False Bonus Packs, False

13  Limited Availability Packs, False Popularity Packs, False Advancement Stats, and Loot

14  Boxes, Plaintiff and the Washington Class would not have purchased those packs.

15       313.  Defendants' conduct has therefore caused and is causing immediate and

16  irreparable injury to Plaintiff and the Washington Class members, and will continue to both

17  damage Plaintiff and the Washington Class members and deceive the public unless

18  enjoined by this Court.

19  **FIFTEENTH CLAIM FOR RELIEF**

20  **Violation of Washington's Right of Privacy (RCW 9.73.030)**

21  **(By Plaintiff Derik Niederquell, individually and on behalf of the Washington Class)**

22       314.  Plaintiffs incorporate by reference all allegations in this First Amended

23  Complaint and restate them as if fully set forth herein.

24       315.  Plaintiff Derik Niederquell hereby brings this Claim, under Washington's

25  Right of Privacy Act (RCW §9.73.030 et seq), against Defendants on behalf of himself and

26  the Washington Class.

27       316.  Defendant intercepted, recorded, and indulged private video, audio, and

28  written communications by surreptitiously recording Plaintiff and the Washington Class

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   without their knowledge or consent and then transmitting these to third parties, as detailed

2   in the logfiles.

3        317.   Accordingly, Plaintiffs are entitled to actual and statutory damages, including

4   mental pain and suffering endured as a result of these violations.

5        318.   Additionally, Plaintiffs are entitled to recover their costs and attorney's fees.

6                             **PRAYER FOR RELIEF**

7        **WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray

8   for relief and judgment against Defendants as follows:

9        (a)   Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil

10            Procedure, appointing Plaintiffs as representatives of the Classes, and

11            designating Plaintiffs' counsel as class counsel;

12        (b)   Awarding Plaintiffs and the class members compensatory damages and

13            actual damages in an amount exceeding $5,000,000, to be determined by

14            proof;

15        (c)   Awarding Plaintiffs and the class members appropriate relief, including actual

16            and statutory damages;

17        (d)   For punitive damages;

18        (e)   For civil penalties;

19        (f)   For declaratory and equitable relief, including a declaration that Defendants

20            violated and have continued to violate California's UCL, the FAL, and the

21            CLRA and an injunction requiring Defendants to comport with California

22            Business & Professions Code §§17200, *et seq.*, and restitution and

23            disgorgement;

24        (g)   For an order enjoining Defendants from continuing to engage in the wrongful

25            acts and practices alleged herein;

26        (h)   Awarding Plaintiffs and the class members the costs of prosecuting this

27            action, including expert witness fees;

28        (i)   Awarding Plaintiffs' and the class members' reasonable attorney's fees and

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

costs as allowable by law;

(j)     Awarding Plaintiffs and the class members reasonable attorney's fees pursuant to Cal. Civ. Proc. Code §1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorney's fees;

(k)     Awarding Plaintiffs and the class members actual damages, punitive damages, reasonable attorney's fees and costs, as well as injunctive relief, pursuant to the CLRA;

(l)     Awarding pre-judgment and post-judgment interest; and

(m)     Granting any other relief as this Court may deem just and proper.

Respectfully Submitted,

DATED:  December 11, 2023                    **KRONENBERGER ROSENFELD, LLP**


By:   ___s/ Karl S. Kronenberger_____
        Karl S. Kronenberger
        Katherine E. Hollist (admitted *pro hac vice*)


**POLLOCK COHEN LLP**
Raphael Janove (admitted *pro hac vice*)
Adam Pollock (admitted *pro hac vice*)
George Krebs (admitted *pro hac vice*)


**JAY KUMAR LAW**
Jay Kumar (*pro hac vice* forthcoming)

*Attorneys for Plaintiffs and the Proposed Classes*

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1

**DEMAND FOR JURY TRIAL**

2       Plaintiffs, by and through their undersigned counsel, hereby demand a trial by jury

3   for all questions of fact that can be decided by a jury in the above-entitled action.

4

5   Respectfully Submitted,

6   DATED: December 11, 2023                **KRONENBERGER ROSENFELD, LLP**

7

8                                            By: ___s/ Karl S. Kronenberger_____
                                                    Karl S. Kronenberger
9
                                             Attorneys for Plaintiffs and the Proposed
10                                           Classes

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28